1   UNITED STATES DISTRICT COURT
    MIDDLE DISTRICT OF FLORIDA
2   ORLANDO DIVISION

3   CASE NO. 6:19-cv-2187-Orl-40DCI

4

    DIANNE LEVESQUE, as Personal
5   Representative of the ESTATE
    OF DONALD WHITMER, JR., for and
6   on behalf of his children BREANNA
    NIKOLE WHITMER, NICHOLAS WHITMER,
7   DONALD WHITMER, III, DAKOTA
    WHITMER, TOMMI WHITMER, TREY
8   WHITMER, BRITTONY WHITMER,

9          Plaintiff,

10  vs.

11

    CITY OF WEST MELBOURNE, a political
12  subdivision of the State of Florida;
    JACOB MATHIS; KEVIN KRUKOSKI; and
13  DANIELLE QUINN, Individually,

14         Defendants.
    _____/

15

16

17  DEPOSITION OF:     BREANNA WHITMER

18  DATE TAKEN:        July 16, 2020

19  TIME:              10:07 a.m. - 5:17 p.m.

20  PLACE:             U.S. Legal Support
                       Imperial Plaza Business Center
21                     6767 North Wickham Road
                       Suite 400
22                     Melbourne, Florida 32940

23  REPORTED BY:       Jill E. Hastey, RPR
                       and Notary Public
24

25

Page 2

```
 1   APPEARANCES:
 2        APPEARING ON BEHALF OF THE PLAINTIFF:
 3             JOHN V. MOORE, ESQUIRE
               John Vernon Moore, P.A.
 4             700 North Wickham Road
               Suite 206
 5             Melbourne, Florida 32935
               john@moorelegal.com
 6
 7        APPEARING ON BEHALF OF THE DEFENDANT
          CITY OF WEST MELBOURNE:
 8
               FRANK M. MARI, ESQUIRE
 9             Bell & Roper, P.A.
               2707 East Jefferson Street
10             Orlando, Florida 32803
               fmari@bellroperlaw.com
11
12        APPEARING ON BEHALF OF THE DEFENDANTS
          JACOB MATHIS, KEVIN KRUKOSKI AND DANIELLE QUINN:
13
               ANDREA G. AMIGO, ESQUIRE
14             Roberts, Reynolds, Bedard & Tuzzio, PLLC
               470 Columbia Drive
15             Building C101
               West Palm Beach, Florida 33409
16             aamigo@rrbpa.com
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2   JULY 16, 2020
 3   DEPOSITION OF:  BREANNA WHITMER
 4        Direct Examination by Mr. Mari        5
          Cross-Examination by Ms. Amigo       120
 5
 6   CERTIFICATE OF REPORTER                   247
     CERTIFICATE OF OATH                       248
 7              *  *  *  *  *
 8                  E X H I B I T S
 9
10   Defendants' Exhibit 1
     Digital Video File
11   Mathis Bodycam Video.mp4
12   Defendants' Exhibit 2
     Digital Video File
13   Contri Video Part 1 IMG_3871.MOV
14   Defendants' Exhibit 3
     Digital Video File
15   Contri Video Part 2 IMG_3872.MOV
16   Defendants' Exhibit 4
     Digital Video File
17   Krukoski Bodycam Video Part 1.mp4
18   Defendants' Exhibit 5
     Digital Video File
19   Krukoski Bodycam Video Part 2.mp4
20   Defendants' Exhibit 6
     Digital Video File
21   Publix Surveillance Multiplex View.mp4
22   Defendants' Exhibit 7
     Digital Video File
23   Publix Surveillance View 1.mp4
24   Defendants' Exhibit 8
     Digital Video File
25   Publix Surveillance View 2.mp4
```

Page 4

```
 1                    I N D E X
 2                  (CONTINUED)
 3                  E X H I B I T S
 4
     Defendants' Exhibit 9
 5   Digital Video File
     Publix Surveillance View 3.mp4
 6
     Defendants' Exhibit 10
 7   Digital Video File
     Publix Surveillance View 4.mp4
 8
     Defendants' Exhibit 11
 9   Digital Video File
     Publix Surveillance View 5.mp4
10
     Defendants' Exhibit 12                     246
11   Photographs
12
          (Defendants' Exhibit 12 retained by Ms. Amigo.)
13
14              *  *  *  *  *
15
16              S T I P U L A T I O N S
17
18        It is hereby agreed and so stipulated by
19   and between the parties hereto, through their
20   respective counsel, that the reading and signing of
21   the transcript are expressly waived by
22   the Deponent.
23
24
25
```

Page 5

```
 1              P R O C E E D I N G S
 2                  **********
 3              BREANNA WHITMER,
 4   having been first duly sworn to tell the truth, was
 5   examined and testified upon her oath as follows:
 6        THE WITNESS:  I do.
 7                DIRECT EXAMINATION
 8   BY MR. MARI:
 9        Q.   Please state your full name for the record.
10        A.   Breanna Whitmer.
11        Q.   Ms. Whitmer, my name is Frank Mari in the
12   Levesque vs. City of West Melbourne case.  I represent
13   the City of West Melbourne.
14             We're here to take your deposition today.  I'll
15   explain first how the process works.  I'm going to ask
16   you a lot of questions today.  Please answer truthfully
17   to the best of your ability.  I am not asking anything
18   that's unnecessary or has no bearing on the case.  It
19   might not be immediately obvious why I'm asking you
20   something, but I assure you I wouldn't be wasting the
21   time doing it if it wasn't important or had no value to
22   this case.
23             At times I might ask a question and you might
24   imagine I know the answer to it.  I might be leading to
25   something else or making sure we're on the same page, so
```

Page 6

1 again, I'm not trying to ask you anything to annoy you
2 or bother you.
3        Have you taken any medications at all in the
4 last 12 hours?
5    A.  No.
6    Q.  Have you consumed any alcohol in the last 12
7 hours?
8    A.  No.
9    Q.  Have you taken any drugs whatsoever in the last
10 12 hours?
11   A.  No.
12   Q.  Does anything at all affect your ability to
13 recall information today?
14   A.  No.
15   Q.  Does anything affect your ability to
16 communicate verbally today?
17   A.  No.
18   Q.  Is there anything at all distracting you from
19 being able to participate fully in the deposition?
20   A.  No.
21   Q.  I might ask a question sometimes that doesn't
22 make sense and you don't understand it.  Please don't
23 hesitate to let me know if you don't understand
24 something I'm asking.  But if you don't let me know, I'm
25 going to move on as if you do understand the question

Page 7

1 and you're able to answer.
2        Please try to give a verbal answer rather than
3 nodding your head to indicate yes or no.  That's for the
4 convenience and benefit of the court reporter and the
5 transcript that may be generated after the deposition
6 today.  The court reporter can't take down head nods or
7 uh-huh, huh-uh --
8    A.  Right.
9    Q.  -- as accurate testimony.  If I start asking a
10 question before you're done giving your answer to the
11 prior question, let me know.  I want -- I need to give
12 you an opportunity to answer the question that I ask, so
13 just let me know if I cut you off by mistake and misread
14 the situation.  Likewise, and particularly for the
15 benefit of the court reporter, please try to let me get
16 the whole question out before you answer.
17        You probably will be able to anticipate a lot
18 of questions I'm asking, but just so the transcript is,
19 number one, easy to generate, and, number two, accurate,
20 just try to let me get the whole question out before you
21 answer.
22   A.  Okay.
23   Q.  From time to time there might be objections
24 during the deposition.  You can still answer the
25 question unless Mr. Moore instructs you not to do so.

Page 8

1 So the objections, other than an instruction not to
2 answer, are something that me and Mr. Moore and Andrea
3 will work out, and we'll presumably work on it after the
4 deposition and not something you need to worry about
5 now.
6    A.  Okay.
7    Q.  If you need to take a break during the
8 deposition, let us know.  We're happy to accommodate
9 that.
10        What's your current address?
11   A.  2275 Starlight Court, Melbourne, Florida.
12   Q.  How long have you lived there?
13   A.  We've been there, like, maybe at least five
14 months.  Five, six months.
15   Q.  Who else lives with you there?
16   A.  My stepmom.
17   Q.  Who is that?
18   A.  Dianne Levesque.
19   Q.  Does anyone else live there with you?
20   A.  No.
21   Q.  Has anyone else lived with you there since you
22 started living there?
23   A.  My brother for a minute, but he went back to
24 Ohio.
25   Q.  Where did you live prior to 2275 Starlight

Page 9

1 Court?
2    A.  I lived on Lighthouse Pointe on U.S. 1,
3 Palm Bay.
4    Q.  Do you remember the address there?
5    A.  I don't.
6    Q.  During what time frame did you live there?
7    A.  I mean, I lived there the past two years.
8    Q.  Okay.  So you lived at that address as of
9 May 21st, 2018?
10   A.  Yeah.  Yeah, I lived there.
11   Q.  Okay.  Who lived there with you?
12   A.  Me and my stepmom and my son.
13   Q.  Did anyone else live there with you during that
14 time?
15   A.  My dad didn't live there, but he came back and
16 forth every now and again.
17   Q.  Anyone else?
18   A.  No.
19   Q.  Prior to that address where did you live?
20   A.  St. Cloud.
21   Q.  Do you remember the address?
22   A.  5150 Boggy Creek Road.
23        MR. MOORE:  You said Boggy?
24        THE WITNESS:  Boggy Creek, yeah.
25   Q.  Do you remember what time frame you lived

Page 10

1   there?
2       A.   2017, after I had my son.
3       Q.   And who lives -- sorry.  Go ahead.
4       A.         -- after          I got that place.
5       Q.   So it sounds like          , 2017, is your
6   son's birthday?
7       A.   Yeah.
8       Q.   And who lived with you at the address at
9   St. Cloud?
10      A.   My dad.
11      Q.   And then your son after he was born?
12      A.   Uh-huh.
13      Q.   Anyone else?
14      A.   No.
15      Q.   And where did you live prior to the address in
16  St. Cloud?
17      A.   I lived in Orlando by the -- by the mall.
18      Q.   Do you remember which mall it was?
19      A.   It was on -- it was near John Young Parkway.
20      Q.   Is that Florida Mall?
21      A.   Yeah.
22      Q.   Do you remember the address there?
23      A.   I don't.
24      Q.   What time frame did you live there?
25      A.   I don't know.  Before I got that place in St.

Page 11

1   Cloud.
2       Q.   Do you have any sense in terms of, roughly, in
3   terms of months or years that you might have lived
4   there?
5       A.   Only a few months.
6       Q.   Who lived with you there?
7       A.   My dad.
8       Q.   Anyone else?
9       A.   No.
10      Q.   Going back to before that, that address or that
11  place near Florida Mall, where did you live?
12      A.   I have my old ID with that address on it.
13      Q.   Would it help you to take a look at it?
14      A.   Yeah.  It was 421 South Orange Blossom Trail.
15      Q.   In Orlando?
16      A.   Yeah.
17      Q.   This is the one prior to the place you lived
18  that was near Florida Mall?
19      A.   No, this was --
20      Q.   Oh, that's the one near Florida Mall?
21      A.   Yeah.
22      Q.   Oh, okay.  What I was asking is, prior to that
23  address, where did you live then?
24      A.   We stayed in and out of hotels a lot at that
25  time.

Page 12

1       Q.   When you say "we," you mean you and your dad?
2       A.   Yeah.
3       Q.   Just to clear something up early, this is one
4   of those questions where I know the answer but I want to
5   make sure the record is clear.  Your father is
6   Donald Whitmer?
7       A.   Yes.
8       Q.   And that's your biological father?
9       A.   Yes.
10      Q.   What's your date of birth?
11      A.        -1998.
12      Q.   What's your social security number?
13      A.             .
14      Q.   Do you have a driver's license now?
15      A.   I don't.
16      Q.   Do you have a state ID card?
17      A.   Yes.
18      Q.   Is that the one you showed the court reporter
19  to get sworn in?
20      A.   Yes.
21      Q.   Have you ever been married?
22      A.   No.
23      Q.   You mentioned you have a son.  Do you have any
24  other children?
25      A.   I have two.

Page 13

1       Q.   What are -- do you have two total or --
2       A.   Two total.
3       Q.   Okay.  So you mentioned your son.  What's your
4   son's name?
5       A.   A      W      .
6       Q.   What's your other child's name?
7       A.   Jo      W      .
8       Q.   What's J      's date of birth?
9       A.        -2018.
10      Q.   Do they live with you?
11      A.   No, not currently.
12      Q.   When was the last time that your son -- or,
13  sorry.  At least J      , when is the last time J
14  lived with you, if ever, I don't know?
15      A.   About seven months ago.
16      Q.   When's the last time that your son lived with
17  you?
18      A.   Both of them, seven months ago.
19           MS. AMIGO:  How do you spell J      ?
20           THE WITNESS:  J-        .
21           MS. AMIGO:  Okay.  Thank you.
22      Q.   Have you ever been convicted of any crime?
23      A.   Yes.
24      Q.   I'm going to want to go through the history
25  with that.  If it's easier for you to start first in

Page 14

1    time or most recently, let me know.  Which way is easier
2    for you?  First in time or more recent?
3        A.   Most recent was also my first time.  I only
4    have one charge.
5        Q.   That makes it easier.  What is that?
6        A.   It's grand theft.
7        Q.   When did that --
8        A.   2017.
9        Q.   Was that when you were arrested or charged with
10   that or is that when you were convicted?
11       A.   No, that's when I was arrested.
12       Q.   When were you convicted of grand theft?
13       A.   I don't know.  2017.
14       Q.   Where did that occur, the conviction I mean?
15   Like what court?
16       A.   Viera.
17       Q.   So Brevard County?
18       A.   Yeah.
19       Q.   Did you have an attorney in connection with
20   that case?
21       A.   This attorney.
22       Q.   Okay.  So Mr. Moore?
23            MR. MOORE:  A time reference?
24            MR. MARI:  Sorry?
25            MR. MOORE:  A time reference would be helpful.

Page 15

1    I didn't represent her through the whole thing.
2            MR. MARI:  Okay.
3            THE WITNESS:  No, just recently.
4            MR. MOORE:  Just toward the end.
5        Q.   Okay.  So when did Mr. Moore start representing
6    you in connection with the grand theft case?
7        A.   Within the last seven months.
8        Q.   Just so I'm clear, were you actually convicted
9    of grand theft?
10       A.   Yes.
11       Q.   What were the circumstances that gave rise to
12   that charge?
13       A.   What do you mean?
14       Q.   Like, in general terms, what happened that led
15   to you being charged and convicted for grand theft?
16   Like, did you steal an iPhone out of an Apple store?
17   Did you steal a car?  General terms like that.
18       A.   Money.
19       Q.   Like from where?
20       A.   A register at Walmart.
21       Q.   Were you working there at the time?
22       A.   Yes.
23       Q.   What was the amount of money that you were
24   charged with taking?
25       A.   Under 15,000, but that wasn't even accurate.

Page 16

1        Q.   So for grand theft at the time, I think, would
2    have to be greater than 600, if I remember right, but
3    somewhere between 600 and 15,000?
4        A.   Yeah.
5        Q.   Can you give me any more specificity other than
6    somewhere in that range of how much that you were
7    charged with taking?
8        A.   2,000.
9        Q.   What was your sentence as a result of that
10   conviction?
11       A.   A year community control and about two years
12   probation.
13       Q.   Have you completed the year community control?
14       A.   I will be completing that.  This September
15   17th, that will be up.
16       Q.   That sounds like you have -- let me just ask,
17   have you begun the two years probation?
18       A.   No, not until September 17th.
19       Q.   Okay.  What are the terms of your community
20   control for that?
21       A.   I mean, I don't get to go anywhere unless I put
22   it down on a travel sheet.  I've got to pay my
23   restitution, which I've started that.
24       Q.   Any other terms of the community control that
25   you can remember?

Page 17

1        A.   Not really.
2        Q.   Any other terms of your sentence that you can
3    remember other than the community control and probation?
4        A.   I've just got to pay my restitution, and that's
5    about it.
6        Q.   So have we now covered every criminal
7    conviction that you've had in your life?
8        A.   Yes.
9        Q.   What's your highest level of formal education?
10       A.   I passed eighth grade.
11       Q.   Have you earned or completed a GED?
12       A.   I'm in the process of getting my GED at home.
13       Q.   Have you ever been involved in any other
14   lawsuit besides this one?
15       A.   No.
16       Q.   Did you do anything to prepare for today's
17   deposition?
18            MR. MOORE:  Besides talking to me.
19       A.   No.
20       Q.   That's a good question.  Do you have an
21   attorney who is representing you in connection with this
22   case?
23       A.   No.  Well, John.
24            MR. MOORE:  "This case" meaning this case that
25        you're being deposed on.

Page 18

1   A.   What?
2        MR. MOORE:  This case that you're being deposed
3   on.
4        THE WITNESS:  Well, yeah, you represent me.
5   Q.   All right.  I've got to ask questions about
6   that.  Is it your understanding that Mr. Moore
7   represents you personally in this case, the Levesque
8   versus City of West Melbourne case?
9   A.   Yeah.
10  Q.   Okay.  Have you signed a retainer agreement
11  with Mr. Moore?
12  A.   I believe so.
13  Q.   Do you remember when you signed it?  Mr. Moore
14  really can't answer for you.  I know it's kind of an odd
15  situation where he may know the answer to this, but I've
16  just really got to ask you.
17  A.   I mean, anything that I signed was around the
18  time my father died, so...
19  Q.   Have you paid anything to Mr. Moore for this
20  case?
21  A.   No.
22  Q.   Have you agreed to pay anything to Mr. Moore
23  for this case?
24  A.   Yes.
25  Q.   To your understanding, when did you retain

Page 19

1   Mr. Moore in connection with this case?
2   A.   Right after my dad died.
3   Q.   So -- I guess we can go off.
4        (Discussion off the record.)
5   BY MR. MARI:
6   Q.   All right.  So going back to the question, what
7   did you do to prepare for today's deposition?
8   A.   I talked to John.
9        MR. MOORE:  Don't say anything pertaining to
10  us.
11       THE WITNESS:  Okay.
12       MR. MARI:  So you're going to instruct her not
13  to answer even if she spoke with you?
14       MR. MOORE:  Yes.
15  Q.   Okay.  Other than the matters for which your
16  attorney instructed you not to answer, did you do
17  anything else to prepare for today's deposition?
18  A.   No.
19  Q.   You didn't review any documents?
20  A.   No.
21  Q.   Didn't watch any videos?
22  A.   No.
23  Q.   Didn't speak with Ms. Levesque?
24  A.   No.
25  Q.   Am I saying that right?

Page 20

1   A.   Levesque.
2   Q.   Levesque.  Okay.  I've got to write that down.
3   Are you currently employed?
4   A.   No.
5   Q.   Was your employment at Walmart your last
6   employment?
7   A.   No.
8   Q.   Where have you worked -- what's your most
9   recent employment?
10  A.   I worked at DIRECTV.
11  Q.   What did you do for DIRECTV?
12  A.   I was the customer service.
13  Q.   Did you work directly for DIRECTV or for some
14  kind of contractor or subsidiary or something like that?
15  A.   It was through PeopleReady.
16  Q.   Okay.  Is that a temp agency?
17  A.   Yes.
18  Q.   Over what time frame did you work for DIRECTV
19  through PeopleReady?
20  A.   I think three months.  I want to say the end of
21  January I started.
22  Q.   January this year?
23  A.   No, 2017.
24  Q.   What was your job title there?
25  A.   Well, I was still taking classes for it to be a

Page 21

1   phone receptionist.
2   Q.   Did you ever complete training for that?
3   A.   No, we moved.
4   Q.   But were you paid for training?
5   A.   Yes.
6   Q.   What was your rate of pay?
7   A.   Like $13 an hour.
8   Q.   Do you remember how much you earned at DIRECTV
9   either over the entire duration that you worked there or
10  over any time frame, like, every two weeks or every --
11  A.   Not really, no.
12  Q.   Do you have any sense of the total amount you
13  would have earned working for DIRECTV through
14  PeopleReady?
15  A.   No.
16  Q.   Where was the actual location where you
17  trained?
18  A.   In Cocoa.
19  Q.   Do you remember the address there?
20  A.   No.
21  Q.   Was it a DIRECTV facility?
22  A.   Yeah.
23  Q.   Do you remember generally where it was in
24  Cocoa?
25  A.   No, I really don't remember.  I wasn't driving

Page 22

1  at the time.
2      Q.   Where did you work prior to DIRECTV through
3  PeopleReady?
4      A.   Walmart.
5      Q.   How long did you work at Walmart?
6      A.   Less than a month.
7      Q.   So when did you start?
8      A.   Beginning of December.
9      Q.   Of 2016?
10     A.   Yes.
11     Q.   It sounds like you were terminated from Walmart
12  in connection with the theft?
13     A.   Uh-huh.  Yes.
14     Q.   Do you remember how much you made while you
15  worked at Walmart?
16     A.   No, because that was through PeopleReady too.
17     Q.   Okay.  What was your job title with Walmart?
18     A.   Cashier.
19     Q.   Did you do any other job functions besides
20  cashier?
21     A.   No.
22     Q.   Prior to Walmart, where did you work?
23     A.   I did day labor a lot.
24     Q.   Was that through some kind of temp agency or
25  organization?

Page 23

1      A.   Yes.
2      Q.   Which one was that?
3      A.   PeopleReady.
4      Q.   What kind of work did you do?
5      A.   Construction.
6      Q.   Over what time frame did you do construction
7  through PeopleReady?
8      A.   I mean, I did it off and on, so since I've been
9  here, since I turned 18.
10     Q.   Which Walmart did you work at?
11     A.   The one on Palm Bay Road.
12     Q.   Here in Melbourne?
13     A.   Palm Bay.
14     Q.   Have you had any other employment that we
15  haven't covered yet?
16     A.   No.
17     Q.   Have you done anything else to earn income that
18  we haven't covered already?
19     A.   No.
20     Q.   Do you have any internet social media?
21     A.   Yes.
22     Q.   What kind of internet social media do you use?
23     A.   Instagram.
24     Q.   What's your Instagram name?
25     A.   I don't know.  I made it a couple years ago.

Page 24

1      Q.   Do you use anything else besides Instagram?
2      A.   No.
3      Q.   Have you ever posted anything to Instagram
4  regarding the circumstances that gave rise to this
5  lawsuit?
6      A.   No.
7      Q.   Have you ever posted anything on Instagram
8  regarding your father?
9      A.   No.
10     Q.   Who is your mother?
11     A.   Bobbi Whitmer.
12     Q.   Do I have it correct that your mother passed
13  away years prior to your father?
14     A.   Yes.
15     Q.   When did she pass away?
16     A.   March 21st, 2010.
17     Q.   What were the -- generally, under what
18  circumstances did she pass away?
19     A.   She accidentally shot herself.
20     Q.   What is your phone number?
21     A.   321-604-9540.
22     Q.   Did you have that same phone number back on
23  May 21st, 2018?
24     A.   No.
25          MS. AMIGO:  Sorry.  I missed the last few

Page 25

1      digits.  55 what?
2      A.   9540.
3      Q.   What was your phone number back on May 21st,
4  2018?
5      A.   It was 321-591-8814.
6      Q.   What telephone carrier did you have at that
7  time, May 21st, 2018?
8      A.   Boost.
9      Q.   What telephone carrier do you have now?
10     A.   Boost.
11     Q.   Besides the number you just gave me for
12  May 21st, 2018, did you have any other telephone number
13  then?
14     A.   No.
15     Q.   Do you remember your father's telephone number?
16     A.   I think it was 423-4830, something close to
17  that.
18     Q.   Also 321 area code?
19     A.   Yes.
20     Q.   Do you remember the telephone carrier?
21          MR. MOORE:  What was the last part?  I'm sorry.
22          THE WITNESS:  423-4830, I believe.
23          MR. MOORE:  Okay.
24     A.   And Boost.
25     Q.   Did anyone ever obtain the actual phone handset

Page 26

1    that your father had back on May 21st, 2018?
2        A.   I did.
3        Q.   Do you still have it?
4        A.   No.
5        Q.   What happened to it?
6        A.   It got stolen.
7        Q.   Was that theft ever reported?
8        A.   No.  I mean, the phone was clear.  Bought that
9    phone the day before he died.
10       Q.   Did he have any other phones -- did he have any
11   other phones on the day he died besides that one?
12       A.   No.
13       Q.   What were the circumstances surrounding the
14   theft of that phone?
15       A.   What?
16       Q.   Do you know who stole the phone?
17       A.   My sister.  My stepsister.
18       Q.   Who is that?
19       A.   Chelsea Haines.
20       Q.   Is that her full name?
21       A.   Yes.
22       Q.   You said that's your stepsister.  How are you
23   related to her?
24       A.   She's my stepmom's daughter.
25       Q.   So Dianne's daughter?

Page 27

1        A.   Yeah.
2        Q.   Does she still have a phone?
3        A.   No.  She's deceased.
4        Q.   Okay.  I didn't know that.  When did she die?
5        A.   A month ago.
6        Q.   Generally, under what circumstances did she
7    die?
8        A.   I really don't know.  We're still waiting for
9    an autopsy report.
10       Q.   In the most general sense, was it a car
11   accident?
12       A.   Her heart stopped.
13       Q.   Okay.  Was that in connection with some kind of
14   medical treatment or procedure?
15       A.   No.  We don't know yet.
16       Q.   Do you know who has that phone that your father
17   had back on May 21st, 2018?
18       A.   No.
19       Q.   Is there any chance Dianne would have it?
20       A.   No.
21       Q.   Did your father have any email addresses?
22       A.   Yeah, but I don't have access to it anymore.
23       Q.   Did you have access to his email at any point?
24       A.   No.
25       Q.   What do you mean when you say you don't have

Page 28

1    access to his email anymore?
2        A.   I can't get into it.  I don't know his password
3    or anything.
4        Q.   What is the email address that he had?
5        A.   It was donnywhitmer68@gmail.com.
6        Q.   Did he have any other email addresses that
7    you're aware of?
8        A.   Not that I know of.
9        Q.   Do you know if anyone has access to your
10   father's Gmail account?
11       A.   No, he did not give that information away.
12       Q.   Did your father use any kind of internet social
13   media?
14       A.   No.
15       Q.   Was your father ever married?
16       A.   Yes.
17       Q.   To whom was your father married?
18       A.   Bobbi Whitmer.
19       Q.   Do you know when they got married?
20       A.   Not off the top of my head, no.
21       Q.   Even generally, do you know, like, say late
22   '90s?
23       A.   He was 18.
24       Q.   Okay.  Do you know anything about where your
25   father worked?

Page 29

1        A.   He worked a lot of places.  He did landscape
2    and construction.
3        Q.   Do you know the names of any of those places?
4        A.   ESCO Services.
5             MS. AMIGO:  Do you how to spell that?
6        A.   E-S-C-O Services, LLC.
7             MS. AMIGO:  E-S-E-O, you said, or C?
8             THE WITNESS:  C.
9             MS. AMIGO:  Sorry.
10       Q.   Is that a temp agency?
11       A.   No, that's a company.
12       Q.   Do you know what he did for ESCO Services?
13       A.   Yeah, landscape and construction and
14   demolition, and they traveled a lot.
15       Q.   Do you know anywhere else that he worked
16   besides ESCO Services?
17       A.   A lot of temp services.
18       Q.   Do you remember the names of any of those?
19       A.   PeopleReady.
20       Q.   Any others besides PeopleReady?
21       A.   No.
22       Q.   Do you remember any of your father's other
23   employers besides the ones you already listed for me?
24       A.   Not in Florida, in Ohio.
25       Q.   Sure.  Where did he work in Ohio?

Page 30

1  A.  Johnson Home Repair.
2      MS. AMIGO:  What was that?
3      THE WITNESS:  Johnson Home Repair.
4      MS. AMIGO:  Sorry.  It's just hard to
5  understand when you're --
6      THE WITNESS:  Sorry.
7      MS. AMIGO:  Yeah, that's okay.
8  Q.  Where is Johnson Home Repair in Ohio?
9  A.  Bloomingburg.
10  Q.  Anywhere else that you remember he worked
11  regardless of where?
12  A.  No.
13  Q.  Do you know how much your father earned at any
14  of his employers?
15  A.  No.
16  Q.  I want to go back to one thing too.  I know I'm
17  sure I got this correct.  Did you serve any time in jail
18  -- strike that.
19      Did you serve any term incarceration in
20  connection with that conviction with Walmart?
21  A.  Yes.
22  Q.  How long were you in jail?
23  A.  Like two months.
24  Q.  Was that here in Brevard County?
25  A.  Yes.

Page 31

1  Q.  When was that two months that you were in jail?
2  A.  Last August.
3  Q.  Was that when it began or ended?
4  A.  I got locked up July 12th, got out at the end
5  of August.
6  Q.  At any other time have you been incarcerated
7  for any reason?
8  A.  Yeah.
9  Q.  What other times were you incarcerated?
10  A.  For violating my probation on the same case.
11  Q.  So when were you incarcerated for violating
12  probation?
13  A.  Again, after I got out.
14  Q.  When in time did that occur?
15  A.  I don't know the exact date or the month, but,
16  I mean, I've been locked up twice within the last six
17  months.  I did two months and then did two months again.
18  Q.  So you told me before from July to August.  Was
19  that the first or second time that you were
20  incarcerated?
21  A.  First, I think.  I don't remember.
22  Q.  When was the other time?
23  A.  After -- or, no, I don't remember.  I don't
24  remember.
25  Q.  Was it this year or 2019?

Page 32

1  A.  This year.
2  Q.  Okay.  Do you have any brothers or sisters?
3  A.  Yes.
4  Q.  I'm going to want to get the full picture here
5  of your family, so what are the names of your brothers
6  and sisters?
7  A.  █████ W██████, D██ Whitmer, Nicholas
8  Whitmer, Donald Whitmer, Tommi Whitmer, Trey Whitmer,
9  and then Brittony Whitmer.
10  Q.  So your father is also the father of all your
11  siblings?
12  A.  Yes.
13  Q.  What is F███'s date of birth?
14  A.  It's ██████████ 2004.
15  Q.  Who is F███'s mother?
16  A.  Bobbi Whitmer.  Same mom, same dad for all of
17  those.
18  Q.  That cuts off a lot of questions I was going to
19  ask.  Where does F███ live?
20  A.  In a foster home here in Florida.
21  Q.  Do you have any contact with F███?
22  A.  No.
23  Q.  Do you have any sense of where that foster home
24  is?
25  A.  No.

Page 33

1  Q.  When's the last time you had contact with
2  F███?
3  A.  He was a baby.
4  Q.  Do you know when F███ entered the DCF system?
5  A.  2011.
6  Q.  Did F███ ever live with your father?
7  A.  Yeah.
8  Q.  And when did F███ live with your father?
9  A.  After my mom died he got taken, so since birth.
10  But after my mom died, he got put into the foster
11  system.
12  Q.  Do you know F███'s telephone number?
13  A.  No.
14  Q.  Sorry if I already asked this, but do you have
15  any way of contacting F███?
16  A.  No.
17  Q.  Do you know if F███ has any kind of criminal
18  history at all?
19  A.  No.
20  Q.  How about D███?  What is his or her date of
21  birth?
22  A.  His, and that's ████████████ 2002.
23  Q.  Do you know where D███ lives?
24  A.  In Ohio.
25  Q.  Do you know where in Ohio, the address or -- if

Page 34

1    you don't know the address, the city or area?
2        A.   Newcomerstown.
3        Q.   Who does D████ live with?
4        A.   Foster family.
5        Q.   Did D████ ever live with your father?
6        A.   No.
7        Q.   Do you have any way of contacting D████?
8        A.   Yes.
9        Q.   How would you contact D████ if you wanted to?
10       A.   I would text him.
11       Q.   Do you have any means of contacting D████
12   other than through telephone?
13       A.   No.
14       Q.   Do you know D████'s phone number?
15       A.   It might be in my contacts, I'm not sure.
16       Q.   How about Nicholas Whitmer?  What is his date
17   of birth?
18       A.   ████████ 2000.
19       Q.   Do you have any contact with Nicholas Whitmer?
20       A.   I haven't recently, no.
21       Q.   When is the last time you had contact with him?
22       A.   Maybe three months ago.
23       Q.   And how did you communicate with him?
24       A.   He called me.
25       Q.   Do you have his phone number now?

Page 35

1        A.   His phone number is not active.
2        Q.   But do you have his old phone number?
3        A.   Yeah.
4        Q.   Did Nicholas ever live with your father?
5        A.   No.
6        Q.   How about your brother Donald?  Do you know his
7    date of birth?
8        A.   ████████ 1995.
9        Q.   Where does he live now?
10       A.   Somewhere in Ohio.  I don't know where.
11       Q.   Do you have any contact with him?
12       A.   Phone.
13       Q.   Do you have his telephone number?
14       A.   In a book.
15       Q.   Do you have any other way of contacting him
16   besides his telephone number?
17       A.   No.
18       Q.   Did your brother Donald ever live with your
19   father?
20       A.   Yeah.
21       Q.   When was that?
22       A.   Up until he was, like, five or six.
23       Q.   And since that time he has not lived with your
24   father at all?
25       A.   Not lived with him, no.

Page 36

1        Q.   So what do you mean by that?  I'll get to that
2    later.  I'm going to ask this question now.  I might
3    come back to it in a second.  What do you mean that your
4    brother Donald never lived with your father since he was
5    five or six?
6        A.   I mean, after we were taken out of the custody
7    when we were younger, we still went back and forth to
8    visit them.
9        Q.   Okay.  What's Tammy's [sic] date of birth?
10       A.   Tammy?
11       Q.   Tommi.  Sorry.  My handwriting is bad.
12       A.   ████████ 1993.
13       Q.   Where does Tommi live?
14       A.   Grove City, Ohio.
15       Q.   Do you have any contact with Tommi?
16       A.   Yeah, through phone.
17       Q.   Do you know her [sic] phone number?
18       A.   His phone number.
19       Q.   Oh, sorry.
20       A.   Yes.
21       Q.   Okay.  Like, do you know it by memory?
22       A.   No.
23       Q.   Did Tommi ever live with your father?
24       A.   Yes.
25       Q.   During what time frame?

Page 37

1        A.   He was, like, seven or eight.
2        Q.   So from birth up until the time Tommi was seven
3    or eight, he lived with your father?
4        A.   Yes.
5        Q.   And then not since then at all?
6        A.   Yeah.  When we came to live here in 2015, he
7    lived with my dad.
8        Q.   And what time frame was that in 2015 that he
9    did live with your dad?
10       A.   December 2015.
11       Q.   Just that one month?
12       A.   No.
13       Q.   Is that when --
14       A.   They went back to Ohio, like, mid-2016.
15            MR. MOORE:  Can we take a quick break?
16            MR. MARI:  That's fine.
17       (Recess held from 10:47 a.m. to 10:56 a.m.)
18   BY MR. MARI:
19       Q.   What is Trey Whitmer's date of birth?
20       A.   ████████ 1993.
21       Q.   Where does Trey live now?
22       A.   In Ohio.
23       Q.   Did Trey ever live with your father?
24       A.   Until he was, like, seven or eight.
25       Q.   And then not at all after that?

Page 38

1   A.   No.
2   Q.   Do you know where in Ohio Trey lives?
3   A.   Somewhere in Hilliard.
4        MS. AMIGO:  Somewhere where?
5        THE WITNESS:  Hilliard.
6        MS. AMIGO:  Hilliard.  Okay.
7   Q.   Do you have Trey's telephone number?
8   A.   No.
9   Q.   Do you have any way of contacting Trey?
10  A.   My brothers get a hold of him.
11       How about Brittony?  What is her date of birth?
12  A.   ██████ 1992.
13  Q.   Do you know her address?
14  A.   Not off the top of my head.
15  Q.   Do you know where she lives generally?
16  A.   Grove City, Ohio.
17  Q.   Did she ever live with your father?
18  A.   Yeah.
19  Q.   Do you know --
20  A.   Like, 13.
21  Q.   Do you have her telephone number?
22  A.   I have it.
23  Q.   Do you have any other way of contacting her
24  besides her telephone number?
25  A.   No.

Page 39

1   Q.   Do you happen to know her telephone number by
2   memory?
3   A.   No.
4   Q.   It sounds like there was some kind -- I think
5   you told me before when your mother died you and your
6   siblings -- you and your siblings no longer lived with
7   your father after that?
8   A.   It was before that that we got took.
9   Q.   Okay.  So what -- was it all at the same time
10  that you and your siblings discontinued living with your
11  father?
12  A.   I mean, yeah.
13  Q.   But was there some event or occurrence that
14  resulted -- I think in your words you were taken from
15  living with your father?
16  A.   By the state.
17  Q.   So was there some event or occurrence that led
18  to you all being taken from your father's custody at
19  that time?
20  A.   They weren't stable.
21  Q.   Were you living up in Ohio when that happened?
22  A.   Yes.
23  Q.   When you say they weren't stable, what was the
24  basis to your understanding for the state of Ohio taking
25  you and your siblings from your father's custody?

Page 40

1   A.   They moved around a lot.
2   Q.   I understand it's probably a very difficult
3   situation.  I'm trying to approach it sensitively, but I
4   think we all know kids don't get taken from home because
5   people move a lot.
6   A.   To my knowledge, that is all that I know.
7   Q.   Okay.  So from what -- what time in your life
8   did you live with your father and what time did you not
9   live with your father?
10  A.   Me?  I was a baby when we were put into my
11  grandparents' home.
12  Q.   That's probably not a good question.  What I
13  should have asked is, were you and your siblings all
14  placed in your grandparents' house --
15  A.   Yes.
16  Q.   -- after being taken out of your father's
17  custody?
18  A.   Yes.
19  Q.   Did you still have contact with your father --
20  I understand you already told me a little bit about
21  this, but when you were growing up, which is to say
22  before you turned 18, did you have contact with your
23  father between the time you were taken out of his
24  custody and you turning 18?
25  A.   Yes.

Page 41

1   Q.   So we talked about you and all your siblings.
2   Did your father have any other children?
3   A.   No.
4   Q.   Did he have any adopted children?
5   A.   No.
6   Q.   Any stepchildren?
7   A.   No.
8   Q.   Are you aware of your father having any bank
9   accounts?
10  A.   He had one.
11  Q.   Do you know what bank he had an account with?
12  A.   TD.  We had a joint bank account.
13  Q.   You and your father did?
14  A.   Yes.
15  Q.   Was anyone else a joint accountholder?
16  A.   No.
17  Q.   Is that account still open?
18  A.   No.
19  Q.   Do you know the account number?
20  A.   No.
21  Q.   Do you have any old account statements for that
22  account?
23  A.   No.
24  Q.   Are you aware of your father having any other
25  bank accounts?

Page 42

1    A.   No.
2    Q.   Does your father have any other accounts with
3  any other banking institution like a brokerage or any
4  other kind of financial institution besides that bank
5  account at TD Bank?
6    A.   No.
7    Q.   As of May 21st, 2018, do you know what the
8  balance was for the TD Bank account?
9    A.   No, not off the top of my head.
10   Q.   I think you already told me that account is
11  presently closed.
12   A.   Yeah.
13   Q.   Do you know what happened to the funds that
14  were in -- I guess I'll back up a little bit and ask a
15  different question.  Were there any funds in the TD Bank
16  account as of May 21st, 2018?
17   A.   There was some, yes, in the joint account.
18   Q.   Do you have any sense of the balance that was
19  in that account as of May 21st, 2018?
20   A.   I don't remember.
21   Q.   Do you have any sense in terms of, like, was it
22  $100, $10,000, $100,000?  Like, any sense at all of the
23  balance in that account?
24   A.   I know it was a couple thousand, because his
25  dad just died.

Page 43

1    Q.   Was your father a member of any kind of clubs?
2  Any kind of clubs like organizations, social groups,
3  anything like that?
4    A.   Not that I know of.
5    Q.   Was he a part of any kind of affiliation or
6  association of any nature at all?
7    A.   Not that I know of.
8    Q.   Did you provide any financial assistance for
9  your father?
10   A.   Meaning?
11   Q.   Like, did you give him money for anything?
12   A.   I mean, we took care of each other.
13   Q.   When you say you took care of each other, was
14  -- did either of you take care of the other more?
15   A.   I mean, he's my dad.  He took care of me.
16   Q.   In your adult life, did either of you take care
17  of the other more than the other?
18   A.   He took care of me and my son.
19   Q.   So in what sense did he take care of you and
20  your son?
21   A.   Financially.
22   Q.   How much financial support did he provide for
23  you?
24   A.   I don't know off the top of my head.
25   Q.   Do you have any sense at all, like, again, like

Page 44

1  $100, $1,000, $100,000, be it every week, month, year?
2  Any sense at all of the amount?
3    A.   He worked under the table a lot, so he paid my
4  bills.  He kept food on the table, kept a roof over our
5  head.
6    Q.   Did you work at all during that time?  Again,
7  I'm just asking about after you turned 18.
8    A.   Yeah.
9    Q.   When you say he worked under the table, what do
10  you mean?
11   A.   Like construction-wise, he did a lot of work
12  with friends of his.
13   Q.   Do you know who his friends are that he worked
14  for?
15   A.   No.
16   Q.   Okay.  So I want to go back to the question
17  about your father's employers, and what I meant to ask
18  is, it's not just work that was not under the table and
19  taxed and reported and everything.  I mean anything he
20  did or benefitted from someone else, even if it was
21  friends paying cash under the table, whatever.  That's
22  what I need to cover when I'm asking about his
23  employment.  So I'm going to return to that question
24  with that understanding.
25       Do you know anything else about your father's

Page 45

1  employment other than what you've already told me during
2  the deposition?
3    A.   No.
4    Q.   And you don't remember what friends he might
5  have worked for under the table?
6    A.   No, I didn't really associate with the people
7  he hung around.
8    Q.   Who were his -- strike that.
9         Who did he hang around with?
10   A.   I -- my dad did not really let me go around
11  people he hung out with.  I'm, like, a younger
12  generation than he is, so he hangs out with much older
13  people.
14   Q.   But do you have any sense of who they were,
15  like, by name, by anything at all?  Any sense of who
16  they were?
17   A.   No.
18   Q.   Do you have any way of contacting any of those
19  people?
20   A.   No.
21   Q.   Would any of your siblings have any way of
22  contacting any of those people?
23   A.   No.
24   Q.   Would any of your siblings know who your dad
25  may have worked with under the table?

Page 46

1   A.   No.
2   Q.   Would any of your siblings know who your dad's
3 friends were?
4   A.   No.
5   Q.   How about Dianne Levesque?  Would she know who
6 any of your dad's friends were?
7   A.   I don't know.
8   Q.   Was she a part of any of those social circles?
9   A.   I don't know.
10   Q.   Would she have any way of contacting any of
11 your dad's friends?
12   A.   I don't know.
13   Q.   Okay.  So let's go back to financial support
14 your dad provided for you during your adult life.  Was
15 your dad your sole means of financial support?
16   A.   Him and my stepmom.
17   Q.   Okay.  So what things did your stepmom do to
18 provide financial support for you?
19   A.   I mean, if my dad didn't work, she did.
20   Q.   Compared to -- in relation to your dad, how
21 much support did your stepmom provide for you?  Like,
22 50/50, 90/10?
23   A.   Pretty much.
24   Q.   Which one?
25   A.   50/50.

Page 47

1   Q.   So what kind of financial support did you
2 provide for your father?  Again, just during your adult
3 life.
4   A.   Well, sometimes he didn't work or was unable to
5 work, so I worked.
6   Q.   Outside of direct financial support, is there
7 any other kind of support or assistance that your father
8 provided for you during your adult life?
9   A.   What do you mean?
10   Q.   Like, besides just paying a bill or giving you
11 money.
12   A.   I mean, he was my dad.  He was my emotional
13 support.  He was my best friend.  I don't know exactly
14 what you're asking.
15   Q.   Right.  And I'm trying to clarify that a little
16 bit.  Was there anything he did, like, help you around
17 the house or help you take care of any of your children?
18   A.   Yeah, he helped me with my son.  He would watch
19 him all the time, play with him.  He tried to help me
20 get my GED once before.
21   Q.   Did your father provide any kind of financial
22 assistance for any of your siblings just in, say, the
23 last five years of your father's life?
24   A.   Yes.  If he could send them money, he did.
25   Q.   Do you have any sense of the amount of money he

Page 48

1 would send them?
2   A.   A couple hundred dollars here and there.
3   Q.   Which of your siblings received any financial
4 support from your father in the last five years of his
5 life?
6   A.   Donald, Brittony, Nick, Tommi.
7   Q.   So, to your understanding, your other siblings
8 did not receive any financial support from your father
9 in the last five years of his life?
10   A.   Yeah, I █████ and Trey did too.  B████, no,
11 because he was adopted.
12   Q.   He was adopted?
13   A.   Yeah.
14   Q.   I thought I asked you before if any of -- I
15 think you had that right.  I don't think I asked you the
16 question that way.  Did your father ever adopt any
17 children?
18   A.   No.
19   Q.   So what do you mean when you say B████ was
20 adopted?
21   A.   The family he's with now adopted him.
22   Q.   When was that adoption?
23   A.   I don't know.
24   Q.   Do you know if your father ever had parental
25 rights terminated for B████?

Page 49

1   A.   No.
2   Q.   That he did not or you don't know?
3   A.   No, I don't know.
4   Q.   Did your father ever receive any kind of public
5 assistance?
6   A.   Food stamps.
7   Q.   Anything else besides food stamps?
8   A.   Not that I know of.
9   Q.   Do you know if he ever sought social security
10 disability?
11   A.   No.
12   Q.   Were you ever involved in any of your father's
13 health care?
14   A.   His health care?
15   Q.   Uh-huh.
16   A.   What do you mean?
17   Q.   Were you aware of him ever going to the doctor,
18 ever being in the hospital, ever -- anything like that.
19 Anything health care related?
20   A.   Yeah.
21   Q.   What was your involvement?
22   A.   I mean, if he was in the hospital, I was there.
23 He's seeing a doctor, I was there.
24   Q.   I'm going to back up a little bit on something
25 else first.  Did your father have any criminal history

Page 50

1   that you're aware of?
2       A.   Yeah, but I don't know specifically what.
3       Q.   What do you know about your father's criminal
4   history?
5       A.   I don't know.
6       Q.   Other than the fact that he had some sort of
7   criminal history, do you have any other knowledge about
8   his --
9       A.   I don't know what his charges are, no.
10      Q.   Was your father ever incarcerated as far as
11  you're aware?
12      A.   Yeah.
13      Q.   When was your father incarcerated?
14      A.   I don't know.
15      Q.   Do you know over what term he was incarcerated?
16      A.   I mean, within the time that me and my siblings
17  lived with my grandparents, that's all I know about it.
18      Q.   Was your father being incarcerated the reason
19  that you and your siblings went to go live with your
20  grandparents?
21      A.   No.  This happened after.
22      Q.   And do you know anything about why your father
23  was incarcerated that time?
24      A.   No.
25      Q.   Was that in Ohio?

Page 51

1       A.   Yes.
2       Q.   Do you have any sense of the duration during
3   which your father was incarcerated?  Was it 10 days, a
4   year, 10 years?
5       A.   I really don't know.
6       Q.   Not even between a matter of days versus years?
7       A.   No.
8       Q.   Okay.  I definitely understand if you don't
9   want to talk about this.  I want to remind you,
10  though -- like, I'm going to accept if you tell me you
11  don't know and you haven't told me something
12  inconsistent with that, but along with saying that, I do
13  want to say, remember you're under oath.  You're sworn
14  to tell the truth.  Even though we're in a conference
15  room, your testimony today is just as if you were in a
16  courtroom and the judge was present.
17      A.   Right.
18      Q.   It carries the same weight.  So I'm going to
19  ask you one more time, and if you really don't know,
20  then that's your answer.  Understand you're under oath
21  and that's the truth.  Okay?  But you have no sense of
22  the -- do you have any sense at all of the duration of
23  your father's incarceration?
24      A.   I don't know.
25           MR. MOORE:  Object to the form.

Page 52

1       Q.   Just don't know?
2       A.   I don't know.
3       Q.   Was your father ever incarcerated in Florida?
4       A.   Not to my knowledge.
5       Q.   And before I move on with this topic, I just
6   want to be sure.  Do you know anything else about your
7   father's criminal history other than what you've already
8   told me?
9       A.   No.
10      Q.   Do you know anything about your father ever
11  being in jail or prison other than what you've already
12  told me?
13      A.   No.
14      Q.   Okay.  Was your father ever hospitalized?  And
15  I'm not talking about in connection with the incident on
16  May 21st, 2018.  We'll cover that later.  But other than
17  that, was your father ever hospitalized?
18      A.   Yeah.
19      Q.   Okay.  For what?
20      A.   I mean, I know that he previously had pneumonia
21  and he OD'd a couple times.
22      Q.   When was it that your father was hospitalized
23  for pneumonia?
24      A.   Oh, gosh, I don't know.  I was not even 18 yet.
25  I was still living with my grandparents.

Page 53

1       Q.   Was that back in Ohio?
2       A.   Yeah.
3       Q.   Do you remember which hospital it was that he
4   was admitted into?
5       A.   No, I don't know.  I didn't have contact with
6   him at the time.
7       Q.   Over what period in your life did you not have
8   contact with your father?
9       A.   About a year after my mom died.
10      Q.   Okay.  And you mentioned that your father also
11  OD'd a couple times and was hospitalized.  When did the
12  first of those incidents occur?
13      A.   I don't know off the top of my head.
14      Q.   That was after your mother passed away?
15      A.   Yes.
16      Q.   Do you remember where he was hospitalized?
17      A.   Once in Ohio.  I don't know where.
18      Q.   Was there a second time that your father OD'd
19  and was hospitalized?
20      A.   Here.
21      Q.   When did that occur?  Was it here?  You mean
22  somewhere in Brevard County, Florida?
23      A.   Yeah.
24      Q.   Do you remember which hospital he was at?
25      A.   Holmes Regional.

Page 54

```
1     Q.   When was he hospitalized at Holmes Regional?
2     A.   Sometime in 2018.
3     Q.   You said sometime in 2018?
4     A.   Possibly.  I don't know, though.
5     Q.   What caused him to OD and go to the hospital?
6     A.   I don't know.
7     Q.   Do you have any sense of what he OD'd on?
8     A.   No.
9     Q.   For any of the occasions during which he was
10   hospitalized for an overdose, do you have any sense of
11   what he overdosed on?
12    A.   I don't know.
13    Q.   Did your father ever participate in any kind of
14   counseling?
15    A.   Not that I know of.
16    Q.   Any kind of substance abuse treatment?
17    A.   No.
18    Q.   Other than the hospitalizations, do you know
19   anything else about any of your father's health care?
20    A.   No.
21    Q.   Let me jump back again a little bit.  Is there
22   any time period that you're aware of in B    's life
23   that B     did not have contact with your father?
24    A.   No.
25    Q.   Was -- as far as you're aware, was there a time
```

Page 55

```
1    period in D    's life that D     did not have contact
2    with your father?
3     A.   No.
4     Q.   Was there any time period in Nicholas's life
5    that Nicholas did not have contact with your father?
6     A.   No.
7     Q.   Was there any time in your brother Donald's
8    life that he did not have contact with your dad?
9     A.   No.
10    Q.   Was there any time period in Tommi's life that
11   he did not have contact with your father?
12    A.   No.
13    Q.   Was there any time period in Trey's life that
14   Trey did not have contact with your father?
15    A.   No.
16    Q.   Was there any time in Brittony's life that
17   Brittony did not have contact with your father?
18    A.   No.
19    Q.   So is it only you that went out of contact with
20   your father for, you said, about a year after your mom
21   died?
22    A.   Yeah.
23    Q.   Are you aware of your father ever being
24   involved in any kind of lawsuit?
25    A.   No.
```

Page 56

```
1     Q.   Are you aware of your father ever being
2    involved in any bankruptcy proceeding?
3     A.   No.
4     Q.   Any insurance claim?
5     A.   No.
6     Q.   Any workers' comp claim?
7     A.   No.
8     Q.   Did your father take any kind of prescription
9    medications?
10    A.   Yeah, he took something for high blood
11   pressure.  That was it.
12    Q.   Do you remember what medication it was?
13    A.   No.
14    Q.   Do you know where he got the prescription?
15   It's kind of a vague question.  I will ask a couple
16   questions in place of it.  Do you know which health care
17   provider gave him the prescription for the high blood
18   pressure medication?
19    A.   Brevard Health Alliance.
20    Q.   What kind of health care facility is Brevard
21   Health Alliance?
22    A.   Oh, I don't know.
23    Q.   Do you know what he went there for other than
24   to get the prescription for high blood pressure
25   medication?
```

Page 57

```
1     A.   No, I'm pretty sure that was it.
2     Q.   Did he have a primary care doctor at Brevard
3    Health Alliance?
4     A.   I don't think so.
5     Q.   Do you know, is that like an urgent care or is
6    that a medical --
7     A.   It's a clinic.
8     Q.   Do you know where your father filled the
9    prescription for the high blood pressure medication?
10    A.   No.
11    Q.   Regardless if your father was actually
12   prescribed the medication, did he take anything else
13   besides the blood pressure medication?
14    A.   Not to my knowledge.
15    Q.   Have you ever seen the medical examiner's
16   report in connection with this case?
17    A.   I mean, the autopsy report?
18    Q.   Yes.
19         MR. MOORE:  Hold on.  There's two autopsies.
20         MR. MARI:  Well, there was really one.
21         MR. MOORE:  There's the autopsy and the medical
22     examiner.
23    Q.   Okay.  Have you ever seen any autopsy report
24   for your father?
25    A.   Yeah.
```

Page 58

1    Q.   So there was one done by the Brevard County
2  Medical Examiner.  Did you see that one?
3    A.   I don't know which one I saw, by who.
4    Q.   Was there a toxicology report attached to the
5  medical examiner's report that you saw?
6    A.   I believe so, but I really didn't go over it.
7    Q.   Did you read it at all?
8    A.   No.
9    Q.   Do you have any knowledge of what's in that
10  toxicology report?
11    A.   I mean, I know he had other drugs in his
12  system.
13    Q.   That's what I was getting to.  Do you have any
14  knowledge at all on how he might have had -- or why that
15  toxicology report might indicate that he had other drugs
16  in his system besides possibly a blood pressure
17  medication?
18    A.   No.
19    Q.   Do you have any knowledge at all of your father
20  ever taking anything besides his blood pressure
21  medication in the 90 days prior to his death?
22    A.   No, not to my knowledge.  I was surprised when
23  I had seen it.
24    Q.   How about outside of -- let me ask the question
25  a little differently.  Do you have any knowledge of your

Page 59

1  father ever taking anything besides the blood pressure
2  medication ever?
3    A.   Pain meds.
4    Q.   When did your father take pain meds?
5    A.   Those are prescribed.
6    Q.   I was going to ask that.  When was your father
7  prescribed pain meds?
8    A.   He got into a car accident maybe two, three
9  weeks before he died.
10    Q.   What pain medications was he prescribed as a
11  result of the car accident?
12    A.   Off the top of my head, I don't remember, but
13  -- yeah, I don't remember what they were.
14    Q.   Where did your father treat as a result of the
15  car accident?
16    A.   They sent him to the Melbourne hospital.
17    Q.   Do you remember which hospital that was?
18    A.   Holmes Regional.
19    Q.   Do you know who prescribed the pain medications
20  following the car accident?
21    A.   No.
22    Q.   Do you know where your father filled the
23  prescription for the pain medications following the car
24  accident?
25    A.   No.

Page 60

1    Q.   Besides those pain meds from the car accident
2  and the high blood pressure medication, are you aware of
3  your father taking any other medications?
4    A.   No.
5    Q.   Did your father ever use any illegal drugs?
6    A.   Not to my knowledge.
7    Q.   Did your father ever take any prescription
8  medications that he was not prescribed?
9    A.   Not to my knowledge.
10    Q.   Did your father ever take more prescription
11  medications that he was prescribed but in a greater
12  amount than prescribed?
13    A.   I don't know.
14    Q.   Were you living with your father when he OD'd
15  here in Brevard County?
16    A.   No.
17    Q.   Was there any kind of memorial proceeding or
18  funeral for your father?
19    A.   No, there wasn't a memorial, but, like, before
20  they cremated him we got to see him again.
21    Q.   When you say "we," who do you mean?
22    A.   Me and my mom.
23    Q.   You mean Dianne?
24    A.   Yeah.
25    Q.   Other than that, was there any kind of funeral,

Page 61

1  memorial service, anything like that?
2    A.   No.
3    Q.   Did you ever deal with any kind of law
4  enforcement investigation regarding your father's death?
5    A.   No.
6    Q.   Ever give any kind of statement to police or
7  Florida Department of Law Enforcement, anyone at all?
8    A.   I mean, yeah, they had me take a statement that
9  day.
10    Q.   Okay.  That's what I was asking.  So other than
11  that statement, did you at all deal with any kind of law
12  enforcement investigation regarding your father's death?
13    A.   No.
14    Q.   Did you deal at all with the medical examiner?
15    A.   No.
16    Q.   When -- I think you mentioned that you did see
17  your father once before his body was cremated.  Where
18  did that occur?
19    A.   The Ammen Family Home [sic].
20    Q.   So that was not at the medical examiner's
21  office?
22    A.   No.
23    Q.   Did you do anything at all related to the case
24  in probation court for your father's estate?
25    A.   What do you mean?

Page 62

1    Q.   Are you aware of any other court case besides
2  the one for which we're taking your deposition that
3  relates to your father's death?
4    A.   Oh, no.
5    Q.   Have you discussed -- other than the statement
6  you gave to law enforcement that you already told me
7  about, have you discussed your father's death or that
8  incident with anyone who worked for the City of West
9  Melbourne?
10   A.   No.
11   Q.   Have you ever gotten any kind of counseling or
12 treatment, anything of the sort, because of the incident
13 that led to your father's death?
14   A.   No.
15   Q.   Do you know if any of your siblings have ever
16 gotten any kind of counseling or treatment, anything of
17 the sort, because of your father's death?
18   A.   No.
19   Q.   Do you have any plans to get any kind of
20 counseling or treatment because of your father's death?
21   A.   I'm supposed to be in counseling.
22   Q.   Is that because of your father's death or is
23 that because of something else?
24   A.   Yes, because of his death.
25   Q.   Okay.  So when you say you're supposed to be

Page 63

1  getting counseling, what do you mean?
2    A.   I mean I'm waiting for a provider to get a hold
3  of me because my caseworker wants me to see a counselor,
4  and my son, because we both have nightmares.
5    Q.   Do you have any definite plans now to see a
6  counselor?
7    A.   Yeah, I'm waiting for a provider to call me.
8    Q.   Have you reached out to providers already for
9  counseling?
10   A.   Yes.
11   Q.   Which providers have you reached out to?
12   A.   I don't know.  My stepdad helps me with that.
13   Q.   Are you aware of any medical bills that -- any
14 medical bills as a result of the incident, May 21st,
15 2018?
16   A.   Yeah, he had some medical bills sent to the
17 house after he died, but I don't know specifically what.
18   Q.   Okay.  Do you know anything more about it other
19 than just bills arrived at the house?
20   A.   No.  My stepmom does.
21   Q.   How old was your son that day as of May 21st,
22 2018?  How old was he?
23   A.   One.
24   Q.   Do you think he has any memory of that
25 incident?

Page 64

1    A.   Yeah, he has nightmares.
2    Q.   Anything other than the nightmares that would
3  indicate he had a memory of the incident?
4    A.   He's been different since, but...
5    Q.   In what way has he been different?
6    A.   He has attachment issues.
7    Q.   So how do those attachment issues manifest?
8    A.   What do you mean?
9    Q.   When you say he has attachment issues, what
10 does that --
11   A.   Whenever somebody walks out of the room he
12 screams and cries.
13   Q.   So other than the attachment issues and the
14 night terrors, do you have any other indication that
15 your son has memory of the incident at Publix from
16 May 21st, 2018?
17   A.   No.
18   Q.   Is there any definite plan for your son to get
19 any kind of counseling or treatment?
20   A.   He already is.
21   Q.   Who is he treating with?
22   A.   I don't know currently because he's with the
23 foster system, so I don't have that information.
24   Q.   When was it that your son was placed with the
25 foster system?

Page 65

1    A.   About seven months ago.
2    Q.   Have you seen him at all since then?
3    A.   Yes.
4    Q.   Does he ever talk about the incident at Publix
5  from May 21st --
6    A.   He can't talk.  He's deaf.
7    Q.   So a better question, then, for me is, does he
8  ever communicate with anyone at all about the incident
9  at Publix, May 21st, 2018?
10   A.   He really can't.  He's only three.  He doesn't
11 even know sign yet.
12   Q.   Okay.  So I do want to ask now about the
13 incident, May 21st, 2018, at Publix, so if you need to
14 take a break at any time during this part of the
15 deposition, just let me know.
16       MR. MOORE:  Do you want to take a break?
17       THE WITNESS:  Yeah.
18       MR. MARI:  Okay.
19       (Recess held from 11:33 a.m. to 11:51 a.m.)
20 BY MR. MARI:
21   Q.   So before I get to the incident at Publix, a
22 couple questions.  Are you aware of your father ever
23 receiving any kind of treatment of any kind with
24 Circles of Care?
25   A.   Yeah.  I don't know when, but I heard about it.

Page 66

1    Q.   What kind of treatment did he have with
2    Circles of Care?
3        A.   Oh, I don't know.
4        Q.   Do you know in general what Circles of Care is?
5        A.   I mean, I think it's for psychiatric.
6        Q.   Did your father ever receive any kind of
7    psychiatric care that you're aware of?
8        A.   I don't know.  I don't know what he was there
9    for.
10       Q.   Do you know when he might have gone to
11   Circles of Care?
12       A.   No, not off the top of my head.
13       Q.   Just to clarify that, Circles of Care is here
14   in Melbourne.  Right?  I'm sorry.  Bad question.  Is
15   Circles of Care in Brevard County, Florida?
16       A.   I think.
17       Q.   Do you have any sense of why he went to
18   Circles of Care?
19       A.   No.
20       Q.   Other than perhaps some possible health care
21   need for treatment there, like, was it court ordered or
22   anything like that?
23       A.   I don't think so.
24       Q.   Do you ever remember your father ever treating
25   with Dr. Jacqueline Llinas here in Melbourne?

Page 67

1        A.   I don't know the name.
2        Q.   L-l-i-n-a-s.  Do you remember your father ever
3    working for Acme Fresh Markets in Ohio?
4        A.   I don't know.
5        Q.   Do you know anything about your father ever
6    working for -- possibly working for a company called
7    Gilchrist Storage Company in Ohio?
8        A.   No.
9        Q.   Okay.  All right.  Now I want to go to the
10   Publix incident on May 21st, 2018.  How did you start
11   your day that day?
12       A.   I mean, he picked me up early.
13       Q.   Do you remember what time?
14       A.   No.  I don't know.  It was just during the
15   daylight.
16       Q.   So your dad picked up you and your son?
17       A.   Yeah.
18       Q.   What happened next after he picked you up?
19       A.   We were driving around, talking.
20       Q.   Do you remember anything you were talking
21   about?
22       A.   We were supposed to go buy a mobile home that
23   day.
24       Q.   So where's the first place you went after your
25   dad picked you up?

Page 68

1        A.   We went to Publix to buy some food.
2        Q.   What time did you arrive at Publix?
3        A.   I don't remember.
4        Q.   Did he have plans to go anywhere else that day?
5    I know you said you were thinking about buying a mobile
6    home, but other than that and Publix, did you have plans
7    to go anywhere else?
8        A.   No.
9        Q.   Did you visit any other store in that shopping
10   center besides the Publix?
11       A.   Dollar Tree.
12       Q.   Did your dad have a large amount of cash on him
13   that day?
14       A.   Yes.
15       Q.   Do you know where he got that money from?
16       A.   His father was -- had just recently died.
17       Q.   Similar question in words, but I need to ask it
18   a little bit -- I did want to ask you what you just
19   answered, but from what bank or financial institution
20   did he get the cash?
21       A.   I'm pretty sure TD Bank.
22       Q.   Do you know what financial institution the
23   funds came from to TD Bank?
24       A.   I don't know.
25       Q.   Do you know anything about your father

Page 69

1    inheriting that money from your grandfather?
2        A.   I don't know much about it.
3        Q.   Did anyone else in your family receive
4    anything?
5        A.   His -- his half-sister.
6        Q.   Do you know her name?
7        A.   Dawn Marie.
8        Q.   Do you know where she lives?
9        A.   No.
10       Q.   Do you have any contact with her?
11       A.   No.
12       Q.   Do you know -- do you know where she might have
13   lived back in May 2018?
14       A.   Somewhere in Ohio.
15       Q.   Would anyone that you know have any way of
16   contacting her?
17       A.   Not to my knowledge.  We don't really talk to
18   her.
19       Q.   So as far as you're aware, did your father take
20   any kind of medications at all May 21st, 2018?
21       A.   Yeah, he took some of his high blood pressure
22   meds.
23       Q.   Anything besides that?
24       A.   Not to my knowledge.
25       Q.   Did he consume any alcohol that day?

Page 70

```
1     A.   Not to my knowledge.
2     Q.   Have you ever seen any of the videos of the
3   incident at Publix on May 21st, 2018?
4     A.   Yeah.
5     Q.   Which video did you see?
6     A.   The ones that were posted online by the news
7   team.
8     Q.   Was that -- to your understanding, was that a
9   video taken by somebody with a cell phone, like another
10  shopper in the store?
11    A.   Yeah.
12    Q.   Have you ever seen any other videos besides
13  those?
14    A.   No, I haven't really wanted to watch them.
15    Q.   Do you remember what time you got to Publix?
16    A.   No.
17    Q.   And you said your father drove there?
18    A.   Yeah.
19    Q.   At any point did you become separated from your
20  father at the Publix shopping center?
21    A.   Yeah.
22    Q.   When was that?
23    A.   When he was talking to the guy at the register,
24  I remember -- and then N█████ started crying so -- and
25  his diaper was wet, so I took him to the car to change
```

Page 71

```
1   his diaper and get him a bottle.
2     Q.   Did you go anywhere else in the shopping center
3   apart from your father that day?
4     A.   No, just to the car.
5     Q.   So before any law enforcement officer showed
6   up, how was your father acting?
7     A.   Well, I was more concerned about the baby
8   because he kept crying.  But he was fine when we got
9   there and then he seemed -- I don't know.  He was, like,
10  trying to understand what the guy at the register -- I
11  don't know.  I don't really remember what all was going
12  on, but something with his card.  And then he wasn't
13  really grasping how you use the new chip with the card,
14  I guess.  I ended -- I went out to the car, so...
15    Q.   Okay.  So how long was it that you were apart
16  from your father at this Publix shopping center?  Like,
17  you went out to the car.
18    A.   I don't know how long we were apart.  After I
19  changed the baby and I was feeding him a bottle, I
20  waited out there for a little bit hoping he would just
21  hurry up and come out because I didn't want to take the
22  baby back in the store, but...
23    Q.   Again, this is before any law enforcement
24  officer arrived.  Was your father upset about anything?
25    A.   I don't remember.
```

Page 72

```
1     Q.   Do you know anything about the exchange that
2   your father had with law enforcement officers the first
3   time before they -- before you spoke to any law
4   enforcement officer, before they took you out in the
5   parking lot, do you know anything about that exchange?
6     A.   No.
7     Q.   What was the first time that you spoke with a
8   law enforcement officer that day?
9     A.   Well, he was walking to the car with some
10  officers.  I guess that he was looking for me, but he
11  knew I went to the car.  That's all.
12    Q.   Whose car was it that you-all went to Publix
13  in?
14    A.   His car.
15    Q.   Was he having trouble finding it in the parking
16  lot?
17    A.   Well, I didn't realize, but we parked down by
18  Dollar Tree, not in front of Publix.
19    Q.   And did he park the car there that day?
20    A.   Yeah.
21    Q.   Did he ever move it at all?  Again, this is
22  before any, you know, before the altercation.  Did he
23  ever move the car?
24    A.   No.
25    Q.   So it was in the same spot in the parking lot?
```

Page 73

```
1     A.   The whole time, yes.
2     Q.   I guess that's a good question.  Was it in the
3   same spot in the parking lot from the time you initially
4   arrived there in the morning through after the physical
5   altercation?
6     A.   Yeah.
7     Q.   It didn't move at all?
8     A.   I don't think so.
9     Q.   Do you have any sense at all of why your father
10  couldn't find you at the car after you left the store?
11    A.   No, not really.
12    Q.   Do you know what he was doing in the store
13  while you were gone?
14    A.   No.
15    Q.   What did he talk to the police about that first
16  time out in the parking lot?
17    A.   They said -- they asked me basically who drove
18  there.  I told them him.  Then they were asking about
19  our licenses.  They told me to have somebody come and
20  get us, which I called my stepmom, and she can't come at
21  the time because she was at work.  And then they were
22  asking me if he was on any medication, and, to my
23  knowledge, I only knew about him taking some -- his
24  blood pressure meds.
25    Q.   Do you remember anything else about the
```

Page 74

1  conversations with police officers out in the parking
2  lot?
3      A.   I don't really remember much more than that.
4      Q.   Just so we're clear, when that reads back on
5  the transcript, I think what you're telling me is that
6  you don't know anything else, but just to be sure so it
7  reads clear, besides what you've already told me, do you
8  remember anything else about the exchange with police
9  officers in the parking lot that day?
10     A.   I don't really remember.
11     Q.   So did the police tell you that neither you nor
12 your father could drive it then?
13     A.   Yes.
14     Q.   Did you call anyone else besides Dianne?
15     A.   No.
16     Q.   Do you remember anything else about the
17 conversation you had with Dianne other than what you've
18 told me?
19     A.   No.
20     Q.   So what was -- just to be clear, those two
21 officers left?
22     A.   I know that the lady left.
23     Q.   Okay.  Do you know what the other officer did?
24 Because earlier, I guess -- so there was a female
25 officer and a male officer.  The female officer left?

Page 75

1      A.   Yeah, I thought she just left and the male
2  officer stayed.
3      Q.   Did you see him stay there?
4      A.   It could have been a different one.  I don't
5  know.  I don't remember.
6      Q.   Did you have any understanding at all that --
7  whether your father was asked to leave the Publix store?
8      A.   No.
9      Q.   Do you have any understanding whether Publix
10 store management wanted your father to leave?  Again,
11 this is just the first encounter he had with police
12 then.
13     A.   No.  To my knowledge, it was the police that
14 asked us to leave.
15     Q.   Okay.  So you were actually asked to leave by
16 police?
17     A.   I'm pretty sure they asked him to leave.
18     Q.   Okay.  I think that's what I meant to ask, so
19 thanks for dealing with my inartful question.
20     A.   Well, they told us to wait for a ride.
21     Q.   So what were you going to do next after Dianne
22 couldn't pick you up?
23     A.   She was going to come get us after she got off
24 work.
25     Q.   Okay.  When was that going to happen?

Page 76

1      A.   Well, she was supposed to be off -- she usually
2  gets off work at 5:00, so she would have been there
3  about 6:00, maybe 5:30.
4      Q.   Do you remember at all what time in the morning
5  that this whole exchange occurred where the officers
6  told your father to leave the Publix --
7      A.   I don't know.
8      Q.   But it was definitely a.m. hours after he said
9  the sun went up, so after sunrise but still a.m. hours?
10     A.   I don't know.  I really don't know the time
11 frame.
12     Q.   Did you have any other plans just besides
13 waiting for Dianne to show up after she was done with
14 work?
15     A.   No.
16     Q.   So what happened after the female officer left?
17     A.   I remember my dad had to pee.
18     Q.   So what did he do to address that?
19     A.   He asked the officer if he could go pee.  He
20 said, "Yeah."
21     Q.   Back in the Publix?
22     A.   Yeah.
23     Q.   So the male officer told him he could return to
24 the Publix?
25     A.   Yeah, just to pee.

Page 77

1      Q.   So what did he do?
2      A.   Well, I went in behind him.  He went to the
3  bathroom.  Well, he didn't go to the bathroom, he headed
4  to the bathroom and then, I don't know, he was like iffy
5  about it because he kept -- he was saying, like, he had
6  to pee but he didn't want to go in there and pee if he
7  didn't -- if they didn't want him in there, so he was
8  wondering why he wasn't wanted there.
9      Q.   So what gives you your understanding that your
10 father was concerned that they didn't want him back in
11 the Publix?
12     A.   Because he kept on going back and forth about
13 going into the restroom to piss, and I said, "Just go to
14 the bathroom so we can go back outside."  And he said --
15 he said, "I've got to pee but I don't really want to if
16 they don't want me in here," because the officer said to
17 go in and straight out.
18     Q.   Did your father ever talk to an employee of
19 that Publix about going back into the store?
20     A.   I don't remember.
21     Q.   So what happened next?
22     A.   I don't really remember.  The things that I
23 remember are when he was taken down by the police.  It's
24 been two years, so that's really the main parts that I
25 remember.

Page 78

1    Q.   Were you present with -- after he returned to
2  the store, were you present with him the whole time?
3    A.   After -- after what?
4    Q.   So after he returned to the store, actually
5  went back inside the store, were you with him that whole
6  time?
7    A.   Yeah.
8    Q.   At any point did he walk beyond -- I mean,
9  further into the store than the cash registers?
10   A.   Just right there in the front of the cash
11 registers.
12   Q.   Did you ever hear any Publix employee ask him
13 to leave?
14   A.   I remember they kept telling him to calm down.
15   Q.   Did any Publix employee tell him to leave?
16   A.   I don't remember.
17   Q.   Do you remember anything else that your father
18 was saying up from -- returning into the store until the
19 time the police arrived again?
20   A.   He wanted the female officer to come back.
21   Q.   What was he saying about that?
22   A.   He just kept saying to call the female officer
23 that was here before, because she said before if he
24 needed anything to call her.  But it's not like we knew
25 her name or her number.  So he kept saying to have her

Page 79

1  come back, and that wasn't happening.  That's about it.
2    Q.   Was he saying that to you?
3    A.   He was yelling to call the female officer.
4    Q.   Who was he yelling it to?  Was he yelling it to
5  you?
6    A.   He told me a couple times and the guy that
7  worked in the store, whoever it was that was telling him
8  to try and calm down.
9    Q.   Was that a Publix employee?
10   A.   Yeah.
11   Q.   Was it the manager of the Publix, do you think?
12   A.   I don't know.
13   Q.   All right.  Where did that exchange occur where
14 he was asking to call the female officer back?
15   A.   When the cops came inside and started asking
16 him to leave.
17   Q.   Okay.  Where in the store?
18   A.   You've got the doors, you've got the registers,
19 and then the aisles in between the registers and the
20 aisles.
21   Q.   Other than that one Publix employee that you
22 mentioned before, did he talk to any other Publix
23 employee?
24   A.   I don't remember.  I don't -- I don't know.
25   Q.   Did he have any kind of issue with the purchase

Page 80

1  that he made before?  Bad question.  I'm going to strike
2  that and ask a different question.
3        When he went back into the store, did he have
4  any kind of issue that he was asking about with the
5  purchase that he made earlier?
6    A.   Yeah, he said they overcharged us for what we
7  bought.
8    Q.   Do you believe that was the case?
9    A.   He was looking at the receipt and he said that
10 they overcharged us.  He didn't understand why he paid
11 so much for the little stuff that we got.
12   Q.   And were you talking to the Publix employee
13 about that?
14   A.   Yeah, the guy at the register -- this is before
15 I went off to the car, though.  That was initially the
16 problem why -- when he stayed in the store and I went
17 out to the car.  I went out to the car to change
18 N[       ], and he stayed there and handled that issue.  I
19 -- that was when he looked at that.
20   Q.   So did that issue ever come up again when your
21 father returned to the store?
22   A.   I don't -- I don't remember.
23   Q.   Do you remember anything else about what might
24 have been said between your father and Publix employees
25 between the time you returned to the store and the

Page 81

1  police arrived the second time?
2    A.   No, I don't remember.
3    Q.   Do you remember anything else that your father
4  was doing between the time he returned into the store
5  and police arrived?
6    A.   Not really.  At that point everything went
7  fast.
8    Q.   How long was it that he was -- he had returned
9  into the store and then police arrived?
10   A.   I don't know.
11   Q.   Do you have any sense?  Was it, like, minutes,
12 half an hour, two hours?
13   A.   I really don't remember.  I wasn't paying
14 attention to what was going on at the time.
15   Q.   What were you doing, then?
16   A.   Standing beside him trying to get him to calm
17 down.
18   Q.   I thought you said that -- maybe I misheard
19 you.  I thought you said you weren't really paying
20 attention to what was going on?
21   A.   No, I wasn't paying attention to time.  I was
22 paying more attention to what was going on.
23   Q.   Okay.  Did your father ever try to use the
24 phone at Publix?
25   A.   Yeah.

Page 82

1    Q.   So what happened there?
2    A.   Well, he tried to call Dianne.  He couldn't get
3  through so I called her work phone, and then he tried to
4  call the police.
5    Q.   Was he using Publix's phone to try to do that?
6    A.   Yeah.
7    Q.   Why was he trying to call the police?
8    A.   Because the cops that were there were not
9  really trying to help him.  He felt threatened by the
10  police over there, pretty much.
11    Q.   I'm talking about just before the police arrive
12  the second time.  Was he using the Publix phone then?
13    A.   To get a hold of Dianne, yeah, but then I ended
14  up calling her from the Publix phone.
15    Q.   Okay.  And did he ever dial 911 on the Publix
16  phone?
17    A.   I don't know.
18    Q.   Do you have any sense at all why he didn't just
19  go back into the Publix, use the restroom and leave?
20    A.   No.
21    Q.   So what happened initially when the officers
22  arrived for a second time?
23    A.   I don't really remember much up until the point
24  that they tased him.
25    Q.   Did the officers tell him to leave the store?

Page 83

1    A.   Yeah, they told him to cooperate -- they kept
2  saying to cooperate and calm down, but --
3    Q.   Did they direct him to leave the store?
4    A.   I don't know.
5    Q.   So that second encounter with law enforcement
6  officers, did they do anything at all to direct him
7  outside the store?
8    A.   I don't know.  I just remember them telling him
9  to calm down and to cooperate.
10    Q.   Cooperate in what manner, as far as you know?
11    A.   He was cooperating.  He wasn't being a threat.
12    Q.   Well, I think you said that the officers were
13  telling him to cooperate.
14    A.   Right, but that doesn't mean that he wasn't
15  already cooperating.
16    Q.   Okay.  What did you -- never mind.  Were the
17  officers trying to direct your father to an exit of the
18  store?
19    A.   Yes.
20    Q.   And was that to leave the store?
21    MR. MOORE:  Objection to form.
22    A.   More so to step outside of the store.
23    Q.   So they did direct him to step outside the
24  store?
25    A.   Yeah.

Page 84

1    Q.   Did they do so more than once?
2    A.   I don't know.  I was trying to get my dad to
3  calm down.
4    Q.   How were you trying to get him to calm down?
5    A.   What more could I have done other than to say,
6  "Dad, calm down."
7    Q.   I don't know.  I'm just asking you what you did
8  or didn't do.
9    A.   I just kept telling him to calm down.
10    Q.   Did you do anything else besides that to try to
11  get him to calm down?
12    A.   No.
13    Q.   Did you ever try to lead him outside the store?
14    A.   What?
15    Q.   Did you ever try to lead him outside the store,
16  to leave the store?
17    A.   Yes.
18    Q.   Did he follow you?
19    A.   No.
20    Q.   What was he saying at that point?
21    A.   I don't remember.
22    Q.   Have you ever seen the body-camera video of the
23  incident from any of the officers?
24    A.   No.
25    Q.   Do you think seeing any of that video would

Page 85

1  help refresh your recollection of the events?
2    A.   I don't really want to watch those videos.
3    Q.   Okay.  I gather that you don't want to watch
4  the videos, but you were right there, and we both know
5  that the officers told your father to leave the store
6  many, many times, so I think I've either got to give you
7  an opportunity to see the videos and then ask you that
8  question again, or give me a real truthful answer to the
9  question.
10    A.   I told you they asked him to leave the store.
11    Q.   Okay.  But I had to drag that out of you.  So
12  what I'm saying is, you were there, you had firsthand
13  knowledge of the event, you're under oath.  You've got
14  to give me truthful answers --
15    MR. MOORE:  Let's just move to the next
16    question.  She understands the terms of a
17    deposition --
18    MR. MARI:  She may understand but she's not
19    complying with them.
20    MR. MOORE:  How so?
21    MR. MARI:  And I want to lay this out.  I don't
22    want to be here all day.  I don't want to play the
23    videos and pause every five seconds and ask
24    questions.
25    MR. MOORE:  Sure.

Breanna Whitmer
July 16, 2020                                                          86 to 89

Page 86

1         MR. MARI:  But it's either that or truthful
2    answers.
3         MR. MOORE:  Right.  She's providing truthful
4    answers.
5         MR. MARI:  When she tells me she doesn't know
6    if the officers told him to leave, that's not the
7    truth.
8    A.    No, I don't know how many times --
9    Q.    Well, that wasn't the first answer you gave.
10        MR. MOORE:  You're mischaracterizing and asking
11   the same question over.  She already has answered.
12        MR. MARI:  I want to put this on the record.  I
13   have the body-camera videos, I have the Publix
14   surveillance video, I have the cell phone video.
15   If at any point you think that your testimony would
16   be improved by seeing those videos, I will give you
17   the opportunity to watch them in their entirety as
18   many times as you want.
19        But I want to put on record that that
20   opportunity is there.  I don't want to go through
21   all these videos and pause every five seconds.
22   You've told me you don't want to watch the videos.
23   The way to avoid that is to give me the truth.
24   Q.    So to clear this up, because I think there was
25   a lot of different answers on this, did the officers

Page 87

1    tell your father to leave the Publix store?
2    A.    Yes.
3    Q.    And did they do so more than once?
4    A.    I'm sure, yeah.
5    Q.    Did that all occur before anybody made physical
6    contact with your father?
7    A.    Yeah.
8    Q.    How many times did they tell him to leave the
9    store?
10   A.    I do not know.
11   Q.    Do you remember anything else that was said by
12   you, your father or the officers before they made
13   physical contact with him?
14   A.    I don't remember.
15   Q.    How did physical contact first occur between
16   either officer and your father?
17   A.    I don't even know what brought that on.  He
18   wasn't being a threat.  I remember him being tased, and
19   then they kept telling him to cooperate.  He wasn't
20   fighting them.  Then they took him down.
21   Q.    Okay.  If you don't know, that's okay, tell me,
22   if that's the truth.  But the question was simply, how
23   was the initial physical contact between an officer --
24   A.    I don't know.
25   Q.    I've got to get the whole question out.  I

Page 88

1    understand you're going to tell me you don't know, but I
2    have just got to get the whole question out.
3         How is the initial physical contact made
4    between the law enforcement officer and your father at
5    Publix May 21st, 2018?
6    A.    I don't remember.
7    Q.    What's the first thing you remember about
8    physical contact between law enforcement and your father
9    at Publix that day?
10   A.    I remember my dad being a little jittery, and
11   he kept saying, "Don't hurt me."  And -- I don't know.
12   I don't remember.  He got -- something happened and they
13   ended up tasing him.
14   Q.    Where did that physical encounter start within
15   the Publix store?
16   A.    Same.  Same place, in front of the registers.
17   Q.    Is that on the store side or closer to the
18   parking lot side of the registers?  I will rephrase.
19        When you say near the registers, was that on
20   the side of the registers near the entrance and the exit
21   to the store or opposite side?
22   A.    The opposite side.
23   Q.    Could the officers immediately handcuff your
24   father?
25        MR. MOORE:  Objection to form.

Page 89

1    Q.    Fine, I will rephrase.  Were the officers
2    immediately able to handcuff your father after the
3    physical encounter initiated?
4    A.    Yeah.
5    Q.    So immediately they put handcuffs on him
6    standing up?
7    A.    No.
8    Q.    Okay.  So it sounds like they were not able to
9    immediately handcuff him after the physical encounter
10   started?
11   A.    Sure.
12        MR. MOORE:  I mean --
13        MR. MARI:  Okay.  You know what, I'm going to
14   watch videos.  Like, this is, you know --
15        MS. AMIGO:  Can we take a break for a minute if
16   you don't mind?
17        MR. MARI:  Yeah.
18   (Recess held from 12:23 p.m. to 12:44 p.m.)
19   BY MR. MARI:
20   Q.    So after police officers initially made
21   contact, physical contact with your father, were they
22   immediately able to handcuff him?
23   A.    No.
24   Q.    What happened after they initially made
25   physical contact with him?

Page 90

1       MR. MOORE:  Objection to form.
2       Q.    I'll rephrase.  How did a law enforcement
3   officer initially make physical contact with your
4   father?
5       MR. MOORE:  Object to form.
6       MR. MARI:  What's wrong with the form?
7       MR. MOORE:  That's evident.  The video is right
8    there.
9       Q.    Okay.  Question stands.
10      A.    All I remember is them tasing him, and then
11  they took him down to the ground.
12      Q.    How long did that take?
13      A.    I don't know.
14      MR. MOORE:  Objection to form.
15      Q.    How long was it between the time the law
16  enforcement officer first made physical contact with
17  your father and the time he was handcuffed on both
18  wrists?
19      MR. MOORE:  Object to the form.
20      Q.    You can still answer.
21      A.    I don't know.
22      Q.    Do you have any sense at all?
23      A.    Not really.
24      Q.    Do you remember anything else between the time
25  a law enforcement officer first made physical contact

Page 91

1   with your father at the time he was handcuffed on both
2   wrists?
3       A.    No.  Once it started getting physical, I was
4   being blocked.
5       Q.    How were you being blocked?
6       A.    I had people step in front of me.
7       Q.    Did you have any view at all at any point of
8   law enforcement officers on the ground with your father?
9       A.    I mean, yeah, I could see them on top of him.
10      Q.    Could you see what anyone was doing during that
11  time?
12      A.    I had seen him in a choke hold with one arm
13  behind his back.
14      Q.    So one of your father's arms was behind his
15  back and the other was not?
16      A.    Yeah, they had one down by his side.
17      Q.    So is it your testimony they had one arm by his
18  side and one behind his back?
19      MR. MOORE:  Objection to form.
20      A.    Yeah.
21      Q.    Was your father trying to hold his arm by his
22  side so it couldn't be handcuffed?
23      MR. MOORE:  Objection to form.
24      A.    No.
25      Q.    Was your father struggling with the officers in

Page 92

1   any way?
2       MR. MOORE:  Objection to form.
3       A.    No.
4       Q.    At any point during the physical encounter, did
5   your father struggle against the law enforcement
6   officers?
7       MR. MOORE:  Objection to form.
8       A.    No.
9       Q.    Did the officers say anything to your father
10  during this whole encounter?
11      MR. MOORE:  Objection to form.
12      A.    I don't remember.
13      Q.    Did you say anything during the time between
14  the time an officer first made physical contact with
15  your father and the time he was handcuffed on both
16  wrists?
17      MR. MOORE:  Objection to form.
18      A.    No, I was just screaming.
19      Q.    Do you remember what you were screaming?  Well,
20  were you screaming words?
21      A.    I don't remember.
22      Q.    Do you remember anything else that occurred
23  between the time an officer first made physical contact
24  with your father and the time he was handcuffed on both
25  wrists?

Page 93

1       A.    No.
2       Q.    At some point I think we established this, but
3   just to be sure, he was handcuffed on both wrists?
4       A.    I don't know.
5       MR. MOORE:  Objection to form.  Sorry.
6       Q.    Did the officers ever get your father in
7   handcuffs on both wrists?
8       MR. MOORE:  Objection to form.
9       A.    I don't know.
10      Q.    What happened after that first handcuff was on
11  him?
12      MR. MOORE:  Objection to the form.
13      A.    I don't know.
14      Q.    Okay.  What's the first thing you remember
15  after you said -- okay.  You mentioned that your
16  testimony was one officer had your father in a choke
17  hold.  How is that choke hold being performed?
18      MR. MOORE:  Objection to form.
19      A.    I don't really know how to answer that without
20  performing it.
21      Q.    Well, I mean, you could describe it with words
22  rather than actually perform it.
23      A.    Right.  I don't -- I mean --
24      Q.    So how would you describe it with words?
25      MR. MOORE:  Objection to form.

Page 94

1    Q.   Okay.  So which arm --
2    A.   I don't remember.
3    Q.   And what manner did he have it around his neck?
4         MR. MOORE:  Objection to form.
5    A.   I don't know.
6    Q.   Have you ever received any kind of training on
7    performing a choke hold?
8    A.   No.
9    Q.   Have you ever done any research on performing a
10   choke hold?
11   A.   No.
12   Q.   Do you know anything about what the City of
13   West Melbourne's policy, if there is one, on use of
14   choke holds?
15        MR. MOORE:  Objection to form.  Actually,
16    strike that.  Sorry.  Withdrawn.
17   A.   I don't know.
18   Q.   What is it about the officer's actions that
19   lead you to say that he was performing a choke hold?
20        MR. MOORE:  Objection to form.
21   A.   Well, he had his arm around his neck.
22   Q.   Can you describe that maneuver in any more
23   detail than you already have for me?
24   A.   No, not really.
25   Q.   Is it your belief that your father could not

Page 95

1    breathe as a result of this choke hold?
2    A.   Yeah.
3    Q.   What leads you to believe that?
4    A.   Him turning purple.
5    Q.   At what point did he turn purple?
6         MR. MOORE:  Objection to form.
7    A.   While he was being -- his airway was being
8    blocked.
9    Q.   At what point in the encounter?  Before the
10   handcuff was on?
11        MR. MOORE:  Objection to form.
12   A.   I don't remember handcuffs being put on.
13   Q.   I thought you told me he had one hand -- a
14   handcuff on one wrist and the other one was on his side.
15   A.   No, I said he had one arm behind his back, like
16   a bird wing, and one arm beside him.  I don't remember
17   seeing handcuffs being put on him.  After a while --
18        MR. MOORE:  Only answer the question.
19        THE WITNESS:  Sorry.
20   Q.   At any point did you see handcuffs on either of
21   your father's wrists that day?
22   A.   I don't remember.
23   Q.   What part of his body turned purple?
24        MR. MOORE:  Objection to form.
25   A.   His whole body.

Page 96

1    Q.   At what point did you leave that immediate
2    vicinity where the encounter occurred?
3         MR. MOORE:  Objection to form.
4    A.   When they took him to the bathroom.
5    Q.   What was going on between your father and law
6    enforcement officers at that time?
7         MR. MOORE:  Objection to form.
8    A.   I don't know.  I couldn't see over people.
9    Q.   Do you have any other recollection of what
10   happened between the time an officer first made physical
11   contact with your father and the time that you left to
12   go to some other room?
13   A.   No.
14   Q.   What room did you go to?
15   A.   They took me to, like, a manager's room to
16   question me.
17   Q.   When you say "they," who do you mean?
18   A.   The --
19   Q.   Was it police officers?
20   A.   Yeah.
21   Q.   Was it a Publix employee?
22   A.   A police officer.
23   Q.   Was any Publix employee involved at all in
24   that?
25        MR. MOORE:  Objection to form.

Page 97

1    Q.   Do you remember what you talked about with
2    police officers in the manager's office at the Publix?
3    A.   They were asking me about my dad and how our
4    day went.  The same thing you're asking me.
5    Q.   Did you witness anything else between law
6    enforcement officers and your father after the time you
7    were initially removed from the scene and you went to
8    the manager's office?
9    A.   No.
10   Q.   Did your father ever fight against the law
11   enforcement officers?
12        MR. MOORE:  Objection to form.
13   A.   No.
14   Q.   Did he ever resist their efforts to try to get
15   him under control?
16        MR. MOORE:  Objection to form.
17   A.   No.
18   Q.   Is there any chance that you might not have
19   been able to see that since your view was obstructed?
20   A.   No.
21   Q.   What did you do -- is there anything else you
22   can remember about what occurred while you were in the
23   Publix manager's office?
24   A.   No, just being questioned.
25   Q.   And do you remember any other details about

Page 98

1   that conversation other than what you already told me?
2       MR. MOORE:  Objection to form.
3       A.   No.
4       Q.   What happened when you left Publix's manager's
5   office?  What did you do is what I'm asking?
6       A.   They took me and my son to the hospital.
7       Q.   Who took you?
8       A.   A couple officers.
9       Q.   Do you remember which officers?
10      A.   I have no idea.
11      Q.   Were those officers that took you and your son
12  to the hospital any of the officers that you dealt with
13  earlier in the day?
14      A.   No.
15      Q.   Do you remember anything you might have talked
16  to with those officers on the way to the hospital?
17      A.   I didn't talk.
18      Q.   What happened when you arrived at the hospital?
19      A.   Me and my son sat in a room until somebody came
20  to talk to me.
21      Q.   Do you remember how long you were there before
22  someone came to talk to you?
23      A.   About an hour.
24      Q.   Which hospital was that?
25      A.   Melbourne Holmes Regional.

Page 99

1       Q.   Who was it that initially came to talk to you?
2       A.   I don't know.  Some sort of -- I don't know who
3   it was.  It wasn't a doctor.
4       Q.   Was it a police officer?
5       A.   No.  It was somebody like -- I don't know who
6   they were.  They came and talked to me to see if I had
7   somewhere to go and someone to stay with that night.
8       Q.   Even if you don't know the person's name or
9   specifically who they work for, in general, was it like
10  a nurse, social worker?
11      A.   Yeah, probably a social worker.
12      Q.   Did it seem to be somebody who worked at the
13  hospital?
14      A.   Yeah.
15      Q.   One detail I want to clear up is, who is
16  N▇▇▇▇?
17      A.   M▇▇▇, that's my firstborn.  I call him by
18  his middle name.
19      Q.   Oh, okay.  Do you remember anything about the
20  conversation you had with the person at the hospital?
21      A.   Not really.  She just wanted to make sure I had
22  somewhere to go and someone to stay with.
23      Q.   Did you ever speak with any law enforcement
24  officer again after that?
25      A.   No.

Page 100

1       Q.   Besides perhaps law enforcement officers, did
2   you speak with anyone else who worked for the City of
3   West Melbourne?
4       MR. MOORE:  Objection to form.
5       A.   I don't think so.
6       Q.   Did anything else happen at the hospital before
7   you left?
8       A.   No.
9       Q.   When did you leave the hospital?
10      MR. MOORE:  Objection to form.  Strike that,
11  actually.  You can answer.
12      A.   I don't remember.
13      MR. MARI:  What's wrong with the form of that?
14  But it's resolved at this point.
15      Q.   When did you leave the hospital?
16      A.   About an hour after I was there.  An hour, hour
17  and a half.
18      Q.   Did anyone tell you what happened with your
19  father?
20      A.   They just told me he was deceased.
21      Q.   Who told you that?
22      A.   The social worker that came and talked to me.
23      Q.   Do you remember anything else that you talked
24  about with the social worker?
25      A.   No.

Page 101

1       Q.   Do you remember anything you told the social
2   worker?
3       MR. MOORE:  Objection to form.
4       A.   No.
5       Q.   Did anyone else come to the hospital, like
6   Dianne, or anyone else you know?
7       A.   She picked me up.
8       Q.   What happened immediately after you left the
9   hospital?
10      A.   She took -- she took me back to her apartment.
11      Q.   What did you discuss with Dianne that day?
12      A.   There wasn't really many words.  She asked
13  where my dad was, and I had to tell her that he was
14  gone.
15      Q.   What was your dad's relationship with Dianne?
16      MR. MOORE:  Objection to form.
17      A.   They had been together since my mom died.
18      Q.   Like, were they boyfriend and girlfriend for
19  some time?
20      A.   Yeah.
21      Q.   Did that ever -- did that ever end, even
22  temporarily, perhaps prior to the time your father died?
23      MR. MOORE:  Objection, form.
24      A.   They've always been good friends.
25      Q.   When did you first meet Dianne?

Page 102

1    A.    2010 when my mom died.
2    Q.    Do you use any kind of corrective lenses for
3  your vision?
4    A.    I'm supposed to wear glasses.
5    Q.    When did you first get a prescription for
6  corrective lenses?
7    A.    A year ago.
8    Q.    Prior to that did you -- were you aware of
9  having any kind of vision deficiency?
10   A.    No.
11   Q.    Did you experience any kind of vision
12 deficiency prior to a year ago?
13   A.    No, not really.
14   Q.    At all?
15         MR. MOORE:  Objection to form.
16   A.    I mean, I can see.
17   Q.    Were you using any kind of corrective lenses on
18 the date of the incident at Publix?
19   A.    Nope.
20   Q.    Have you ever been diagnosed with any kind of
21 hearing issue?
22   A.    No.
23   Q.    Do you have any reason to believe that you
24 might have any kind of hearing issue?
25   A.    No.

Page 103

1    Q.    Have you ever been diagnosed with any kind of
2  memory-related issue?
3    A.    No.
4    Q.    Do you have any reason to believe that you
5  might have any kind of memory-related issue?
6    A.    No.
7    Q.    Have you ever had any interaction with any law
8  enforcement officers that were there at the Publix the
9  date of the incident on any separate occasion?
10         MR. MOORE:  Objection to form.
11   A.    Not that I know of.
12   Q.    Have you ever had any interaction at all with
13 the City of West Melbourne Police Department other than
14 on that day, May 21st, 2018, at Publix?
15   A.    I don't know.  I don't think so.
16   Q.    Since there was some objections and since you
17 couldn't remember some stuff, I do want to go through
18 the body-camera video and see if that can clear up some
19 issues.
20         MR. MOORE:  Is this being marked, for the
21   record?
22         MR. MARI:  Yes, I'll mark it as Exhibit 1.  And
23   I will -- you've already got a copy, but I can send
24   you another one.  And I'll get a copy to the court
25   reporter electronically since it's a digital video

Page 104

1  file.
2    Q.    All right.  So the file I'm going to be playing
3  has the file name "Mathis Bodycam Video dot mp4."  I'm
4  going to start it at 26 seconds elapsed.
5         (Video being played.)
6    Q.    I'm going to pause it real quick at 34 seconds
7  elapsed.  Do you see your father in the frame at that
8  time as we're looking at the video now?
9    A.    No.
10   Q.    Do you have any sense of who that is in the top
11 left corner of the frame?
12   A.    Well, the light is glaring on the TV.
13   Q.    If you want to move, go ahead.
14   A.    Yeah, that's my dad.
15   Q.    Are you in this frame?
16   A.    Yeah.
17   Q.    And are you holding -- where are you in this
18 frame?
19   A.    I'm wearing the green shirt.
20   Q.    And are you holding your son?
21   A.    Yeah.
22         (Video being played.)
23   Q.    We're paused again at 48 seconds elapsed.  Do
24 you see someone -- it looks like a man wearing a blue
25 shirt and black pants in the video.  Is that the Publix

Page 105

1  employee we were talking about earlier?
2         MR. MOORE:  Objection to form.
3    A.    I don't know.  I don't remember what he looked
4  like.
5    Q.    Okay.  So there was a Publix employee we talked
6  about before.  Do you think that person was a male?
7    A.    Yeah.
8         MR. MOORE:  Objection to form.
9    Q.    Do you have any sense of what his age was?
10        MR. MOORE:  Objection to form.
11   A.    No.
12   Q.    Do you have any recollection of his physical
13 appearance?
14        MR. MOORE:  Objection to form.
15   A.    No.
16   Q.    Do you think it's someone other than the
17 individual that's in this frame wearing a blue
18 long-sleeved shirt and black pants?
19        MR. MOORE:  Objection to form.
20   A.    I don't know.
21   Q.    Okay.
22         (Video being played.)
23   Q.    We're paused again at a minute 16 elapsed.
24 Have you heard the officer direct your father to go
25 outside multiple times at this point?

Page 106

1       MR. MOORE:  Objection on form.
2   A.  Yeah.
3   Q.  And is your father complying with that?
4       MR. MOORE:  Objection to form.
5   A.  No.
6   Q.  Did you hear your father yelling at the
7   officers?
8       MR. MOORE:  Objection to form.
9   A.  He wasn't yelling at them.
10  Q.  Did you hear your father yelling?
11  A.  Yeah.
12      MR. MOORE:  Objection to form.
13  Q.  Who was he yelling at?
14      MR. MOORE:  Objection to form.
15  A.  You can hear him saying, "Please."
16  Q.  Right.  I hear what's on the video, but you
17  said he wasn't yelling at the officers, but it seems he
18  was yelling.  So was he yelling at someone?
19  A.  I suppose.  It sounded like --
20      MR. MOORE:  Objection to form.
21      MS. AMIGO:  What was that?
22  A.  Yeah.
23  Q.  Who was he yelling at?
24      MR. MOORE:  Objection to the form.
25  A.  I don't know.

Page 107

1   Q.  Did either of the officers make physical
2   contact with him at any point up to this point?
3       MR. MOORE:  Objection to form.
4   A.  No.
5       (Video being played.)
6   Q.  We're paused again at a minute 31 elapsed.
7   Since the last time we paused, have you again heard the
8   officers direct your father to go outside multiple
9   times?
10      MR. MOORE:  Objection to form.
11  A.  Yeah.
12  Q.  And in the segments of video we've watched
13  already, have the officers warned that they might have
14  to go hands-on with him if he does not listen and go
15  outside?
16      MR. MOORE:  Objection to form.
17  A.  Yeah.
18  Q.  And, again, up until this point, a minute 31
19  elapsed, is your father listening and going outside like
20  the officers told him to do?
21      MR. MOORE:  Objection to form.
22  A.  No.
23  Q.  I'm going to ask it a little bit differently
24  since there was an objection.
25      Up until this point, is your father going

Page 108

1   outside like the officers directed him to do?
2       MR. MOORE:  Objection to form.
3   A.  No.
4       (Video being played.)
5   Q.  We're paused again at a minute 45.  In the
6   segment of video we just watched, since we last paused,
7   has the officers again directed your father to go
8   outside multiple times?
9       MR. MOORE:  Objection to form.
10  A.  Yeah.
11  Q.  And were you trying to get your father to go
12  outside?
13      MR. MOORE:  Object to the form.
14  A.  Yeah.
15  Q.  It seems like right around this point the
16  physical encounter begins.
17      MR. MOORE:  Object.  There's no question.
18  Q.  Is that correct?
19      MR. MOORE:  Objection to form.
20  A.  Yeah.
21      (Video being played.)
22      MR. MOORE:  Let's take a break.
23  Q.  Paused again at a minute 55.
24      MR. MARI:  Note for the record the witness got
25      up and walked out of the room.

Page 109

1       MR. MOORE:  Take a break.
2       MR. MARI:  She was up and leaving before we
3       said we were taking a break.
4       MR. MOORE:  I think I said it previously,
5       but...
6       (Recess held from 1:10 p.m. to 1:16 p.m.)
7   BY MR. MARI:
8   Q.  All right.  So we're still paused at 1:55.
9   Maybe try some of these questions again.  Did your
10  father physically struggle with the law enforcement
11  officers?
12      MR. MOORE:  Objection to form.  You can still
13      answer.
14  A.  He struggled, yeah.
15  Q.  Did he resist their efforts to bring him under
16  physical control?
17      MR. MOORE:  Objection to form.
18  A.  No.
19  Q.  No?  At any point did your father hold on to
20  the shelving at Publix to try and resist the law
21  enforcement officers?
22      MR. MOORE:  Objection to form.
23  A.  I don't know.
24  Q.  At any point did he try to pull away from them?
25      MR. MOORE:  Objection to form.

Page 110

1    A.   I don't know.
2    Q.   At any point did he try to hold his hands under
3  his body from being handcuffed?
4         MR. MOORE:  Objection to form.
5    A.   I don't know.
6    Q.   Okay.
7              (Video being played.)
8    Q.   We're pausing it at 2:10.  Have you even
9  watched this last segment of video that we just played?
10 Were you looking at the TV?
11        MR. MOORE:  Objection to form.
12        MR. MARI:  Well, if the objection is if the
13     video is the best evidence of what happened --
14        MR. MOORE:  It is.
15        MR. MARI:  -- then we're playing it, but she's
16     not watching it.
17        MR. MOORE:  It's not a requirement for her to
18     watch the video.  It's the best evidence, you're
19     right, but there's no requirement for her to watch
20     the video.
21        MR. MARI:  So the video itself is --
22        MR. MOORE:  She can turn her head and --
23        MR. MARI:  So the video itself is the best
24     evidence and her testimony is that, you know, he
25     wasn't trying to struggle against the officers.

Page 111

1         MR. MOORE:  The video speaks for itself.  Best
2      evidence.  I mean, how is she going to testify as
3      to what he's doing?  She wasn't the one trying to
4      take him down.
5    Q.   Okay.  Ms. Whitmer, from the portions of the
6  video we watched so far, were you any more than 10 feet
7  away from your father?
8         MR. MOORE:  Objection to form.
9    A.   I don't know.
10   Q.   Up until this point, which I'll represent,
11 since you're not watching the video and not actually
12 looking at it, that this is where your father first goes
13 to the ground with the officer.  What was the furthest
14 distance you were from him?
15        MR. MOORE:  Objection to form.
16   Q.   Up until this point?
17        MR. MOORE:  Objection to form.
18   A.   I'm not really sure.
19        MS. AMIGO:  Sorry.  I didn't hear you.
20   A.   I'm not sure.
21   Q.   When did somebody step in front of you?
22        MR. MOORE:  Object to the form.
23   A.   When it started getting physical.  He was
24 blocking me.
25   Q.   Who was blocking you?

Page 112

1    A.   An officer.
2    Q.   Was anything else blocking you?
3         MR. MOORE:  Objection to form.
4    A.   No.
5    Q.   What part -- what part of the scene was blocked
6  from your perspective?
7    A.   Not from my view.
8         MR. MOORE:  Objection to form.
9    Q.   What do you mean?
10   A.   He was standing in front of me because I had a
11 baby in my arms.
12   Q.   What do you mean you were being blocked?
13   A.   I mean, he was blocking me from getting closer
14 to my father.
15   Q.   Was any -- so was any of your vision being
16 blocked of this incident?
17   A.   Not for the most part.
18   Q.   Let's continue on from 2:10, then.
19             (Video being played.)
20   Q.   Paused again at 2:32.  Is your father
21 continuing to struggle against the officers still?
22        MR. MOORE:  Objection to form.
23   A.   I don't know.
24   Q.   Were you there still?
25        MR. MOORE:  Objection, form.

Page 113

1    A.   There's people blocking me, standing in front
2  of me, stepping in my way, trying to take my kid out of
3  my hands.
4    Q.   It seems like there's more detail about this
5  incident that you're telling me now then the first time
6  I asked about it.
7         MR. MOORE:  Objection.  Is that a question?
8         MR. MARI:  There is a question coming.
9         MR. MOORE:  Okay.
10   Q.   Who was it that was standing in front of you?
11   A.   I don't know.
12        MR. MOORE:  Objection to the form.
13   Q.   Can you be heard -- are you heard on this
14 video?
15        MR. MOORE:  Objection to form.
16   Q.   Do you hear your own voice?
17   A.   Yeah.
18   Q.   What were you saying?  What was your part?
19        MR. MOORE:  Objection to form.
20   A.   I was screaming, "Stop."
21   Q.   Who were you telling to stop?
22        MR. MOORE:  Objection to form.
23   A.   The cops.
24   Q.   Anyone else?
25        MR. MOORE:  Objection to form.

Page 114

1    MS. AMIGO:  Was there an answer?
2    THE REPORTER:  No.
3    Q.   Was there anyone else you were telling to stop?
4    MR. MOORE:  It was asked and answered before.
5    MS. AMIGO:  She didn't answer.
6    MR. MARI:  The court reporter didn't hear an
7    answer.
8    MS. AMIGO:  He asked, "Was there anyone else?"
9    and you didn't answer.
10   MR. MOORE:  Objection.  He's already asked
11   that, though, is what I'm referencing.
12   A.   No.
13   MS. AMIGO:  Was that a no?
14   A.   No.  No.
15   Q.   All right.  Let's go to a different video.  For
16   the record, this is the "Contri Video Part 1
17   IMG_3871.MOV."  I'm going to start playing from no time
18   elapsed.
19               (Video being played.)
20   Q.   Did you just watch anything we just played?
21   A.   I don't want to watch them.  I lived it.
22   Q.   I understand you lived it, but, you know, I've
23   asked you questions about this and, as we play the
24   video, we are starting to get more information from you.
25   A.   What's the point?  Ask the question.

Page 115

1    MR. MOORE:  Wait for the question.
2    Q.   The point is you were not answering truthfully
3    the first time I asked before I started playing the
4    video.  That's the point.
5    MR. MOORE:  She was answering truthfully.
6    A.   Actually, I was answering truthfully because I
7    don't remember a lot of it, and I don't want to.
8    Q.   Okay.  Just to be clear, you do not want to
9    remember this incident?
10   A.   Obviously I have to.
11   Q.   Are you making an effort to not remember this
12   incident?
13   MR. MOORE:  Objection.
14   A.   No.  Obviously now I'm trying to remember
15   because I have to.
16   Q.   Up until now, have you been making an effort to
17   not remember this incident?
18   MR. MOORE:  Objection to form.
19   A.   No, not really.
20   MR. MARI:  Okay.  Well, look, if she's just not
21   going to watch the video, then, remember, I'm going
22   to note it for the record that --
23   MR. MOORE:  That's fine.
24   MR. MARI:  -- I will play the video, but I'm
25   not going to sit here and waste my time.  So the

Page 116

1    option is on the table to watch it if that's going
2    to help refresh her recollection.
3    MR. MOORE:  I don't think it's going to help.
4    MR. MARI:  And if you want to -- if you,
5    Mr. Moore, want to ask questions as well, I will
6    volunteer to go back and play the videos to assist
7    in your questioning.  But I don't want, you know,
8    the excuse, if this goes to trial, to be, "Oh, she
9    didn't have a chance, you know, now she remembers
10   because she's watched the video."
11   There's a chance now to watch the video.  If
12   she's just going to refuse to do it, then I'm not
13   going to waste my time playing it.
14   MR. MOORE:  But your questions, they have no
15   probative value.  You're not going to get more out
16   of this testimony than you would from watching the
17   videos, the bodycams, the cell phone video, the
18   hundreds of cameras in Publix.  You're going to get
19   the same information.
20   MS. AMIGO:  But my issue is she's listed as a
21   witness in this case.  She's testifying she doesn't
22   remember.  She's not answering the questions.
23   THE WITNESS:  Because I don't remember.
24   MS. AMIGO:  I think the questions -- hold on.
25   The questions that Mr. Mari posed was, "Would

Page 117

1    watching the videos refresh your memory?"  And I
2    believe the answer was, "Yes."  That's why we're
3    watching the videos.  You can't argue that the
4    video is the best evidence and then she not watch
5    the videos even though she testified that these
6    videos would refresh her recollection.
7    MR. MOORE:  That's exactly what we're doing.
8    The best evidence rule applies.
9    MS. AMIGO:  But if she testified that watching
10   the videos would assist in her recollection of
11   testimony, then she needs to watch the videos.
12   MR. MOORE:  She doesn't have to watch the
13   videos if she doesn't want to.  The best evidence
14   still applies regardless.
15   Q.   So the question for the witness is:  If I play
16   any more video during this deposition, will you watch
17   it?
18   A.   No.
19   Q.   Then I think we've got a record on that and,
20   yeah, I think it's clear.
21   MS. AMIGO:  Can we take a break for a second?
22   MR. MARI:  Yeah.
23   (Recess held from 1:26 p.m. to 1:31 p.m.)
24   BY MR. MARI:
25   Q.   I want to be sure I have your answer clear.

Page 118

1   There are other videos besides the one I played earlier,
2   the portion of the one I played earlier, I mean, and the
3   portions that I started to play on the second one.  Will
4   you watch any other video that we haven't already
5   watched of this incident?
6       A.   No.
7            MR. MOORE:  For the record, you can play the
8       video.
9            MR. MARI:  I'm not going to waste time.  I
10      don't want to play the video at all.  I hoped to be
11      done with the deposition by now.  I didn't want to
12      play it at all.  I tried to give an off-ramp to
13      possibly playing the video.
14           MR. MOORE:  You can continue to play it.
15           MR. MARI:  But it's a waste of time if she's
16      not going to watch it and not answer questions,
17      so...
18      Q.   Can you remember anything else about the
19  incident at Publix that you haven't already related to
20  me during the deposition today?
21           MR. MOORE:  So what was the question?
22           MR. MARI:  If she can remember anything else
23      about the incident at Publix -- and I'll add the
24      date, May 21st, 2018 -- that she hasn't already
25      told me during the deposition today.

Page 119

1            MR. MOORE:  Okay.
2       A.   No, not really.
3       Q.   Not really isn't an unequivocal no?
4       A.   No.  No.
5       Q.   So just to be clear, there is nothing else you
6   can remember about the incident at Publix, May 21st,
7   2018, other than what you've already told me today?
8       A.   No.
9            MR. MOORE:  Are you saying yes to --
10      Q.   Are you saying there's nothing else that you
11  can tell us?
12           MR. MOORE:  Is there anything else that you
13      want to say that you can tell him that you haven't
14      already said?
15      A.   I mean, we've pretty much gone over everything.
16      Q.   I'm going to try it again because it's still
17  not clear to me.  I think I know what you're saying, and
18  I'm not trying to bother you.  But this record, I know
19  if someone is reading this, someone who is not here
20  today, it's not going to be clear to them, so I'm going
21  to try one more time.
22           Is there anything else about the incident at
23  Publix on May 21st, 2018, that you can remember that you
24  haven't already told me during the deposition today?
25      A.   No.

Page 120

1       Q.   Okay.  Just before I'm done, I want to mark as
2   exhibits a few more things.  So we have 1 and 2.
3            Three is going to be another digital video,
4   "Contri Video Part 2 IMG_3872.MOV."
5            Four is going to be "Krukoski Bodycam Video
6   Part 1.mp4."
7            And then 5 is going to be "Krukoski Bodycam
8   Video Part 2.mp4."
9            I'm also going to mark whatever our next
10  numbered exhibit is:  Publix Surveillance Multiplex
11  View.mp4; Publix Surveillance View 1.mp4; Publix
12  Surveillance View 2.mp4; Publix Surveillance View 3.mp4;
13  Publix Surveillance View 4.mp4; Publix Surveillance View
14  5.mp4.
15           MR. MARI:  Okay.  And those are all the
16      questions I think I have today.
17                   CROSS-EXAMINATION
18  BY MS. AMIGO:
19      Q.   I have some questions.  My name is Andrea
20  Amigo.  I represent Officer Krukoski and Officer Mathis
21  in this case.  Do you need to take a break before we get
22  into my line of questioning?
23      A.   No.
24      Q.   Okay.  So the same rules apply.  Obviously
25  you're still under oath.  If you don't understand my

Page 121

1   questions, please let me know and I will do my best to
2   rephrase those.
3            Let me get on the record, I know Mr. Mari
4   wanted to show you the videos of the body webcam
5   surveillance video, the cell phone video.  I just want
6   to confirm, you are not going to -- or you do not wish
7   to watch those videos even during my line of
8   questioning.  Is that correct?
9       A.   Correct.
10           MR. MOORE:  Just for the record, there's no
11      indication that they are being played.
12      Q.   But my question is, you are refusing to watch
13  those videos.  Is that correct?
14      A.   Yes.
15      Q.   Okay.  So like I was saying before, same rules
16  apply.  If you don't understand what I'm asking you,
17  please let me know and I will do my best to rephrase the
18  question.  If you do need to take a break at any point,
19  let us know and we'll take a quick break and resume the
20  deposition.  I just ask that you let me finish my
21  questions before you start answering.
22           You might anticipate what I'm going to ask you,
23  which is fine, but I might go in a different direction
24  than you're thinking, so just do me a favor and let me
25  finish and I'll give you the same respect and let you

Page 122

1  finish your answer before I start asking you the next
2  question.  Okay?  Do you understand?
3      A.  Yes.
4      Q.  Okay.  And that's the other thing.  Everyone
5  does it.  Try to give verbal responses to the questions
6  because the court reporter cannot take down nods of the
7  head or shaking of the head.  And, also, if you could
8  try to keep your hands away from your mouth, it makes it
9  a lot easier for the court reporter to understand what
10 you're saying, for me to understand your answer, and
11 that way I don't have to keep asking you to rephrase it.
12 You know, it just slows things down.  Okay?
13     A.  Uh-huh.
14     Q.  Yes?
15     A.  Yes, ma'am.
16     Q.  And if you could just speak up a little.  I
17 know we're all being very good wearing our masks and
18 trying to abide by the COVID restrictions, but it makes
19 it kind of hard to understand people, obviously, with
20 the mask on, so if you could please speak up I would
21 appreciate it.
22         Do you have a middle name?
23     A.  Nickole.
24     Q.  Nickole.  And how do you spell Nickole?
25     A.  N-i-c-k-o-l-e.

Page 123

1      Q.  All right.  Have you gone by any other name?
2      A.  No.
3      Q.  You mentioned earlier when Mr. Mari was
4  questioning you that you had a brother who stayed with
5  you at some point in time at the Starlight address and
6  then moved to Ohio.  Who was that?
7      A.  Tommi.
8      Q.  Tommi?  And where in Ohio is Tommi now?
9      A.  I don't know.  Somewhere in Grove City.
10     Q.  And how long did Tommi stay with you at the
11 Starlight address in Melbourne?
12     A.  Maybe, like, five or six months.
13     Q.  Because I thought you testified that you were
14 at that address for five to six months.  So were you
15 guys at the address together for the same period of
16 time?
17     A.  Yeah.
18     Q.  Okay.  And you were with Dianne Levesque -- is
19 it Levesque?
20     A.  Levesque.
21     Q.  Levesque.  Sorry.  -- Dianne Levesque at that
22 address as well?
23     A.  Yes.
24     Q.  So all three of you only stayed at that address
25 for five to six months?

Page 124

1      A.  Yeah.
2      Q.  Okay.
3      A.  Well, I still live there.
4      Q.  You still live there?
5      A.  Yeah.
6      Q.  Okay.  So that just confused me.  So you've
7  been there for the last five to six months?
8      A.  Yeah.  Well, no, it's been longer than that
9  now.
10     Q.  Okay.  So I wrote down five to six months at
11 this address, so --
12         MR. MOORE:  So if you want to clarify why you
13     live there.  There was a fire to the previous
14     property.
15         THE WITNESS:  Yeah.
16     Q.  Okay.  So let's --
17         MR. MOORE:  Let's take it from there.
18     Q.  If we can backtrack --
19         MR. MOORE:  Sorry.
20     Q.  That's okay.  Because I had in my notes you
21 were at that address for five to six months at the 2275
22 Starlight Court, Melbourne, Florida.
23         MR. MOORE:  That's after the fire.
24         THE WITNESS:  Yeah.
25         MR. MOORE:  Okay.  Before that you --

Page 125

1      A.  We were in a different apartment in the same
2  complex but it caught fire.
3      Q.  So prior address was at 2275 Starlight but a
4  different apartment number?
5      A.  No, it was Orbit Court.
6      Q.  Orbit Court.  And that was in Melbourne?
7      A.  Yeah.
8      Q.  Okay.  And how long were you at Orbit Court?
9      A.  Like, two weeks.
10     Q.  And then it caught fire?
11     A.  Yeah.
12     Q.  And what year was this?
13     A.  2020.
14     Q.  So for the last five to six months you're at
15 the 2275 Starlight address, but prior to that you were
16 at Orbit Court for only two weeks?
17     A.  Yeah.
18     Q.  And who did you live with at Orbit Court?
19     A.  My brother.
20     Q.  So Tommi?
21     A.  Yeah.
22     Q.  Anyone else?
23     A.  My mom, stepmom.
24     Q.  Right.  Other than you, Tommi, and your
25 stepmom, anybody else live there?

Page 126

1    A.   No.
2    Q.   So your kids didn't live with you there?
3    A.   No.
4    Q.   And I think you testified earlier -- I think
5  it's the Boggy Creek Road address -- that you moved
6  there after your son was born, which is your first son.
7  Right?
8    A.   Yeah.
9    Q.   A____?
10   A.   Yeah.
11   Q.   Or M____?
12   A.   He goes by M____.
13   Q.   M____.  I'm sorry.  And you said your dad
14 lived with you at that address.  Is that right?
15   A.   Yes.
16   Q.   Okay.  Did he live with you the whole time or
17 was it on and off?
18   A.   The whole time.
19   Q.   And how long did you, your dad, and your first
20 son live at that address?
21   A.   I don't know.  Three, four months.
22   Q.   What year was this?  So 2017?
23   A.   Yeah.
24   Q.   Okay.  And then you testified that you lived in
25 an apartment by the Florida Mall on John Young Parkway

Page 127

1  for a few months, and I think that was the one on
2  South Orange Blossom Trail.  Is that right?
3    A.   Yes.
4    Q.   How long were you at that address?
5    A.   I don't remember.  Not long.
6    Q.   Do you remember what year that was?
7    A.   Maybe 2016 or 2017.  I was pregnant at the
8  time.
9    Q.   With your first?
10   A.   Yes.
11   Q.   And did your dad live there with you the entire
12 time that you were there or was it on and off?
13   A.   He lived there but he was working, so he
14 traveled a lot.
15   Q.   How often did your dad travel for work?
16   A.   He would be gone, like, a week at a time.
17   Q.   How many weeks during the year would he be gone
18 for work?
19   A.   Through a year?
20   Q.   Yeah.
21   A.   I don't know.
22   Q.   Okay.  How many weeks a month would he be gone?
23   A.   Like, two.
24   Q.   For the five years prior to this incident, how
25 many weeks did he travel for work?

Page 128

1    A.   He didn't have that job very long.  He only
2  worked there for, like, a year or so.
3    Q.   With what company was that?
4    A.   ESCO Services.
5    Q.   So was that the only job that he worked that
6  required him to travel?
7    A.   Yes.
8    Q.   Okay.  And in the five years prior to this
9  incident, which I have the date of incident as May 21,
10 2018, so basically from May of 2013 to the date of the
11 incident, do you know whether your father was
12 incarcerated at all during that time frame?
13   A.   No, I don't know.
14   Q.   And he would have worked for ESCO Services
15 during that time frame, the five-year time frame before
16 the date of incident?
17   A.   Oh, yeah.
18   Q.   Yes?
19   A.   Yes.
20   Q.   Okay.
21        MR. MOORE:  Just to be clear, you're asking for
22   the entire five years?
23        Q.   Right.  For the entire five years -- well,
24 during that time frame, your father worked for about a
25 year for ESCO Services?

Page 129

1    A.   Yes.
2    Q.   And do you know the years that he worked for
3  ESCO Services?
4    A.   It was probably sometime in 2016 through 2017.
5    Q.   And do you remember -- I don't know if you were
6  asked already, and I apologize, but what did he do for
7  ESCO?  Was it the construction?
8    A.   Yes.
9    Q.   Do you remember what his job title was?
10   A.   It was metal stud framer.
11   Q.   Metal steel framer?
12   A.   Metal stud framer.
13   Q.   Oh, metal stud.  Sorry.  Do you have any idea
14 how much he earned?
15   A.   No.
16   Q.   During the five years prior to this incident,
17 other than ESCO Services, did your father work for any
18 other company?
19   A.   He worked for PeopleReady a lot.
20   Q.   I'm sorry?
21   A.   PeopleReady.
22   Q.   PeopleReady.  Okay.  But you don't know who he
23 worked for through PeopleReady.  Right?
24   A.   Not off the top of my head, no.
25   Q.   And I think you testified earlier you don't

Page 130

1  exactly know what he earned through PeopleReady?
2      A.   No.
3      Q.   Was that correct?
4      A.   Yes.
5      Q.   How long did you and your dad share a bank
6  account?
7      A.   Maybe, like, six or seven months before he
8  died.
9      Q.   And that was the one at TD Bank.  Correct?
10     A.   Yes.
11     Q.   Do you still have an account at that bank?
12     A.   No.
13     Q.   Why did you open a shared banking account with
14 your dad?
15     A.   He wanted to.
16     Q.   And did he say why?
17     A.   I don't remember.
18     Q.   Did you ever share a bank account with your dad
19 at any point in your -- at any other point in your life?
20     A.   No, that was my first bank account.
21     Q.   Was that your father's first bank account?
22     A.   I don't know.
23     Q.   And I think if I understood your testimony
24 correct, you don't know how much was in that account on
25 the day of the incident.  Is that correct?

Page 131

1      A.   No.
2      Q.   Who handled the bank account?  Like, who kept
3  track of the funds or kept, you know, a ledger?
4      A.   He did.
5      Q.   He did?
6      A.   Yes.
7      Q.   Okay.  Did you ever withdraw any money from
8  that account?
9      A.   I mean, yeah.
10     Q.   Yes?
11          MR. MOORE:  I'm sorry.  Did you --
12     Q.   Did you withdraw any money from that account?
13     A.   Yeah.
14     Q.   And when did you withdraw money from that
15 account?
16     A.   I mean, a little bit here and there.
17     Q.   But was that before this incident or after?
18     A.   Both.
19     Q.   And do you recall how much you withdrew after
20 this incident?
21     A.   No.
22     Q.   Do you recall how much you withdrew before this
23 incident?
24     A.   I mean, I've made many withdrawals.  It's on
25 the account too.  I don't know.

Page 132

1      Q.   And your current address is the Starlight
2  address we talked about?
3      A.   Yes.
4      Q.   Have you ever given a deposition before?
5      A.   No.
6      Q.   And I can't recall if you were asked, but have
7  you ever been a party to a lawsuit?
8      A.   No.
9      Q.   Have you ever been a witness in a case, whether
10 it be criminal or civil?
11     A.   No.
12     Q.   So you've never given testimony like this, like
13 we're here today --
14     A.   No.
15     Q.   -- or in a courtroom?  I mean other than the
16 criminal cases that we talked about.
17     A.   No.
18     Q.   What's your -- so your first son's date of
19 birth was ████-17, and then your second son ████-18.
20 Did I get that right?
21     A.   Yes.
22     Q.   And I know you described Dianne Levesque as a
23 stepmom.  Did she ever adopt you or did she marry your
24 father at any point?
25     A.   No.

Page 133

1      Q.   You just refer to her as your stepmom?
2      A.   Yes.
3      Q.   So growing up you lived with both your father
4  and your mother, Bobbi Whitmer?
5      A.   Yes.
6      Q.   And I think you testified that at some point
7  you were removed from their care because of instability
8  issues with moving around a lot.  Is that right?
9      A.   Yeah.
10     Q.   Okay.  When you mean moving around a lot, were
11 you moving out of Ohio?
12     A.   Back and forth from Ohio to California.
13          MR. MOORE:  Just so we -- you said you moved
14     around after your mom passed.  Right?
15          THE WITNESS:  No, no, before she passed.
16          MR. MOORE:  Okay.  I just want to make sure.
17     Q.   Yeah, my notes, I had it as you were taken from
18 custody and you stopped living with your dad at -- I
19 guess everyone stopped living with your dad at the same
20 time because the State of Ohio came in and decided, I
21 guess, there was some instability issues.  Did I get
22 that right?
23     A.   Yes.
24     Q.   And you were moving from Ohio to California?
25     A.   Yeah, back and forth.  They went back and

Page 134

1   forth.
2       Q.   And did you have family in California?
3       A.   Yeah.
4       Q.   What part of California?
5       A.   Oh, I don't know.
6       Q.   How old were you at the time?
7       A.   I was a baby.
8       Q.   Do you stay in touch with any family in
9   California now?
10      A.   Yeah.
11      Q.   And what family do you have in California?
12      A.   My cousin, my aunt.
13      Q.   And what's your cousin's name?
14      A.   Anthony.
15      Q.   And the last name?
16      A.   Boggs.
17      Q.   How do you spell it?
18      A.   B-o-g-g-s.
19      Q.   And then your aunt?
20      A.   Lynn Ross.
21      Q.   Is that L-y-n-n?
22      A.   Yes.
23      Q.   And then R-o --
24      A.   -- s-s.
25      Q.   Okay.  And where in California do they live?

Page 135

1       A.   Not sure.
2       Q.   Do you know what city?
3            MR. MOORE:  Objection to form.
4       A.   No.
5       Q.   I'm sorry?
6            MR. MOORE:  Objection to form.
7       Q.   So you don't know the city?
8       A.   No.
9       Q.   Okay.  Any other family in California?
10      A.   No.
11      Q.   And how often are you in contact with his
12   family?
13      A.   I mean, I talk to them every now and then.
14      Q.   And how are they related to you?
15      A.   My mom's side of the family.
16      Q.   Okay.  Have you spoken to them about this case?
17      A.   Not so much about the case, but they know about
18   my dad's death.
19      Q.   What did you tell them about your father's
20   death?
21      A.   They just know that he was killed at Publix.
22      Q.   And you told them that?
23      A.   Yeah.
24      Q.   What else did you tell them?
25      A.   That's it.  We're not that close.

Page 136

1       Q.   Have you gone to California to see them?
2       A.   No.
3       Q.   Ever?
4            MR. MOORE:  Objection to form.
5       A.   When I was little.
6       Q.   But not of recently?  Not in the last five
7   years?
8       A.   No.
9       Q.   Did they come out to Florida after knowing
10   about your father's passing?
11      A.   No.
12      Q.   And did you reach out to them to tell them
13   about the incident at Publix or did they reach out to
14   you?
15      A.   Actually, one of my siblings did.
16      Q.   Okay.  So you didn't talk about it?
17      A.   They -- my cousin called one of my siblings.
18      Q.   Okay.  But did you personally speak with your
19   aunt or cousin in California about the incident at
20   Publix?
21      A.   Yeah, when they called me.
22      Q.   Okay.  And when did you have this conversation
23   with them?
24      A.   A couple years ago.
25      Q.   And other than telling them that he passed

Page 137

1   away, did you discuss any of the specifics of what
2   happened?
3            MR. MOORE:  Objection to form.
4       A.   No.
5       Q.   No?
6       A.   No.
7       Q.   Did you tell them what you saw?
8            MR. MOORE:  Objection to form.
9       A.   No.
10      Q.   So you didn't discuss any details about the
11   interaction between the police and your father?
12           MR. MOORE:  Objection to form.
13      A.   No.
14      Q.   I guess who, since you were a baby, if -- okay.
15   Strike that.
16           Correct me if I'm wrong, but were you a baby --
17   when the State of Ohio took custody of you and you no
18   longer lived with your parents, were you a baby?
19      A.   Yeah, I was one.
20      Q.   Okay.  One year old.  So who told you, I guess,
21   the reason why you were taken out of custody from your
22   parents?
23      A.   My grandmother.
24      Q.   Okay.  And I meant to ask, what was your
25   grandmother's name who you went to live with?

Page 138

1    A.   Karen Habecker.
2    Q.   How do you spell Habecker?
3    A.   H-a-b-e-c-k-e-r.
4    Q.   And did she live in Ohio with you?
5    A.   Yes.
6    Q.   Is she still alive?
7    A.   No.
8    Q.   And besides your grandmother, were you living
9  with anyone else when she took custody of you and your
10 siblings, obviously?
11   A.   My grandpa.
12   Q.   Your grandpa.  Okay.  What was your
13 grandfather's name?
14   A.   Douglas Habecker.
15   Q.   Same last name?
16   A.   Yeah.
17   Q.   Okay.  And is he alive?
18   A.   No.
19   Q.   And they are grandparents on your mom's side or
20 dad's side?
21   A.   My grandma is my dad's mom, and my grandpa,
22 he's not blood related.
23   Q.   Okay.  So your grandmother married him later
24 on?
25   A.   Yeah.

Page 139

1    Q.   Okay.  So for how long did you live with your
2  grandparents at that point?  You were one years old, so
3  till when?
4    A.   I left when I was 15.
5    Q.   And where did you go?
6    A.   To live with my dad.
7    Q.   And where was that?
8    A.   Columbus, Ohio.
9    Q.   Do you recall the address?
10   A.   483 East Markison Avenue.
11   Q.   And how long did you live with him at that
12 address?
13   A.   We lived at that address for a couple of months
14 but then we started staying at hotels.
15   Q.   And did you live with anyone else other than
16 your father at that address?
17   A.   Dianne.
18   Q.   So was that address a piece of property owned
19 by Dianne or is that like a rental?
20   A.   It was a rent to own.
21   Q.   So three of you only stayed there for two
22 months and then all three of you went to stay in hotels?
23   A.   Yes.
24   Q.   And why was that?
25        MR. MOORE:  Objection to form.

Page 140

1    A.   Because there was a bug problem in the house.
2    Q.   And the hotels you stayed at were also in
3  Columbus?
4    A.   Yes.
5    Q.   For how long were you staying at hotels with
6  Dianne and your father?
7    A.   A couple of years.
8    Q.   And that whole time you stayed in Columbus?
9    A.   Yeah.
10   Q.   In that whole two-year stretch, Dianne also
11 stayed with your father and you at these different
12 hotels?
13   A.   Yes.
14   Q.   And how many hotels did you end up staying at?
15 Do you remember?
16   A.   Over a couple years?  No.
17   Q.   Was it more than five?
18        MR. MOORE:  Objection to form.
19   A.   Yes.
20   Q.   More than 10?
21        MR. MOORE:  Objection to form.
22   A.   Yeah.
23   Q.   More than 20?
24        MR. MOORE:  Objection to form.
25   A.   No.

Page 141

1    Q.   So somewhere between 10 and 20?
2    A.   Yeah.
3    Q.   And were these motels?
4        MR. MOORE:  Objection to form.
5    Q.   Like, that you can rent by the day or were they
6  actually a hotel?
7    A.   We stayed at weekly rate hotels.
8    Q.   So then that would have been from when you were
9  15 years old until you're 17.  Is that right?
10   A.   Yes.
11   Q.   And then after that, where did you --
12   A.   We moved here.
13   Q.   Did you continue living with your dad or did
14 you move out?
15   A.   We moved here.
16   Q.   So to Florida?
17   A.   Yes.
18   Q.   And where did you and your dad first move to
19 Florida?
20   A.   Merritt Island.
21   Q.   Merritt Island?
22   A.   Yes.
23   Q.   And did you move to Merritt Island also with
24 Dianne?
25   A.   Yes.

Page 142

1    Q.  Do you recall the address in Merritt Island?
2    A.  500 Oxford Avenue.
3    Q.  And was this a rental?
4    A.  It was a house, yeah.
5    Q.  Do you have any idea who paid the rent for the
6  house?
7        MR. MOORE:  Objection to form.
8    A.  No.
9    Q.  How long were you at the Oxford Avenue address?
10   A.  Maybe, like.  Two or three months.
11   Q.  Did you all move together somewhere else?
12   A.  Yeah, we started staying in hotels.
13   Q.  Why is that?
14       MR. MOORE:  Objection to form.
15   A.  The house -- the people in the house got into a
16  fight.
17   Q.  Oh, so other than you, Dianne and your father,
18  other people lived in the Oxford house?
19   A.  Yeah, the person that was letting us rent the
20  house.
21   Q.  So the owner?
22   A.  Yeah.
23   Q.  Okay.  So did the three of you rent a room in
24  the house?
25   A.  We lived there like it was our own house, but

Page 143

1  the owner would come in and out too.
2    Q.  Okay.  So then there was a fight with the owner
3  and then you started staying at hotels again?
4    A.  Yes.
5    Q.  And do you recall who the owner was?
6        MR. MOORE:  Objection to form.
7    A.  No.
8    Q.  And when you say then stayed at hotels, was
9  that in Merritt Island as well?
10   A.  Yeah.
11   Q.  And you testified that there was some kind of
12  issue with the owner.  That's what led you guys to
13  leave.  Is that correct?
14       MR. MOORE:  Objection to form.
15   A.  Yes.
16   Q.  Okay.  Do you recall what happened?
17       MR. MOORE:  Objection to form.
18   A.  No.
19   Q.  Were you involved in that, I guess,
20  disagreement with the owner?
21   A.  No.
22   Q.  Who was involved with the disagreement?
23       MR. MOORE:  Objection to form.
24   A.  It was my dad and the owner of the house.
25   Q.  Was it a disagreement about payment?

Page 144

1        MR. MOORE:  Objection to form.
2    A.  I don't know.
3        MR. MOORE:  Do you mind if we take a 10-minute
4    break?
5        MS. AMIGO:  Sure.
6        (Recess held from 2:04 p.m. to 2:10 p.m.)
7  BY MS. AMIGO:
8    Q.  So in the last five years prior to May 21,
9  2018, was there any point in time where you did not live
10  with your father?
11   A.  No.
12   Q.  So the entire five years prior to this
13  incident, you and your father lived at the same place
14  the entire time?
15       MR. MOORE:  The same place?
16   Q.  Yes, same address in the five years prior to --
17       MR. MOORE:  I thought you were talking about
18    the same physical address.
19   Q.  No, I'm sorry.  Let me rephrase that.  So in
20  the five years prior to May 21, 2018, you and your
21  father resided at the same physical address?
22   A.  Other than when he traveled, yeah.
23   Q.  And that physical address could have been
24  either, you know, an apartment or, what, was it a hotel
25  or do you recall in the five years prior to this

Page 145

1  incident what physical address you and your father
2  shared?
3        MR. MOORE:  Objection to form.  Are you saying
4    one physical address still?
5    Q.  Well, that's what I'm trying to find out.  What
6  addresses or what location did you and your father both
7  reside at together the five years prior to this
8  incident?
9        MR. MOORE:  I thought that was on the record
10    already.
11   A.  The one in Merritt Island, the one in Orlando,
12  the one in St. Cloud, then Palm Bay.
13   Q.  Okay.  And I know we were just talking about
14  Merritt Island where you stayed for a couple of months.
15  Right?
16   A.  Yep.
17   Q.  And then I think you testified that you ended
18  up moving to hotels after that.  Correct?
19       MR. MOORE:  Objection to form.
20   A.  Yes.
21   Q.  Okay.  And those hotels were in Merritt Island?
22       MR. MOORE:  Objection to form.
23   A.  Yes.
24   Q.  Okay.  All right.  So as we sit here today, do
25  you recall any of the specific hotels you stayed at with

Page 146

1  your father?
2          MR. MOORE:  Object to the form.
3      A.  No.
4      Q.  Did you ever live in Hillsborough County?
5          MR. MOORE:  Objection to form.
6      Q.  In Tampa?
7          MR. MOORE:  Asked and answered.  She's given
8      you all her addresses.
9      A.  No.
10     Q.  No?  Okay.  Do you know if your father ever
11 lived in Hillsborough County?
12         MR. MOORE:  Objection to form.
13     A.  I don't know.
14     Q.  Or in Tampa?
15         MR. MOORE:  Objection to form.
16     A.  No, I don't know.
17     Q.  Because what I was trying to -- I was looking
18 at my notes from your prior testimony, and it looks like
19 the addresses you provided were maybe for the last two
20 to three years, so I'm trying to figure out going back
21 from your current address today, which was the Starlight
22 address.  Right?  And I want to go backwards from there,
23 so I'll go through my notes and then, you know, you can
24 correct me if I'm wrong and then maybe fill in the
25 blanks if you don't mind.

Page 147

1      A.  Okay.
2      Q.  Okay.  So 2275 Starlight, you've been at that
3  address for how long?
4      A.  Five or six months.
5      Q.  Okay.  And then prior to that I have the
6  Orbit Court.  Correct?
7      A.  Yes.
8      Q.  So that's still in 2020.  Right?
9      A.  Yes.
10     Q.  Okay.  And then prior to Orbit Court, was that
11 the Lighthouse Pointe address?
12     A.  Yes.
13         MR. MOORE:  Wait.  I thought you testified it
14     was Wildbriar.
15         THE WITNESS:  It is Wildbriar.
16         MR. MOORE:  Well, at some point I thought she
17     said something else.
18         MS. AMIGO:  I have, "Lighthouse Pointe, U.S. 1,
19     Palm Bay, don't recall the address."  But if --
20         THE WITNESS:  Wildbriar, he said it.  That was
21     it.  I forgot.
22         MR. MOORE:  Well, I didn't know if you said
23     that --
24         THE WITNESS:  I just remembered the name of the
25     place.

Page 148

1      Q.  So the road is Wildbriar?
2      A.  Yes.
3      Q.  Okay.  And so then prior to Wildbriar -- and I
4  think you testified that you were there for two years?
5      A.  Yeah.
6      Q.  So prior to Wildbriar -- is the one prior to
7  that Boggy Creek Road?
8      A.  Yes.
9      Q.  Okay.  And you were there for three to four
10 months after your son was born in ███████ 2017.
11 Correct?
12     A.  Yes.
13     Q.  Okay.  So then prior to that was the
14 Orange Blossom Trail address?
15     A.  Yes.
16     Q.  And that was in 2016 or 2017 for a few months?
17     A.  Yes.
18     Q.  So then prior to Orange Blossom Trail, do you
19 recall where you lived?
20     A.  In a bunch of hotels at that point.
21     Q.  In the same area, in Orlando?
22     A.  No, Melbourne/Palm Bay area.
23     Q.  And that would have been sometime before 2016?
24     A.  Yes.
25     Q.  And for how long before 2016?

Page 149

1      A.  Until I got a place in Orlando.
2      Q.  So how long were you living in hotels before
3  you got a place in Orlando?  Was it years?  Months?
4      A.  Months, I want to say.  I came here in 2015.
5  When I left Merritt Island we stayed in hotels until I
6  moved to Orlando.
7      Q.  Okay.  Let's see if I understand that
8  correctly.  All right.  So prior to moving to OBT,
9  Orange Blossom Trail, I had you at St. Cloud.  Right?
10     A.  Orlando on OBT, that was before St. Cloud.
11     Q.  Okay.  So then prior to moving to the Orlando
12 area, where were you?
13     A.  Hotels.
14     Q.  Those hotels were Melbourne/Palm Bay.  Right?
15     A.  Yes.
16     Q.  Okay.
17         MR. MOORE:  Hold on now.  Were they in
18     Melbourne/Palm Bay?  I mean, do you remember where
19     the motels are?  You said Merritt Island.
20     A.  We stayed in so many.  We stayed at Merritt
21 Island, we stayed at Palm Bay, we stayed in Melbourne.
22         MR. MOORE:  Well, if you can't recall, you have
23     to make --
24     Q.  And I don't want you to guess, so if you don't
25 know you can say "I don't know."

Page 150

1     A.   I don't know.
2     Q.   Okay.  So then -- but do you have any idea
3   timeframe-wise how long you were living from hotel to
4   hotel before finding a place in Orlando?
5     A.   No.
6     Q.   Okay.  So then prior to that, prior to living
7   in these hotels, where did you live?
8     A.   Merritt Island.
9     Q.   And that was the address you gave me before we
10   took the break?
11     A.   Yes.
12     Q.   Okay.  And prior to that where did you live?
13   Because my understanding you were only there for a
14   couple months.  Right?
15         MR. MOORE:  Objection to form.
16     A.   Yeah.
17     Q.   So prior to the Merritt Island address, where
18   did you live?
19         MR. MOORE:  Objection to form.
20     A.   Ohio.
21     Q.   And that was in Columbus?
22     A.   Yes.
23     Q.   Okay.  Outside of Ohio and Florida, live in any
24   other states?
25     A.   No.

Page 151

1         MR. MOORE:  Objection to form.
2     Q.   And you testified earlier that you had a
3   stepsister, Chelsea James.  Correct?
4     A.   Yes.
5     Q.   Did she ever live with you?
6         MR. MOORE:  Is she your legal stepsister?
7         THE WITNESS:  Huh?
8         MR. MOORE:  Is she your legal stepsister?
9     A.   No, not legally she's not my stepsister.
10     Q.   Well, you described her as your stepsister.
11   Right?
12     A.   Right.
13     Q.   So I'm just going off your testimony.  So
14   regardless if she's your legal stepsister or not, did
15   Ms. James live with you at any point?
16     A.   No.
17     Q.   And I think you testified that she stole your
18   dad's phone after this incident?
19     A.   Yes.
20     Q.   How do you know she stole your dad's phone?
21         MR. MOORE:  Objection to form.
22     A.   She told me.
23     Q.   And did she say what she did with it?
24         MR. MOORE:  Form.
25     A.   She lost it.

Page 152

1     Q.   I'm sorry?
2     A.   She lost it.
3     Q.   When did she steal the phone?
4         MR. MOORE:  Object to form.
5     A.   Two years ago.
6     Q.   I mean, how far after this incident?
7     A.   It wasn't long after I got it.  I had it for a
8   couple weeks.
9     Q.   Okay.  I know you went through your siblings,
10   so I just had some questions about, you know, if you
11   have any information regarding some of their background
12   or history.  Do you have any knowledge of whether any of
13   your siblings have ever been arrested or convicted?
14     A.   No.
15     Q.   No, you don't know, or no, they haven't?
16     A.   No, they haven't.
17     Q.   Okay.  I think you testified that with
18   Dakota Whitmer, that you're in contact with Dakota via
19   text.  Is that correct?
20         MR. MOORE:  Objection to form.
21     A.   Yes.
22     Q.   Okay.  How often are you in touch with Dakota?
23         MR. MOORE:  Objection to form.
24     A.   A couple times a week.
25     Q.   Is that always through texts?

Page 153

1         MR. MOORE:  Objection to form.
2     A.   Yes.
3     Q.   Do you speak on the phone?
4     A.   Seldomly.
5     Q.   And have you ever spoken with Dakota about this
6   case?
7     A.   I mean, yeah.
8     Q.   What have you discussed with Dakota?
9     A.   Same thing I told all of them, which is what
10   happened the day he died.
11     Q.   And what did you tell them?
12         MR. MOORE:  Objection to form.
13     A.   That he was killed at Publix.  Didn't give them
14   much detail about it.
15     Q.   And is that a conversation that you had with
16   all of your siblings?
17     A.   Yeah, and they all know the same thing.
18     Q.   Okay.  And does that include ▓▓?
19     A.   No.
20     Q.   So other than ▓, you've spoken with
21   ▓▓, Nicholas, Donald, Tommi, Trey, and Brittony
22   about your father dying at Publix?
23     A.   Yes.
24     Q.   Okay.  It's your testimony that you never got
25   into any detail about what you saw or heard at the

Page 154

1   Publix with any of your siblings?
2       A.   Right.
3            MR. MOORE:  Objection to form.
4       Q.   Where does Nicholas live now?
5            MR. MOORE:  Objection to form.
6       A.   In Ohio.  I'm not sure specifically where.
7       Q.   And just going back to D██████, have you seen
8   Dakota in the last five, six years?
9       A.   Yes.
10      Q.   And when did you see D██████?
11           MR. MOORE:  Objection to form.
12      A.   A year ago.
13      Q.   And was that in Ohio or in Florida?
14      A.   In Ohio.
15      Q.   So you traveled to Ohio to visit D██████?
16           MR. MOORE:  Objection on form.
17      A.   Yes.
18      Q.   Did you visit with anyone else in Ohio?
19      A.   All my siblings.
20      Q.   And one year ago, so we're in July of 2020 now,
21  so this would have been July 2019 that you traveled to
22  Ohio?
23      A.   Maybe a year and a half ago, but, yeah.
24      Q.   Okay.  So maybe earlier than 2019?
25      A.   Yeah.

Page 155

1       Q.   Okay.  And did you travel with anyone else to
2   Ohio?
3       A.   My stepmom.
4       Q.   And that's Dianne.  Right?
5       A.   Yes.
6       Q.   Anybody else?
7       A.   My kids.
8       Q.   Anyone else?
9       A.   No.
10      Q.   And how long were you in Ohio?
11      A.   Like a week.
12      Q.   And what was the purpose of your trip?
13      A.   Just visiting family.
14      Q.   And did I hear you right?  Did you say you saw
15  all of your siblings?
16      A.   Yes.
17      Q.   Okay.
18           MR. MOORE:  All your siblings in Ohio, that
19           lived in Ohio?
20      A.   Yes.
21      Q.   Right, obviously.  Okay.  Unless you had a
22  family reunion in Ohio that I don't know about.  But my
23  understanding is it would have been anyone who lives in
24  Ohio is who you saw?
25      A.   Yes.

Page 156

1       Q.   Okay.  All right.  And so that would have
2   included -- I have D█████, Nicholas, Donald, Tommi,
3   Trey, and Brittony?
4            MR. MOORE:  Objection to form.
5       A.   Yes.
6       Q.   Okay.  And I think you testified earlier that
7   D█ was placed in a foster home in Florida sometime
8   after your mother passed away?
9            MR. MOORE:  Objection to form.
10      Q.   Or did I misunderstand that?
11      A.   No, that's correct.
12      Q.   Is that correct?  Okay.  And my understanding
13  from your testimony is your mother passed away in March
14  of 2010?
15      A.   Yes.
16      Q.   So how long after your mother's passing was
17  D█ placed in foster care?
18           MR. MOORE:  Objection to form.
19      A.   It was before 2011.
20           MR. MOORE:  Are the questions based off of
21           being unclear as to what she's already testified
22           to?
23      Q.   Yes, because I have here it was in 2011 that --
24  entered DCF, but then you also said it was when your mom
25  died, so I want to make sure.

Page 157

1       A.   No, not right when my mom died.  It wasn't
2   right when my mom died.  It was a little after she died.
3       Q.   Okay.  And she passed away in March of 2010, so
4   I was trying to get the time frames right.
5       A.   Yes.
6       Q.   So it would have been sometime after March
7   2010, before 2011?
8       A.   Yes.
9       Q.   Okay.  When was the last time you had contact
10  with Dakota?
11           MR. MOORE:  Objection to form.  Asked and
12           answered.
13           MS. AMIGO:  It wasn't asked, actually.
14           MR. MOORE:  It was.
15      A.   Like a week ago.
16      Q.   One week ago, you said?
17      A.   Yeah.
18      Q.   When was the last time you communicated with
19  Dakota regarding your father and this incident?
20           MR. MOORE:  Objection to form.
21      A.   We don't talk about it much.
22      Q.   When would have been the last time?
23      A.   I don't know.
24      Q.   And with Nicholas -- I think you testified you
25  hadn't had any recent contact.  Is that correct?

1   A.   Yes.
2   Q.   And what about with Donald?  When was the last
3 time you communicated with Donald?
4   A.   A couple days ago.
5   Q.   And with Donald or with D▓▓▓▓, did you discuss
6 this case or the fact that you're giving a deposition in
7 this case?
8        MR. MOORE:  Objection to form.
9   A.   No.
10   Q.   And when was the last time you communicated
11 with Donald regarding this case or your father?
12   A.   Probably a couple months.
13   Q.   A couple months?
14   A.   (Nods head.)
15   Q.   Yes?
16   A.   Yes.
17   Q.   And what did you discuss with Donald?
18        MR. MOORE:  Objection to form.
19   A.   He was just asking how the case was going.
20   Q.   And what did you tell him?
21   A.   Nothing new.
22   Q.   And that was it?
23   A.   Yeah.
24   Q.   You discuss anything else about the case?
25        MR. MOORE:  Objection to form.

1   A.   No.
2   Q.   And with Tommi, when would have been the last
3 contact with Tommi?
4   A.   Probably like a week.
5   Q.   A week ago?  Yes?
6   A.   Yes.
7   Q.   Okay.  And what did you discuss with Tommi?
8   A.   We just talked about his kid.
9   Q.   Did you ever speak with Tommi regarding this
10 case or your father?
11        MR. MOORE:  Objection to form.
12   A.   Not recently.
13   Q.   When would have been the last time?
14        MR. MOORE:  Objection to form.
15   A.   Probably when he moved here.
16   Q.   Well, I thought he moved back to Ohio in 2016.
17 Did he move back to Florida after that?
18   A.   Yeah, he was living with me on Starlight.
19   Q.   Oh, that's the same brother?
20   A.   Yeah.
21   Q.   Okay.  I had in my notes for some reason that
22 he moved back to Ohio in 2016.  Is that correct?
23   A.   Yeah, and then he came back.
24   Q.   And so that was in 2020?
25   A.   Yes.

1   Q.   Okay.  But now he's back in Ohio?
2   A.   Yes.
3   Q.   Okay.  So then the last time you would have
4 discussed this case would have been sometime five or six
5 months ago?
6   A.   Yes.
7   Q.   Okay.  And what did you discuss with Tommi?
8        MR. MOORE:  Objection to form.
9   A.   Not much to discuss.  We just -- he wanted an
10 update on the case, which there really isn't an update
11 at this point.
12   Q.   But do you recall what kind of update you gave
13 him?
14        MR. MOORE:  Objection to form.  If you can't
15     remember, then you can't remember.
16        MS. AMIGO:  You can object to the form, but I
17     appreciate you not doing speaking objections.
18   Q.   So with Trey have -- or have you had any recent
19 contact with Trey?
20   A.   I don't know.
21   Q.   I'm sorry?
22   A.   It's been a while.
23   Q.   Did you have any contact with Trey following
24 this incident?
25   A.   No.

1   Q.   And how long before?
2   A.   Huh?
3   Q.   When was the last time you had contact with
4 Trey before this incident?
5   A.   I don't know.
6   Q.   Was it more than a year before the incident?
7        MR. MOORE:  Objection to form.
8   A.   Five years?
9   A.   No, it was no more than a year.
10   Q.   I'm sorry?
11   A.   No more than a year.
12   Q.   Okay.  So sometime in 2017?
13        MR. MOORE:  Objection to form.
14   A.   I've talked to him since.
15   Q.   Okay.  So that's what I'm trying to figure out.
16 When's the last time you had contact with Trey?
17   A.   You said before this incident.
18   Q.   Well, okay.  I think I asked, "Have you had
19 contact with Trey?" and you said not anytime soon or not
20 any, you know, recent time.  So what I'm trying to
21 figure out is when is the last time you had contact with
22 Trey?
23   A.   Before Tommi came here, so, like, about a month
24 ago.
25   Q.   Okay.  And during that last contact with Trey,

Page 162

```
1   did you discuss this matter?
2      A.  No.
3      Q.  And when was the last time you discussed this
4   matter with Trey?
5      A.  I haven't.
6      MR. MOORE:  Objection to form.
7      Q.  You haven't ever?
8      A.  No.
9      Q.  And with Brittony, when was the last time you
10  had any contact with her?
11     A.  A few days ago.
12     Q.  And is this by text also?
13     A.  Yes.
14     Q.  And what did you discuss with Brittony?
15     A.  She's talking about her kids.
16     Q.  Do you ever discuss this matter with Brittony?
17     A.  Kind of.
18     Q.  And what have you discussed with her?
19     A.  She tries to talk about it, but I don't like to
20  talk about it, so...
21     Q.  And when would have been the last time you
22  actually discussed this matter?
23     MR. MOORE:  Objection.
24     A.  A year ago.
25     MR. MOORE:  Objection.  Form.  Sorry.
```

Page 163

```
1      Q.  I'm sorry?
2      A.  A year.
3      Q.  I think you testified earlier that your father
4   may have overdosed a couple of times.  Did you go to the
5   hospital at either time when he overdosed?
6      A.  Yeah.
7      Q.  Which time?
8      A.  In Ohio.
9      Q.  And how old were you?
10     A.  I don't know.
11     Q.  Well, you moved here when you were 15 --
12  right? -- to Florida?
13     A.  I was 17 when I came here.  I moved here 2015.
14     Q.  Oh, that's what it was, 2015.  Okay.  So it
15  would have been sometime before 2015?
16     A.  Yes.
17     Q.  Did you visit him the other time where you
18  testified he overdosed in Brevard County?
19     MR. MOORE:  Objection to form.
20     A.  No.
21     Q.  I think you testified it was 2018.  Correct?
22     A.  Yeah.
23     Q.  Were you in Florida at the time?
24     A.  Yes.
25     MR. MOORE:  Objection to form.
```

Page 164

```
1      Q.  Was he living with you at the time?
2      MR. MOORE:  Objection to form.
3      A.  No.
4      Q.  Where was he living?
5      A.  Well, he lived with me, but he was staying in a
6   hotel at the time.
7      Q.  Why?
8      A.  I don't know.
9      Q.  Do you recall when in 2018 this happened?
10     MR. MOORE:  Objection to form.
11     A.  No.
12     Q.  I know you might not know the exact date, but
13  was it early or late 2018?
14     MR. MOORE:  Objection to form.
15     A.  Early.
16     Q.  Do you know what hotel you were staying in at
17  the time?
18     MR. MOORE:  Objection to form.
19     A.  No.
20     Q.  How long had he been staying at a hotel at the
21  time?
22     MR. MOORE:  Objection, form.
23     A.  Maybe a couple weeks, I don't know.
24     MR. MARI:  It wasn't this case, but I do want
25  to note that I was in a hearing in a different
```

Page 165

```
1   federal case yesterday and the judge specifically
2   called out an attorney and admonished them for
3   making nonsensical objections during a deposition
4   that only served to lengthen it and obstruct the
5   deposition, so --
6      MR. MOORE:  Is that -- are you trying to put
7   something on the record?
8      MR. MARI:  It is on the record.  The question,
9   "Why was your father staying at a hotel at that
10  time?" what's wrong with the form?
11     MR. MOORE:  Best evidence.  I'm going to
12  maintain my objections.
13     MR. MARI:  You can maintain your objections.  I
14  just want to note that these objections are just to
15  lengthen this deposition unnecessarily and obstruct
16  it.
17     MR. MOORE:  Absolutely not, but you're entitled
18  to your opinion.
19     Q.  Okay.  So I think you testified that he was
20  staying at a hotel for about two weeks prior to the OD?
21     A.  No, I said he was staying at a hotel for about
22  that long.
23     Q.  But at the time of the OD was he at the hotel?
24     A.  Yes.
25     Q.  And then after the OD did he go back to stay at
```

Page 166

1  a hotel?
2      A.   No, he came home.
3      Q.   And when you say "home," where is that?
4      A.   Wildbriar.
5      Q.   I'm sorry?
6      A.   Wildbriar.
7      Q.   And at that time were you staying with Dianne
8  still?
9      A.   Yes.
10     Q.   Anyone else?
11     A.   My kids.
12     Q.   And why didn't you visit him in the hospital
13  then?
14          MR. MOORE:  Objection to form.
15     A.   Because I was at home with my kids.
16     Q.   And I think you testified earlier, when you
17  were asked regarding contact with your father, that you
18  were the only one that did not have contact with him for
19  a year after your mom passed away.  Is that correct?
20     A.   Yes.
21     Q.   And why is that?  Why did you stop having
22  contact with your father?
23     A.   Because I was mad at him.
24     Q.   Why were you mad at him?
25     A.   Does that matter?

Page 167

1          MR. MOORE:  Answer the question if you know.
2      A.   Because he called me a bitch for the first
3  time.
4      Q.   Why did he call you a bitch?
5      A.   Because he was drunk.
6      Q.   Was this an incident that happened while you
7  were both staying together?
8      A.   No.
9      Q.   Okay.  So when did this occur?
10     A.   It was just a visit.  It was in Columbus.
11     Q.   So you were in Columbus at the time?
12     A.   I lived in Galloway with my grandparents.  I
13  went to go visit him with my siblings.  He got drunk and
14  was saying goofy things.
15     Q.   Who were you with?
16     A.   My siblings.
17     Q.   Which ones?
18     A.   Tommi, Donald.
19     Q.   I'm sorry?
20     A.   Tommi and Donald.
21     Q.   Okay.  And so what led up to this altercation
22  or verbal altercation with your dad?
23          MR. MOORE:  Objection to form.
24     A.   I don't know.  He was just drunk.
25     Q.   Did you see him drinking?

Page 168

1      A.   Yes.
2      Q.   Was he on any drugs?
3          MR. MOORE:  Objection to form.
4      A.   No.
5      Q.   Do you know if he had taken any drugs at the
6  time?
7          MR. MOORE:  Objection.
8      A.   No.
9      Q.   You don't know?
10     A.   I don't know.
11     Q.   So other than calling you a bitch, was there
12  any other reason why you stopped talking to him?
13          MR. MOORE:  Objection to form.
14     A.   Just the way he was acting.
15     Q.   How else was he acting?
16     A.   Like he was drunk.
17     Q.   Was this the first time you ever saw your
18  father drunk?
19     A.   Yes.
20     Q.   And this was back in -- this was after your
21  mother passed away, so after March of 2010?
22     A.   Yes.
23     Q.   How soon after that?
24     A.   About a month.
25     Q.   So sometime in May of 2010?

Page 169

1          MR. MOORE:  Objection to form.
2      A.   Yes.
3      Q.   And so after -- so for one year after May of
4  2010 you didn't speak with your father?
5          MR. MOORE:  Objection to form.
6      A.   No.
7      Q.   No, that's not correct, or is that correct?
8      A.   Yes, that's correct.
9      Q.   Okay.  Did he try to reach out to you or
10  communicate with you?
11     A.   I don't know.
12     Q.   Well, did you ever have any missed calls or any
13  texts from him?
14          MR. MOORE:  Objection to form.
15     A.   I didn't have a phone.
16     Q.   Were you still -- for that one-year period
17  after this incident where he called you this name, were
18  you still living with your grandparents?
19     A.   Yes.
20     Q.   Okay.  And did they have a phone?
21     A.   They had a house phone.
22     Q.   Did he ever call you at the house phone?
23          MR. MOORE:  Objection to form.
24     A.   I don't know.
25     Q.   Did your grandparents ever tell you that he

Page 170

1  called you?
2      A.   No.
3      Q.   Did he ever send you any cards or letters?
4           MR. MOORE:  Objection to form.
5      A.   I don't know.  No.
6      Q.   And then after that year period, when was the
7  first time you had contact with your father again?
8      A.   I don't even remember.
9      Q.   Do you recall how it was that you communicated
10 with him again?
11     A.   He came to the house one day.
12     Q.   And that's your grandparents' house?
13     A.   Yes.
14     Q.   And then after he came to visit that time, did
15 you start speaking with him again?
16     A.   Yes.
17     Q.   I think you testified earlier that your dad
18 went and saw someone at the Brevard Health Alliance?
19     A.   Yes.
20     Q.   Did you ever go with him to that clinic?
21     A.   I did, but I stayed in the lobby with my kid.
22     Q.   How many times?
23     A.   Just once.
24     Q.   And how long ago was that?
25     A.   When we got in that wreck, so I don't remember

Page 171

1  when we got in the wreck.  It was before he died, like
2  that month before.
3      Q.   And did you treat at the Brevard Health
4  Alliance too?
5      A.   No.
6      Q.   Do you have a primary care doctor?
7      A.   No.
8      Q.   Do you go to any urgent care or any clinic for
9  treatment?
10     A.   Brevard Health Department in Viera.
11     Q.   And have you ever been hospitalized?
12          MR. MOORE:  Objection to the form.
13     A.   Yes.
14     Q.   And where have you been hospitalized?
15          MR. MOORE:  Objection to form.
16     A.   Florida Hospital in Orlando.
17     Q.   Anywhere else?
18     A.   No.
19     Q.   When was this hospitalization?
20     A.   2018.
21     Q.   And what was the reason for your
22 hospitalization?
23     A.   I was admitted to the hospital two weeks before
24 I had my second son.
25     Q.   And why was that?

Page 172

1           MR. MOORE:  Objection to form.
2      A.   Because I was high risk.
3      Q.   And why were you high risk?
4           MR. MOORE:  Objection to form.
5      A.   Because the baby had a diaphragmatic hernia.
6      Q.   Did you have any complications with your second
7  childbirth?
8           MR. MOORE:  Objection to form.
9      A.   No.
10     Q.   Any complications with your first?
11          MR. MOORE:  Objection to form.
12     A.   No.
13     Q.   Any other times that you've been to the
14 hospital?
15          MR. MOORE:  Objection to form.
16     A.   No.
17     Q.   Any emergency room visits?
18          MR. MOORE:  Objection to form.
19          MS. AMIGO:  And what's the, I guess, issue?
20          MR. MOORE:  Wouldn't the emergency room be part
21 of the hospital?
22          MS. AMIGO:  An emergency room visit might be
23 different than being hospitalized.
24          MR. MOORE:  Well, you said any other hospitals.
25 Right?

Page 173

1           MS. AMIGO:  Well, I asked before, "Have you
2  been to any other hospital?"
3           MR. MOORE:  And the relevance of it?
4      Q.   Okay.  Any emergency room visits?
5      A.   No.
6      Q.   None in your lifetime?
7      A.   I mean, yeah, in my life.  I don't know how
8  many.
9      Q.   Okay.  Where?
10     A.   In Ohio.
11     Q.   Where in Ohio?
12     A.   Columbus, Ohio.
13     Q.   What hospital?
14     A.   Doctors West.
15     Q.   Doctors West.  Okay.  Why did you go to
16 Doctors West?
17          MR. MOORE:  Objection to form.
18     A.   Fractured my wrist.
19     Q.   When was this?
20     A.   I don't know.  I was a kid.
21     Q.   How old were you?
22     A.   I don't know.
23     Q.   Any other emergency room visits?
24     A.   Yeah, here, but only for, like, a headache or a
25 toothache or something.

Page 174

1    Q.   Where?
2    A.   I don't -- I don't know.
3    Q.   You have no idea what hospitals in Florida?
4    A.   No.  Like, I haven't been to an emergency room
5    in a couple years.
6    Q.   But as you sit here today, it's your testimony
7    you don't recall any of the names of the hospitals that
8    you've been to in Florida?
9    A.   I know it was Holmes Regional but it could have
10   been Melbourne or Palm Bay.  I don't know which one.
11   Q.   I'm not asking you to give me an exact address,
12   just the name.  So Holmes Regional?
13   A.   Holmes Regional.
14   Q.   Okay.  Any other emergency room visits in your
15   --
16   A.   No.
17   Q.   -- lifetime?
18        Just let me finish the question, because the
19   court reporter has to take down my question before you
20   answer.  Okay?  So like I said at the beginning, just --
21   I know you might anticipate what I'm going to ask you,
22   but just wait until I'm done.  Okay?
23        And just so we're clear -- because I know I
24   asked you about hospitalizations and you mentioned
25   Florida Hospital.  Any other hospitalizations in your

Page 175

1    lifetime that you recall?
2    A.   No.
3    Q.   Okay.  Not just in Florida.
4    A.   No.
5    Q.   Have you gone to any urgent care facility like
6    an MD Now or walk-in clinic?
7        MR. MOORE:  Objection, form.
8    A.   Brevard Health Department.
9    Q.   And what -- well, strike that.
10       What's the purpose of you going to the Brevard
11   Health Department?
12       MR. MOORE:  Objection to form.
13   A.   I had prenatal care there.
14       MS. AMIGO:  And I know you keep objecting to
15   the form.  What's wrong with the form of the
16   question?
17       MR. MOORE:  The relevance.
18       MS. AMIGO:  She's making a claim.  There's a
19   claim on this case, from what I understand, for
20   loss of companionship, loss of, you know, mental --
21   or mental anguish, pain and suffering, so all of
22   that comes into play and that's all relevant.
23       MR. MOORE:  Well, when you asked her when has
24   she ever been to any urgent care in her life,
25   you're not specifying a date, a date range.  You're

Page 176

1    just saying, "Have you ever been to an urgent
2    care?"
3        MS. AMIGO:  Right, in your life, and that
4    specifies the time range.
5    Q.   When were you born?
6    A.   1998.
7    Q.   Okay.  So from ████, I believe you said,
8    1998, until today, besides Brevard Health Department,
9    have you gone to any type of walk-in clinic or facility?
10   A.   Aspire.
11   Q.   What's it called?
12   A.   Aspire.
13   Q.   Aspire.  Okay.  And where was that?
14   A.   Palm Bay.
15   Q.   And why did you go to Aspire?
16   A.   Because I needed to do counseling.
17   Q.   And what was that for?
18   A.   Counseling.
19   Q.   I mean, what kind of counseling?
20   A.   Mental.
21   Q.   So, like, with a mental health specialist or
22   psychologist?
23   A.   Yes.
24   Q.   Okay.  And how long ago was this?
25   A.   Two years ago.

Page 177

1    Q.   So if we're in July 2020, this would have been
2    July 2018?
3    A.   It was after my dad died.
4    Q.   Okay.  Because I thought you were asked if you
5    had undergone any kind of treatment, and you said no, so
6    now that we're maybe clarifying this here --
7    A.   Actually, I said that I was waiting for a
8    provider to get a hold of me to get more treatment
9    because I'm supposed to see a counselor.
10   Q.   But I think the question was, "Have you ever
11   had treatment?"  And you said you're waiting on a
12   provider or that you were told you need to get
13   treatment.  So regardless, I'm clearing this up now,
14   because it was my understanding, based on my notes, from
15   what you testified earlier, is that you hadn't had any
16   treatment, you're waiting on a provider.
17   A.   I went once, that's why.  I didn't go back.
18   Q.   So one time two years ago after this incident?
19   A.   Yes.
20   Q.   Okay.  And did they diagnose you with anything?
21   A.   No.  I didn't go back.
22   Q.   Were you prescribed any medication?
23   A.   No.
24   Q.   Do you remember the name of the person you met
25   with?

Page 178

1   A.   No.
2   Q.   And why didn't you go back?
3   A.   Because I didn't want to.
4   Q.   I'm sorry?
5   A.   Because I didn't want to.
6   Q.   Okay.  So other than Aspire, any other type of
7   mental health treatment, counseling, either with a
8   psychologist, psychiatrist, social worker, anyone, since
9   the date of this incident?
10  A.   No.
11  Q.   Okay.  And when did you or Dianne -- I know you
12  testified Dianne was handling this -- reach out to try
13  to get treatment again?
14  A.   I don't remember.
15  Q.   Was it this year?
16  A.   Yes.
17  Q.   Was it in the last month?
18  A.   Last couple of months, yeah.
19  Q.   Okay.  So sometime in June --
20  A.   Yeah, actually, June.
21  Q.   Okay.  And did you reach out or did Dianne
22  reach out for you?
23  A.   Dianne.
24  Q.   Okay.  And who did you reach out to?
25  A.   Aspire.

Page 179

1   Q.   So sometime in June of this year and you still
2   haven't heard back from Aspire?
3   A.   They were closed for a minute because of COVID.
4   Q.   Did you try to reach out to any other facility
5   for any type of counseling or treatment?
6   A.   No.
7   Q.   And have you followed up with Aspire as we sit
8   here today to schedule something?
9   A.   (Nods head.)
10  Q.   I'm sorry?
11  A.   No.
12  Q.   And prior to the day of the incident, have you
13  ever undergone any type of counseling, any type of visit
14  with a psychologist, psychiatrist, mental health
15  counselor?
16  A.   No.
17  Q.   Had you ever been diagnosed by anyone with any
18  type of psychological or psychiatric condition --
19  A.   No.
20  Q.   -- prior to the incident?
21  A.   No.
22  Q.   Okay.  And had you ever been prescribed any
23  type of psychological or psychiatric medication prior to
24  May 21, 2018?
25  A.   No.

Page 180

1   Q.   And before we got into Aspire you were talking
2   about Brevard Health Department.  You went there for
3   prenatal.  Is that it?
4   A.   Yeah.
5   Q.   And was that prenatal for your first and your
6   second?
7   A.   Yes.
8   Q.   Any other facility that you've been to for any
9   type of medical treatment, let's say, in the 10 years
10  prior to this incident?
11  A.   No.
12  Q.   Have you been to a hospital since May 21, 2018?
13  A.   No.
14  Q.   Have you been to any emergency room since
15  May 21, 2018?
16  A.   Well, yeah, I have, to have my second child.  I
17  was in the hospital after that.  That was it, though.
18  Q.   Okay.  And where did you -- where was your
19  second child born?
20  A.   Florida Hospital.
21  Q.   Oh, right.  Sorry.  And what about your first
22  child?  Where was he born?
23  A.   Kissimmee.
24  Q.   Was there a specific hospital in Kissimmee?
25  A.   Osceola Regional.

Page 181

1   Q.   Any urgent care visits since May 21, 2018?
2   A.   No.
3   Q.   And that incident back in May of 2010 after
4   your mother passed away where you had the incident with
5   your dad, other than him calling you a bitch, did it get
6   physical at all?
7   A.   No.
8   Q.   Were the police called?
9   A.   No.
10  Q.   And did Tommi or Donald stop speaking with your
11  father after that incident?
12  A.   No.
13  Q.   Did you tell any of your other siblings -- I
14  know Tommi and Donald were there.  Did you tell anyone
15  else about what happened?
16  A.   No.
17  Q.   I think you were asked earlier about your
18  siblings and whether they have undergone any counseling
19  or treatment since the date of this incident, and I just
20  don't know if I understood your answer correctly so I
21  just wanted to clarify.  Do you know whether they did or
22  not, or no, they did not?
23  A.   No, they didn't.
24  Q.   Okay.  And I think you testified your son -- is
25  it M████ with the attachment issues?

Page 182

1     A.   Yeah.
2     Q.   Is that correct?  Okay.  And I thought, if I
3  heard you correctly, you said that he did get
4  counseling?
5     A.   He's having some sort of therapy, but I don't
6  know who with or where.
7     Q.   Do you know who authorized this therapy or who
8  set this up?
9     A.   No.
10    Q.   Do you know when this therapy started?
11    A.   No.
12    Q.   And why is it that you don't know about this?
13 Is it because he's in foster care?
14    A.   Yes.
15    Q.   Okay.  So the foster care system might have set
16 this up?
17    A.   Yes.
18    Q.   Okay.  Now, why are both of your children in
19 foster care?
20    A.   Because I missed a couple doctors'
21 appointments.
22    Q.   Because you missed doctor appointments?
23    A.   Yeah.
24    Q.   Was that part of your probation or your --
25 Like, can you explain that?

Page 183

1     A.   My son was supposed to get his hearing aids and
2  I missed two doctors' appointments with the doctor.
3     Q.   It was doctor appointments for your son?
4     A.   Yeah.
5     Q.   Okay.  I'm sorry.  I thought it was doctor
6  appointments for you.
7     A.   No.
8     Q.   Okay.  So there's two doctor appointments that
9  you missed for a hearing aid?
10    A.   Yes.
11    Q.   And so how did that lead up to both of your
12 kids being put into the foster system?
13    A.   They said it was medical neglect.
14    Q.   And who said that?
15    A.   DCF.
16    Q.   And how did DCF get involved?
17    A.   Because I got locked up.
18    Q.   And was that for the incident at Walmart that
19 we talked about before?
20    A.   Yes.
21    Q.   And that was another thing I wanted to clarify,
22 because I -- it was my understanding that -- well,
23 strike that.
24        I think you testified that you worked at
25 Walmart in 2016?

Page 184

1     A.   2016 or '17.
2     Q.   Okay.  Because I thought I had your arrest for
3  the Walmart incident as December of 2017.  Does that
4  sound correct?
5     A.   Yes.
6     Q.   Okay.  And you had only worked at Walmart for
7  about a month.  Right?
8     A.   Yeah.
9     Q.   So -- but you didn't get -- well, strike that.
10        But you weren't incarcerated for the December
11 2017 charge until just recently, 2019?
12    A.   Yeah, because I was -- I violated my probation.
13    Q.   Okay.  So how did you violate probation?
14    A.   I went out of county.
15    Q.   Where did you go?
16    A.   Cocoa Beach, city.
17    Q.   And why were you going to Cocoa Beach?
18    A.   To go to the beach.
19    Q.   And what happened?
20    A.   I got pulled over.
21    Q.   And when did this happen?
22    A.   I don't know.  Within the last year.
23    Q.   And why did you get pulled over?
24    A.   I wasn't wearing a seatbelt.
25    Q.   Was there any other reason for the violation of

Page 185

1  probation?
2     A.   No.
3     Q.   And then how long were you incarcerated for?
4     A.   Like a month and a half.
5     Q.   And at what point -- I know you testified that
6  your children had been in foster care for seven months?
7  Right?  Or since seven months ago.  Is that right?
8     A.   Yes.
9     Q.   So did DCF get involved as soon as they were
10 put on notice that you violated probation or was it once
11 you were incarcerated?
12    A.   When they knew that I violated.
13    Q.   Were there any other times that you violated
14 probation?
15    A.   Yeah.
16    Q.   When else?
17    A.   My PTI, but that would be because I got into a
18 wreck.  I got into a wreck and being involved with the
19 police, so that violated my PTI.
20    Q.   And PTI is pretrial intervention?
21    A.   Yeah.
22    Q.   What wreck are you talking about?
23    A.   I don't even know when it was.  It was a couple
24 years ago.  A car hit me and I drove away anyways.
25    Q.   Did you suffer any injuries as a result of that

Page 186

1  accident?
2      A.  No.
3      Q.  Did you end up going to the hospital or
4  anything?
5      A.  No, it was just a bump.
6      Q.  A bump where?
7      A.  The back of the vehicle.
8      Q.  Okay.  So you rear-ended somebody and drove
9  away?
10     A.  No.
11     Q.  Or they rear-ended you?
12     A.  They rear-ended me.
13     Q.  Okay.  So then --
14         MR. MOORE:  Can we take a break?
15         MS. AMIGO:  We can take a quick break.
16         (Recess held from 3:04 p.m. to 3:20 p.m.)
17  BY MS. AMIGO:
18     Q.  So we were talking about the violation of
19  probation two years ago as a result of that motor
20  vehicle accident that you were telling me about.  Was
21  there any, like, punishment as a result of the violation
22  of probation?  Like, were you incarcerated following
23  that?
24     A.  No, they just reinstated me.
25     Q.  What do you mean?

Page 187

1      A.  My probation.
2      Q.  Okay.  So since that violation was two years
3  ago, that would have been in 2018.  That was from when
4  you were on probation for the Walmart arrest.  Right?
5      A.  Yes.
6      Q.  Was that motor vehicle accident on March 27,
7  2019?
8      A.  I don't know the date.
9      Q.  Does that sound about right?
10     A.  I honestly don't know.
11     Q.  Were you ordered to pay any fines or court
12  costs?
13     A.  I don't remember.
14     Q.  Any other times where you violated probation?
15     A.  No.
16     Q.  Do you recall being arrested for driving
17  without a license in October of 2019?
18         MR. MOORE:  Do you recall?
19     A.  I don't know.
20     Q.  Do you recall if that led to any violation of
21  probation?
22         MR. MOORE:  Objection to form.
23     A.  If it was, then, yeah, it violated me, but I
24  don't remember if I was or not.
25     Q.  Do you recall any arrests for petty theft in

Page 188

1  July of 2019?
2          MR. MOORE:  Object to form.
3      A.  Yeah.
4      Q.  And why were you arrested?
5      A.  I was accused of theft.
6      Q.  I'm sorry?
7      A.  I was accused of theft.
8      Q.  Who accused you?
9      A.  Dollar General.
10     Q.  Which Dollar General?
11     A.  I don't know.
12     Q.  In what city?
13     A.  Melbourne.
14     Q.  Were you shopping there?
15     A.  Yeah.
16     Q.  This wasn't like a job that you had?  You were
17  a patron?
18     A.  Yeah.
19     Q.  So you were shopping at the Dollar General in
20  Melbourne and they accused you of theft and called the
21  police?
22     A.  Yeah.
23     Q.  What police responded?  What department?
24     A.  I don't know.
25     Q.  And what happened as a result of that arrest?

Page 189

1      A.  I was arrested.
2      Q.  Okay.  And what happened as a result of that
3  arrest?
4      A.  They -- I was -- they reinstated me, my
5  community control.
6      Q.  Did you serve any time in jail?
7      A.  Yes.
8      Q.  How long?
9      A.  Two months.
10     Q.  And when was this?
11     A.  I don't remember.  This year or last year.
12     Q.  Well, early in July of 2020 so --
13     A.  2019.
14     Q.  -- it would have been 2019?
15         Any other arrests or convictions that we
16  haven't talked about?
17     A.  No, that should be it.
18     Q.  I think you testified earlier that you have
19  suffered from nightmares since this incident.  Is that
20  correct?
21     A.  Yep.
22     Q.  And how frequent?
23     A.  A couple times a week.
24     Q.  And when did these start?
25     A.  Since my dad died.

Page 190

1  Q.  Was it that same day?
2  A.  I didn't sleep that night.
3  Q.  So the following day?
4  A.  Sure.
5  Q.  So since May 22nd of 2018, twice a week you
6  have nightmares as a result of this incident.  Is that
7  your testimony?
8  A.  That's a little specific, but sure.
9  Q.  Well, I don't want to put words in your mouth.
10 That's what you were telling me so I just want to
11 confirm.
12 A.  Yeah.
13 Q.  And prior to May of 2018, had you ever suffered
14 from nightmares?
15 A.  No.
16 Q.  And other than the nightmares, have you had any
17 other issues since the date of this incident?
18 A.  No.
19 Q.  Have you ever been Baker Acted?
20 A.  No.
21 Q.  Do you know what that is?
22 A.  Yes.
23 Q.  You testified earlier that you were recently
24 told you might need glasses or corrective lenses.  Is
25 that right?

Page 191

1  A.  Yes.
2  Q.  Do you recall where you went for the eye exam?
3  A.  Eyeglass World.
4  Q.  Which location?
5  A.  Melbourne.
6  Q.  And did they write you a prescription for
7  corrective lenses?
8  A.  Yes.
9  Q.  But you just haven't gotten them yet?
10 A.  (Nods head.)
11 Q.  Is that correct?
12 A.  Yes.
13 Q.  So you're not wearing contacts today or
14 anything?
15 A.  No.
16 Q.  And how long ago was this that you had the eye
17 exam done?
18 A.  I think three months ago.
19 Q.  I think you testified earlier, too, that you
20 believe your son is having nightmares, M██████?
21 A.  Yes.
22 Q.  And how frequent?
23 A.  He wakes up every night screaming, crying.
24 Q.  And when did that start?
25 A.  When my dad died.

Page 192

1  Q.  So same as you, the same day or the following
2  day?
3  A.  Well, for him it was definitely the same night.
4  Q.  And how frequent?
5  A.  Every night.
6  Q.  And I know he's staying -- in the last seven
7  months has been with foster care.  Do you know whether
8  he's still having those nightmares?
9  A.  Not as frequent.
10 Q.  And how frequent now?
11 A.  I don't know.  They said it wasn't an every
12 night thing.  He does it every so often.
13 Q.  But you have no idea?
14 A.  No.
15 Q.  Okay.  Do you have any pending criminal charges
16 against you?
17 A.  No.
18 Q.  And how did you get to the deposition today?
19 A.  Uber.
20 Q.  Did anyone come with you today?
21 A.  Family member.
22 Q.  And who is that?
23 A.  Well, Dianne's family.  Carson.
24 Q.  Carson?
25 A.  Yeah.

Page 193

1  Q.  Same last name?
2  A.  No.  I don't even know his last name.
3  Q.  And how long --
4  A.  Oh, Doebler.  Doebler.
5  Q.  How do you spell that?
6  A.  D-o-e-b-l-e-r.
7  Q.  D-o-e-b-l-e-r?
8  A.  Yes.
9  Q.  Okay.  And how is he related to Dianne?
10 A.  Not related, but he's her family.  Her
11 ex-husband's stepson.
12 Q.  Do you know the ex-husband's name?
13 A.  No.
14 Q.  No?
15 A.  No.
16 Q.  How long have you known Carson?
17 A.  About a month.
18 Q.  Does he live with you guys?
19 A.  No.
20 Q.  Do you know where he lives?
21 A.  Somewhere in Melbourne.
22 Q.  Did you discuss this case with him?
23 A.  No.
24 Q.  Have you ever?
25 A.  No.

Page 194

1    Q.    So you both took an Uber here?
2    A.    Yes.
3    Q.    Do you know if Dianne has ever discussed this
4    case with Carson?
5    A.    She hasn't.
6    Q.    Now, going back to your children, who is the
7    father of your children?
8          MR. MOORE:  Do you know the father of your
9    children?
10   Q.    Do you know who the father is?
11         MR. MOORE:  Do you or do you not know?
12   A.    I don't know.
13   Q.    You don't know the name of the father of your
14   child?
15   A.    No.
16   Q.    Okay.
17         MR. MOORE:  No one's on the certificate or
18   anything like that.  Right?
19         THE WITNESS:  No.
20   Q.    So there's no father listed, you said, on the
21   birth certificate?
22   A.    No.
23   Q.    For either M████ or J████?
24   A.    No.
25   Q.    How did you become pregnant with M████?  Was

Page 195

1    it artificial insemination?
2    A.    No.
3    Q.    What about your second child?  Was it
4    artificial insemination?
5    A.    No.
6    Q.    Okay.  So --
7          MR. MOORE:  It was with someone, but you don't
8    know who or --
9          THE WITNESS:  No, I don't know.
10         MR. MOORE:  Yeah, whatever the answer is, it
11    could be multiple people or whatever?
12         THE WITNESS:  Yeah.
13   Q.    That's what I was wondering.  Do they both have
14   the same father?
15   A.    I mean, I don't know.
16   Q.    Did the father of either M████ or J████,
17   their fathers, terminate any parental rights?
18   A.    No.
19   Q.    Were either of those pregnancies as a result of
20   any kind of sexual assault or rape?
21   A.    No.
22   Q.    So other than the incident that we talked about
23   in May of 2010 or approximately in May 2010 with your
24   dad after your mother passed away, did your mother's
25   passing affect your relationship with your father in any

Page 196

1    way?
2    A.    No.
3    Q.    Was there any other point in time, other than
4    the incident in May of 2010, that you stopped speaking
5    with your father for any reason?
6    A.    No.
7    Q.    Did you and your father ever get into any kind
8    of altercation?
9    A.    No.
10   Q.    Not just in 2010, but at any time?
11   A.    No.
12   Q.    Do you know how long your dad knew Dianne?
13   A.    Not really.
14   Q.    Do you know how they met?
15   A.    He met Dianne here.  That was while my mom was
16   still alive.
17   Q.    In Florida?
18   A.    Yeah.
19   Q.    Did Dianne ever live in Ohio?
20   A.    Yeah.
21   Q.    So when they first met, Dianne and your father,
22   in Florida, while your mom was still alive, were they in
23   a relationship, a romantic relationship?
24   A.    No.
25   Q.    So they're just friends?

Page 197

1    A.    Yes.
2    Q.    Okay.  And in Ohio, did your father ever live
3    with Dianne?
4    A.    She lived with us.
5    Q.    She lived with you?
6    A.    Yeah.
7    Q.    Oh, okay.  And that was after your mother
8    passed away?
9    A.    Yes.
10         MR. MOORE:  This Is the same Dianne that you
11    already referenced.  Right?
12         THE WITNESS:  Yeah.
13         MS. AMIGO:  Was that true?
14         MR. MOORE:  Yeah.
15         MS. AMIGO:  Okay.  I just wanted to make sure.
16   Q.    Did your father and Dianne ever fight?
17   A.    Not really.
18   Q.    When you say not really --
19   A.    I mean, they had arguments but...
20   Q.    Were there any domestic violence incidents
21   between your father and Dianne?
22   A.    No.
23   Q.    Was there any point in time where Dianne stayed
24   with your father and you weren't living with them?
25   A.    I mean, yeah, until I -- it was just them two

Page 198

1  until I moved in when I was 15.
2      Q.  Okay.  So do you know, during those time frames
3  when you weren't there, if there was any incidents,
4  domestic violence incidents, between the two of them?
5      A.  No.
6          MR. MOORE:  Just real quick, when do you-all
7      want to take lunch?
8          MS. AMIGO:  I was going to try to see if we can
9      power through, but if you need to take a break --
10         MR. MARI:  I don't.  I'm good.  I want to get
11     out of here as soon as possible.
12         MR. MOORE:  I mean, how much longer?
13         MS. AMIGO:  It just depends on how many more
14     breaks we take.  I mean, if you want to see if we
15     can get through it and then -- but if you see --
16     you know, obviously I don't know --
17         MR. MOORE:  I mean, two hours more --
18         MS. AMIGO:  No, I don't think it's going to be
19     two hours.
20         MR. MOORE:  An hour?
21         MS. AMIGO:  Well, they have snacks here.
22     Right?
23         MR. MOORE:  It's 3:30, and so 4:30, I mean, did
24     you want to take a lunch?
25         THE WITNESS:  Yeah.

Page 199

1          MR. MOORE:  I mean, we don't know how long this
2      is going to go.
3          MS. AMIGO:  I wouldn't say two hours.
4      Definitely not two hours.  I think we can power
5      through it.  And if you guys need to take a break
6      to get a snack or something, but I think if we
7      break for lunch that might be a little excessive
8      because, you know, we can try to wrap it up.  Do
9      you think you can power through it?
10         THE WITNESS:  Yeah.
11     Q.  Okay.  I just want to clarify something with
12 respect to your employment.  I know you were asked
13 before about whether you're currently employed and prior
14 employment.  My understanding, after we started talking,
15 was that you worked in Walmart December of 2017, not
16 2016.  Right?
17     A.  Right.
18     Q.  So was the DIRECTV job before Walmart or after
19 Walmart?
20     A.  After.
21     Q.  Okay.  I think you testified earlier today it
22 was January of 2017 that you worked for DIRECTV, so
23 would it have been January 2018?
24     A.  Yeah.
25     Q.  Okay.  And with respect to the Walmart arrest,

Page 200

1  do you know which police agency investigated the grand
2  theft case?
3          MR. MOORE:  Objection to form.
4      A.  No, I don't.
5      Q.  Do you recall the police responding to Walmart?
6      A.  No.
7      Q.  Do you recall an officer arriving to Walmart
8  and meeting with you and the manager or the loss
9  prevention person?
10     A.  No.
11     Q.  Okay.  Do you recall any officer contacting you
12 on the phone to discuss that investigation?
13     A.  Yeah.
14     Q.  And do you recall who you spoke with?
15     A.  No.
16     Q.  Do you recall what was said?
17     A.  Not really.
18     Q.  Did the officer give you a number to contact
19 him?
20     A.  I don't remember.
21     Q.  Do you know if any of the officers involved in
22 this matter were involved with investigating that grand
23 theft case at Walmart?
24     A.  Not that I know of.
25     Q.  And you testified earlier about your father's

Page 201

1  medical conditions.  You mentioned high blood pressure.
2  Did your father suffer from any other medical condition?
3      A.  No.
4      Q.  Did he suffer from insomnia?
5          MR. MOORE:  Objection.  Objection, form.
6      A.  He was never diagnosed with it.
7      Q.  Did he ever complain to you of having insomnia?
8      A.  Sometimes.
9      Q.  And prior to the date of this incident, was he
10 suffering from insomnia?
11         MR. MOORE:  Objection to form.
12     A.  Not that I know of.
13     Q.  And did he have any issues with his lungs?
14         MR. MOORE:  Form.
15     A.  Not that I know of.
16     Q.  And what about his kidneys?
17         MR. MOORE:  Objection to form.
18     A.  Not that I know of.
19     Q.  Are you aware of any issues he had with his
20 heart?
21         MR. MOORE:  Objection to form.
22     A.  No.
23     Q.  Are you aware of him ever being diagnosed with
24 any psychological or psychiatric condition?
25         MR. MOORE:  Objection to form.

Page 202

1    A.   No.
2    Q.   Are you aware of him ever being diagnosed with
3  bipolar?
4         MR. MOORE:  Objection, form.
5    A.   No.
6    Q.   Did your father have any hearing problems?
7         MR. MOORE:  Objection to form.
8    A.   Not that I know of.
9    Q.   Did he wear any hearing aids?
10   A.   No.
11   Q.   Did you notice any physical issues with your
12  father, if he was having any complaints or issues with
13  his blood pressure?
14   A.   I don't recall.
15   Q.   Like, did you ever notice him sweating
16  excessively?
17        MR. MOORE:  Objection to form.
18   A.   I don't know.
19   Q.   Ever have bloodshot eyes?
20   A.   I don't know.
21   Q.   Other than the facilities that you mentioned
22  before about where your father went, do you know if he
23  actually ever went to the emergency room?
24   A.   Not that I know of.
25   Q.   Did your father ever have any surgeries?

Page 203

1    A.   Not to my knowledge.
2    Q.   Any work-related accidents whether or not he
3  filed a workers' comp claim?
4    A.   I don't think so.
5    Q.   Did he ever suffer any non-work-related
6  accident, like a slip and fall, sports injury or motor
7  vehicle accident?
8    A.   The accident that we got into before he died.
9    Q.   And that was a motor vehicle accident?
10   A.   Uh-huh.
11   Q.   Yes?
12   A.   Yes.
13   Q.   Any slip and falls?
14   A.   No.
15   Q.   Any sports-related injuries?
16   A.   No.
17   Q.   So with the motor vehicle accident, when did
18  that occur?
19   A.   A couple weeks before he died.
20   Q.   I have a date of January 26, 2018.  Does that
21  sound right?
22        MR. MOORE:  Objection, form.
23   A.   Yes.
24   Q.   So that would have been maybe four months
25  before?

Page 204

1    A.   Yeah, I guess.
2    Q.   And you were in the vehicle at the time?
3    A.   Yes.
4    Q.   Was there anyone else in the car?
5    A.   My son.
6    Q.   And that was M██████?
7    A.   Yes.
8    Q.   Anyone else?
9    A.   No.
10   Q.   And whose vehicle were you driving?
11   A.   My stepmom's.
12   Q.   Dianne's?
13   A.   Yes.
14   Q.   And where did this accident happen?
15   A.   On U.S. 1.
16   Q.   In Melbourne?
17   A.   Palm Bay.
18   Q.   And who was driving?
19   A.   My dad.
20   Q.   And how did the accident happen?
21   A.   Steering wheel locked up.  He tried to turn it
22  to the side and it flipped.
23   Q.   Did you suffer any injuries?
24   A.   No.
25   Q.   Did your son suffer any injuries?

Page 205

1    A.   No.
2    Q.   What about your father?
3    A.   Not that I know of.  He was at the clinic, and
4  that's when he got diagnosed with high blood pressure,
5  but that was it.
6    Q.   Wasn't he ejected from the vehicle?
7         MR. MOORE:  Objection, form.
8    A.   No, he was still in the vehicle.
9    Q.   Did the vehicle land on top of him?
10        MR. MOORE:  Objection to form.
11   A.   No.  It was upside down, but he was in it.
12   Q.   Was he not wearing a seatbelt?
13   A.   No.
14   Q.   So he wasn't?
15   A.   No.
16   Q.   Were you wearing your seatbelt?
17   A.   Yes, and I took it off.
18   Q.   Before the accident?
19   A.   Before it flipped, yeah.
20   Q.   Why did you take it off?
21   A.   So I could unstrap my son out of the car seat.
22   Q.   Were you given any treatment at the scene?
23   A.   No.
24   Q.   And why is that?
25   A.   I was fine.  I didn't want to leave my kid.

Page 206

1    Q.   Did you refuse treatment?
2    A.   Yes.
3    Q.   And were any of you taken to the hospital?
4    A.   My son was taken to the hospital in Palm Bay,
5    and my dad was taken to the hospital in Melbourne.
6    Q.   Was that Holmes Hospital?
7    A.   Yes.
8    Q.   Did you get examined at the hospital?
9    A.   No.
10   Q.   Did you ever see any doctor after this
11   accident?
12   A.   No.
13   Q.   And what about your son?  What kind of
14   treatment did he receive at the hospital?
15   A.   They ran an X-ray to make sure his neck wasn't
16   hurt or anything.
17   Q.   Do you know what treatment your dad received?
18   A.   They took him to a separate hospital.  I don't
19   know.
20   Q.   And did either of you have health insurance or
21   car insurance at the time?
22   A.   No.
23   Q.   Do you know if there were any witnesses to this
24   accident?
25   A.   No, not that I know of.

Page 207

1    Q.   Did your father ever take any psychiatric
2    medication?
3         MR. MOORE:  Objection to form.
4    A.   Not that I know of.
5    Q.   And I know you were asked about Circles of
6    Care.  Did you ever visit him when he was at Circles of
7    Care?
8    A.   No.
9    Q.   And why not?
10   A.   Because if he was in Circles of Care I didn't
11   see him because I was at home taking care of my kid.
12   Q.   How long was he at Circles of Care?
13   A.   I don't know.  I don't even recall him being in
14   Circles of Care.
15   Q.   Okay.  Was there any point in time where your
16   dad received any mental health counseling, like,
17   inpatient-wise?
18        MR. MOORE:  Objection, form.
19   A.   No.
20   Q.   And what about outpatient where --
21        MR. MOORE:  Objection to form.
22   Q.   -- he goes in for something and comes back
23   home?
24   A.   No.
25        MR. MOORE:  I think we should take a break if

Page 208

1    we're just going through, like, this many
2    repetitive things.
3         MR. MARI:  It's not repetitive.
4    Q.   Was your father ever Baker Acted?
5         MR. MOORE:  Take an hour break?  Lunch?
6         MS. AMIGO:  I don't think we should take an
7    hour.  I think that's a little much.  What time is
8    it now?  It's 3:46.  So, I mean, if you guys want
9    to take, like, half an hour or something.  I don't
10   know if Frank has any objections to that, but I
11   wouldn't say a whole hour.
12        MR. MARI:  I'd rather get this thing done and
13   not eat at all.
14        MR. MOORE:  What do you want to do?  Stay?
15        THE WITNESS:  I'm hungry.
16        MS. AMIGO:  Off the record.
17       (Recess held from 3:48 p.m. to 4:00 p.m.)
18   BY MS. AMIGO:
19   Q.   All right.  I think the question that was left
20   pending was, has your father ever been Baker Acted?
21   A.   What is it?
22   Q.   Was your father ever Baker Acted?
23   A.   I don't know.
24   Q.   Was your father ever Marchman Acted?  Do you
25   know what that is, the Marchman Act?

Page 209

1    A.   No.
2    Q.   That's if a family member or someone who knows
3    the person feels that they could be a danger to
4    themselves or someone else, they can have that person
5    detained or put into custody.  Did that ever happen?
6    A.   Not that I know of.
7    Q.   And have you ever been Marchman Acted?
8    A.   No.
9    Q.   Did you live with Dianne and your father in
10   Ohio in 2012, in Columbus?
11   A.   Yes.
12   Q.   Did you ever witness a domestic violence
13   incident that occurred in May of 2012?
14   A.   No.
15   Q.   Were you made aware of any domestic violence
16   incident in May of 2012?
17        MR. MOORE:  Objection to form.
18   A.   I don't recall.
19   Q.   You don't recall?  Were you ever arrested or
20   trespassed for theft in September 2014 at a T.J.Maxx?
21   A.   I don't remember.
22   Q.   Do you recall being with your father and being
23   detained for theft at T.J.Maxx?
24   A.   I don't remember.
25   Q.   Like hiding items in your purse?

Page 210

1    A.   I don't remember.
2    Q.   Are you aware your father was Baker Acted in
3    2017?
4         MR. MOORE:  Objection, form.
5    A.   I don't know.
6    Q.   Your father ever take a synthetic drug called
7    flakka?
8         MR. MOORE:  Objection to form.
9    A.   I have no idea.
10   Q.   Have you ever heard of flakka?
11   A.   No.
12   Q.   Did you or any of your siblings ever visit your
13   father while he was incarcerated?
14   A.   Not that I know of.
15   Q.   Well, did you?
16   A.   No.
17   Q.   And you just don't know if your siblings did?
18   A.   No.
19   Q.   No, you don't know?
20   A.   I don't know.
21   Q.   Are you aware of your dad being arrested for
22   aggravated assault with a deadly weapon?
23   A.   No.
24   Q.   Child neglect?
25   A.   No.

Page 211

1    Q.   Possession of methamphetamine or oxycodone?
2    A.   No.
3    Q.   Failure to store a firearm?
4    A.   No.
5    Q.   Back in August of 2011, where was your father
6    living?
7    A.   I don't know.
8    Q.   Were you living with him at the time?
9    A.   No.
10   Q.   Do you know if any minor children were living
11   with him at the time?
12   A.   I don't know if █████ -- no.
13   Q.   You don't know if █████ did?
14   A.   No.
15   Q.   Was Dianne Levesque living with your father
16   back in August of 2011?  Do you know?
17   A.   I don't know.
18   Q.   Other than the State of Ohio, did any other
19   state agency ever investigate your father for any child
20   neglect?
21   A.   Not that I know of.
22   Q.   How about the State of Florida?
23   A.   No.
24   Q.   On the date of -- well, strike that.
25        Did -- do you know if your father ever sold

Page 212

1    drugs?
2    A.   Not that I know of.
3    Q.   Did he ever manufacture drugs?
4    A.   Not that I know of.
5    Q.   And what about Dianne Levesque?  Had she ever
6    used any illicit drugs?
7    A.   No.
8    Q.   Or at least as long as you've known her?
9    A.   No.
10   Q.   Has Dianne Levesque ever sold any drugs?
11   A.   No.
12   Q.   Has Dianne Levesque ever manufactured any
13   drugs?
14   A.   No.
15   Q.   So just so I'm clear, you never lived with
16   Dianne and your father in Tampa.  Is that correct?
17   A.   Right.
18   Q.   So going to the date of this incident, which I
19   have as May 21, 2018, how old was your father?
20   A.   45.
21   Q.   I have his date of birth as ███-72.  Is that
22   right?
23   A.   Yes.
24   Q.   And on the date of this incident, he was
25   staying at a hotel.  Is that right?

Page 213

1    A.   Yes.
2    Q.   Do you recall which one?
3    A.   No.
4    Q.   And where were you staying at?
5    A.   With my stepmom.
6    Q.   How tall was your father on the date of this
7    incident?
8    A.   Six foot.
9    Q.   How much did he weigh?
10   A.   I don't know.
11   Q.   Do you know approximately how much?
12   A.   Not really.
13   Q.   So within the 12-hour period prior to the
14   incident, what did you do?  Were you working?
15   A.   What's the question?
16   Q.   The 12 hours before the incident -- or let's
17   say 24 hours before this incident, what were you doing?
18   Were you at work?  Were you at home?
19   A.   I was at home.
20   Q.   Okay.  And did you consume any medications
21   within the 12-hour period prior to this incident?
22   A.   No.
23   Q.   Did you consume any over-the-counter
24   medication?
25   A.   No.

Page 214

1    Q.  Did you consume any alcohol within the 12 hours
2  before this incident?
3    A.  No.
4    Q.  Did you consume any illicit drugs within the 12
5  hours before this incident?
6    A.  No.
7    Q.  Do you know what your father did within the
8  24-hour period prior to this incident?
9    A.  No.
10    Q.  So do you have any idea what medications, if
11  any, he could have taken prior -- within the 24-hour
12  period prior to this incident?
13    A.  No.
14    Q.  You have no idea?
15    A.  No.
16    Q.  That's correct?  That's correct you have no
17  idea?
18    A.  I mean, other than his blood pressure meds, I
19  don't know.
20    Q.  Did you see him take his blood pressure meds
21  within the 24-hour period prior to this incident?
22    A.  Yeah, he took a couple in the car.
23    Q.  What time?
24    A.  When he picked me up.
25    Q.  How do you know it was a blood pressure

Page 215

1  medication?
2    A.  Because they were in his prescription bottle.
3    Q.  Did you read the bottle?
4    A.  No, but he only had one prescription.
5    Q.  As far as you know?
6    A.  Yeah.
7    Q.  Okay.  What was the name on the prescription,
8  like the name of the medicine?
9    A.  I don't remember.
10    Q.  Did he take anything else in your presence?
11    A.  No.
12    Q.  Do you have any idea whether he consumed any
13  alcohol within the 24-hour period prior to this
14  incident?
15    A.  Not that I know of.
16    Q.  Do you know if he took anything over the
17  counter within the 24 hours prior to this incident?
18    A.  No, I don't know.
19    Q.  And do you know whether he used any illicit
20  drugs within the 24-hour period prior to this incident?
21    A.  Not that I know of.
22    Q.  Were you with your father during the 24-hour
23  period prior to this incident?
24    A.  No.
25    Q.  I mean other than the time that you're in the

Page 216

1  car and then at Publix.
2    A.  No.
3    Q.  Where were you at the time that you met up that
4  morning?
5    A.  At my stepmom's.
6    Q.  You were at your stepmom's house?
7    A.  Yeah.
8    Q.  So did he come pick you up?
9    A.  Yes.
10    Q.  So you weren't at a friend's house?
11    A.  No.  I was supposed to go see a friend that
12  night, but I never did.
13    Q.  What friend?
14    A.  Gage.
15    Q.  Gage?
16    A.  Yes.
17    Q.  What's the last name?
18    A.  Whaley.
19    Q.  Wiley?
20    A.  W-h-a-l-e-y.
21    Q.  So you were supposed to see a friend the night
22  before but you didn't go?
23    A.  Yeah.
24    Q.  So what time did he pick up from your stepmom's
25  house?

Page 217

1    A.  I don't know.
2    Q.  And that day before he picked you up, what did
3  you do when you first got up?
4    A.  I got dressed and I got my kid a bottle.
5    Q.  Anything else?
6    A.  I changed my kid and I fed him.  That's about
7  it.
8    Q.  So the first time you saw your dad that day was
9  at your stepmom's house?
10    A.  Yes.
11    Q.  Did he go inside?
12    A.  No.
13    Q.  Was your stepmom at home?
14    A.  No.
15    Q.  Do you have any idea what your father did when
16  he first got up that morning?
17    A.  No.
18    Q.  So after him picking you up at your
19  stepmother's house, he picked you and your son up?
20    A.  Yes.
21    Q.  And then where did you go after that?
22    A.  Went to Publix.
23    Q.  Straight to Publix?
24    A.  Yeah.
25    Q.  And as you sit here today, do you recall what

Page 218

1  time approximately that was?
2      A.   I don't know.
3      Q.   Did you stop anywhere in between your stepmom's
4  house and Publix?
5      A.   No.
6      Q.   Did you go to the park?
7      A.   No.
8          MR. MOORE:  Her probation officer said that
9      there's a rule that precludes going beyond 5:00
10     p.m.  Are any of you aware of that?
11         MS. AMIGO:  No.
12         MR. MOORE:  30(d)(2) federal rule.
13         MR. MARI:  I'll look it up.
14     Q.   All right.  So did you notice anything unusual
15  about your father that morning?
16     A.   No.  He was fine until we got to the store.
17  I'm not going to get in trouble, am I?
18     Q.   Well, it's only 4:12.
19         MR. MOORE:  I'll ask for you.
20     Q.   Okay.  Did he complain about anything to you?
21         MR. MOORE:  How long is your Uber drive?
22         THE WITNESS:  It's a 20-minute drive.
23         MR. MARI:  There's no 5:00 p.m. limit, and the
24     rule says --
25         MR. MOORE:  The rule is seven.

Page 219

1          MS. AMIGO:  Yeah, but we took many breaks.
2          MR. MOORE:  There's a seven-hour limit.
3          MS. AMIGO:  Right, but that doesn't count
4      breaks.  We took many breaks.
5          THE WITNESS:  I'm just worried about my
6      probation.  I don't want to get violated again.
7          MR. MOORE:  I'm not telling you whether or not
8      she's calculated our breaks in or not, but she
9      cited that rule.
10     Q.   Did he complain to you about how he was feeling
11  at all?
12     A.   No.
13     Q.   Do you have any idea how long you were at
14  Publix the first time?
15     A.   No.
16     Q.   And how was he acting during that first visit?
17     A.   He didn't start acting weird until the cops got
18  there.
19     Q.   And when you say "the cops," was that the first
20  interaction he had with the police?
21     A.   Yes.
22     Q.   When you were in the car?
23     A.   Yeah.
24     Q.   Did you witness that interaction at all?
25     A.   No.

Page 220

1      Q.   And at what point -- you mentioned going to the
2  Dollar Tree or Dollar General.  When did that happen?
3      A.   We went into Publix first and then we ended up
4  going to Dollar Tree.
5      Q.   Was your father acting any differently than he
6  was at Publix at Dollar Tree?
7      A.   No.
8      Q.   Was he upset?
9      A.   Yeah.  I don't know.
10     Q.   You don't know or he was?
11     A.   I don't know.
12     Q.   Was he acting confused at all at Publix with
13  the purchase, or the charges?
14     A.   Yeah.
15     Q.   And was he having issues paying at Publix?
16     A.   Yeah, he didn't get how the chip worked on the
17  card.
18     Q.   And then did you help him with that?
19     A.   I don't remember.
20     Q.   Did he ever have any issues paying with a
21  credit card or a debit card before that you know of?
22     A.   No.  That was the first time he had a card with
23  a chip on it.
24     Q.   And did you guys speak to a manager at that
25  point?

Page 221

1      A.   I don't remember.
2      Q.   So your first time seeing the police officer
3  was when you're in your vehicle with your son?
4      A.   What?
5      Q.   The first time that you saw any officers at the
6  Publix was when you're in your vehicle with your son?
7      A.   Yeah, when they were walking to the car.
8      Q.   And did you speak with the male officer?
9      A.   The female officer questioned me.
10     Q.   Did you ever speak with the male officer during
11  that encounter?
12     A.   I don't remember.
13     Q.   Do you recall the male officer saying anything
14  to you?
15     A.   I don't remember.
16         MR. MOORE:  Objection, form.
17     Q.   I'm sorry?
18     A.   I don't remember.
19     Q.   And then after -- my understanding is after the
20  female officer spoke with you, they told both of you to
21  get a ride because neither of you had a license.  Is
22  that correct?
23     A.   Yeah.
24     Q.   And then you -- I think your testimony earlier
25  was that your -- they told your dad not to go back into

Page 222

1  the Publix.  Is that correct?
2      A.   Yeah.
3      Q.   But your dad went in because he had to pee.
4  Correct?
5      A.   Yeah, but they said he could.
6      Q.   But when he went inside he didn't go to the
7  bathroom.  Correct?
8          MR. MOORE:  Objection.
9      A.   No.
10         MR. MOORE:  Objection to the form.
11     Q.   All right.  So then when you went back into
12 Publix the second time, did you use the phone in Publix
13 to call anyone?
14         MR. MOORE:  Objection.
15     A.   Yes.
16     Q.   Is that when you called Dianne?
17     A.   Yes.
18     Q.   Do you recall referring to Dianne as a bitch at
19 any point?
20     A.   No.
21     Q.   So during the time that you're inside Publix
22 the second time using the phone, is your dad saying
23 anything?
24         MR. MOORE:  Objection to form.
25     A.   I don't remember.

Page 223

1      Q.   How was he acting?
2          MR. MOORE:  Objection to form.
3      A.   I don't remember.
4      Q.   And then I think you mentioned that he called
5  911, your father?
6          MR. MOORE:  Objection to form.
7      A.   Yeah.
8      Q.   Did you ever call 911?
9      A.   No.
10     Q.   And did the police arrive to the Publix the
11 second time that you're there?
12     A.   Did more cops come?
13     Q.   Yes.
14     A.   I don't know.
15     Q.   Do you recall ever leaving your dad the second
16 time around when you're in Publix, leaving Publix to go
17 outside?
18     A.   The second time?
19     Q.   Yeah.
20     A.   No.
21     Q.   So you stayed inside the whole time?
22     A.   Yeah.
23     Q.   Okay.  Do you recall a male officer approaching
24 you or your father inside Publix the second time?
25         MR. MOORE:  Objection to form.

Page 224

1      A.   I don't remember.
2      Q.   Do you recall what the officer looked like?
3      A.   No.
4          MR. MOORE:  Objection to form.
5      Q.   How did your father react when the police came
6  to Publix the second time around?
7          MR. MOORE:  Objection to form.
8      A.   Scared.
9      Q.   Did he start yelling?
10         MR. MOORE:  Objection to form.
11     A.   Yeah.
12     Q.   Did you understand what he was saying?
13     A.   I don't remember.
14     Q.   Was he moving around?
15     A.   Yes.
16     Q.   Was he agitated?
17         MR. MOORE:  Objection to form.
18     A.   He was scared.
19     Q.   Was he moving his arms around?
20         MR. MOORE:  Objection to form.
21     A.   He kept pulling his pants up, for the most
22 part.
23     Q.   Did you ever see him move his arms other than
24 pulling up his pants?
25     A.   I don't know.

Page 225

1      Q.   During the first interaction with the police
2  officers, did your father tell you whether any of those
3  officers hit or struck him during the first interaction?
4      A.   I don't -- I don't think so.
5      Q.   Did your father tell you whether any of the
6  officers threatened him during that first interaction?
7      A.   I don't remember, no.
8      Q.   You don't recall, or no?
9      A.   I don't recall.
10     Q.   And then when the second officer arrived on the
11 scene -- I know we were watching the video earlier.
12 When the second officer arrived on the scene, do you
13 remember what he looked like?
14     A.   No.
15     Q.   Were both officers in uniform?
16         MR. MOORE:  Objection to form.
17     A.   Yes, I think.
18     Q.   So you can tell that they were wearing a police
19 uniform?
20     A.   Yes.
21     Q.   Do you have any idea how tall the officers were
22 or how much they weighed?
23     A.   No.
24     Q.   And did your father become agitated when the
25 second officer came in?

Page 226

1          MR. MOORE:  Objection to form.
2     A.  He was scared the whole time.
3     Q.  What did your father say when the second
4  officer came in?
5     A.  I don't know.
6     Q.  Did you say anything when the second officer
7  came in?
8          MR. MOORE:  Objection to form.
9     A.  I don't remember.
10    Q.  Were there customers near or in the vicinity of
11 you, your father, and the officers at the time?
12         MR. MOORE:  Objection form.
13    A.  Yes.
14    Q.  And how far away was your father from the
15 customers in the store at that time?
16         MR. MOORE:  Objection to form.
17    A.  I don't know.
18    Q.  Did your father get close to any customer near
19 the cashier?
20         MR. MOORE:  Objection to form.
21    A.  I don't know.
22    Q.  How far away were you from your father during
23 the second interaction with the police officers?
24         MR. MOORE:  Objection to form.
25    A.  I don't know.  I tried to stay close to him

Page 227

1  until it started getting physical.
2     Q.  So how close?
3     A.  I was beside him until they started backing me
4  off.
5     Q.  Did your father pull away his arms when the
6  officers tried to get him in custody?
7          MR. MOORE:  Objection to form.
8     A.  I don't remember.
9     Q.  Did your father tense up his body?
10         MR. MOORE:  Objection to form.
11    A.  I don't know.
12    Q.  You testified earlier that one of the officers
13 deployed a taser.  Do you know which officer?
14         MR. MOORE:  Objection, form.
15    A.  I don't know which one.
16    Q.  Did you see how the officer deployed the taser?
17    A.  They got him in the side.
18    Q.  What side?
19    A.  I don't remember.
20    Q.  Do you know how many times your father was
21 tased?
22    A.  No.
23    Q.  And when you say "the side," what do you mean
24 "the side"?  The side of his torso?
25    A.  This side.

Page 228

1     Q.  I'm sorry?
2     A.  This side.
3     Q.  So his torso?
4     A.  I don't know.
5     Q.  Chest?  Back?  Stomach?
6     A.  His side, like over here on the side.  I don't
7  know what that's called specifically.
8     Q.  Okay.  So just for the record, you're pointing
9  to like where the ribcage area is, that side?
10    A.  Yes.  Yes.
11         MR. MOORE:  The right side.
12    Q.  Upper body?
13    A.  Yes.
14    Q.  Okay.  Upper body, right side?
15    A.  Yes.
16    Q.  Did you see any prongs from the taser?
17    A.  I don't know.
18    Q.  Was your father handcuffed at the time that he
19 was tased?
20         MR. MOORE:  Objection, form.
21    A.  No.
22    Q.  I'm sorry?
23    A.  No.
24    Q.  No?  Did your father comply with the officers'
25 commands after he was tased?

Page 229

1          MR. MOORE:  Objection to form.
2     A.  I don't know.
3     Q.  I'm sorry?
4     A.  I don't know.  No.
5     Q.  Did your father get taken down to the ground?
6          MR. MOORE:  Objection to the form.
7     A.  Yes.
8     Q.  Did you see how he was taken to the ground?
9          MR. MOORE:  Objection, form.
10    A.  There was a lot of ruckus.  No, not
11 particularly.  I just had seen how he was on the ground.
12    Q.  Do you know which officer took him to the
13 ground?
14    A.  Not by the name.  Just the heavier-set one.
15    Q.  When you say "heavier-set," how much do you
16 think he weighed?
17    A.  I don't know.  The taller one.
18    Q.  And were you still holding your son at the time
19 when your dad was taken to the ground?
20         MR. MOORE:  Objection to the form.
21    A.  Yes.
22    Q.  And were you moving around during the
23 interaction between your father and the officers?
24         MR. MOORE:  Objection, form.
25    A.  I don't remember.

Page 230

1    Q.   Were there any obstacles between you and your
2  father and the officers?
3         MR. MOORE:  Objection to form.
4    A.   Just --
5    Q.   I'm sorry?
6    A.   Just a couple people.
7    Q.   Any, like, racks or anything like that?
8         MR. MOORE:  Objection to form.
9    A.   I don't remember.
10   Q.   Do you have any idea how long your father
11 struggled with the officers before he was taken to the
12 ground?
13   A.   No.
14   Q.   And did the officers give any verbal commands
15 to your father while he was on the ground?
16        MR. MOORE:  Objection, form.
17   A.   They just kept saying, "Relax."
18   Q.   Do you know how many times they said "relax"?
19   A.   A few.
20   Q.   Any idea how many?
21        MR. MOORE:  Objection to form.
22   A.   I don't know.
23   Q.   Do you know, was it both officers or one
24 officer who said that?
25        MR. MOORE:  Objection to form.

Page 231

1    A.   I don't know.
2    Q.   And did your father comply with the officers'
3  commands to relax?
4         MR. MOORE:  Objection on to form.
5    A.   Well, he had to.  He was already gone.
6    Q.   But prior to, did your father continue to
7  struggle while he was on the floor with the officers?
8         MR. MOORE:  Objection to form.
9    A.   No.
10   Q.   Did you see any of the officers kick your
11 father while he was on the ground?
12   A.   I don't -- I don't know.
13   Q.   You don't know or did you see it?
14   A.   I don't know.
15   Q.   Well, did you see it or did you not see it?
16 You either saw it or you didn't.
17   A.   No.
18   Q.   No?
19   A.   No.
20   Q.   Did you see any of the officers punch your
21 father while he was on the ground?
22   A.   No.
23   Q.   Did you see any of the officers strike your
24 father in any way while he was on the ground?
25   A.   No.

Page 232

1    Q.   I think you were asked earlier about your
2  father being handcuffed.  Do you know which officer
3  handcuffed your father?
4         MR. MOORE:  Objection to form.
5    A.   No.
6    Q.   Did the officers continue to give verbal
7  commands to your father while trying to handcuff him?
8         MR. MOORE:  Objection to form.
9    A.   I don't know.
10   Q.   Were they still telling him to relax?
11        MR. MOORE:  Objection, form.
12   A.   I don't know.
13   Q.   Do you know how much time passed from the
14 moment your father was taken to the ground until when he
15 was handcuffed?
16   A.   No.
17   Q.   And what happened after your father was
18 handcuffed?
19        MR. MOORE:  Objection to form.
20   A.   I don't know.  He was taken into the back room.
21   Q.   Did you -- well, strike that.
22        Where were you, I guess, in relation to your
23 father when he was handcuffed?
24        MR. MOORE:  Objection, form.
25   A.   I had to have been in the back room, because I

Page 233

1  don't remember seeing him handcuffed.
2    Q.   Did you see the officers render any aid to your
3  father?
4         MR. MOORE:  Objection to form.
5    A.   Doing what?
6         MR. MOORE:  I'm sorry.  Strike that.
7    Q.   Rendering any aid to your father, like CPR or
8  anything?
9    A.   I don't recall.
10   Q.   Did you observe any physical injuries to your
11 father after he was handcuffed, like something you could
12 observe?
13   A.   I don't know.  I was in the back room.
14   Q.   Or what about right before he was handcuffed?
15 Did you observe any physical injuries?
16   A.   His whole body was purple.
17   Q.   Did you notice anything else?
18   A.   Nope.
19   Q.   I know you testified earlier you gave a
20 statement to the police and you testified today about a
21 choke hold.  Which officer are you claiming placed the
22 choke hold on your father?
23        MR. MOORE:  Objection to form.
24   A.   I don't know his name.
25   Q.   But can you describe him?

Page 234

1    A.   The taller one.
2    Q.   Okay.  And how was he placing your father in a
3  choke hold?
4        MR. MOORE:  Objection to form.
5    A.   I don't know how to describe that.  He had one
6  arm around his neck.
7    Q.   Which arm?
8    A.   I don't know.
9        MR. MOORE:  Objection, form.
10   Q.   And where was his other arm?
11       MR. MOORE:  Objection, form.
12   A.   Locked with his hand.
13   Q.   Locked with your father's hand?
14   A.   No.  I don't know how to describe it.  I don't
15 know.
16   Q.   So you don't know which arm was around your
17 father's neck, as you claim, and you don't know where
18 the other officer -- where the officer's other hand was?
19   A.   Correct.
20       MR. MOORE:  Objection to form.
21   Q.   Could you see both hands?
22   A.   No.
23   Q.   Okay.  So you just saw one arm around your
24 father?
25   A.   Yeah.

Page 235

1    Q.   Okay.  Did you ever see any of the officers
2  actually place hands around your father's neck?
3    A.   No.
4    Q.   Did you say anything to your father while he
5  was struggling with the police?
6        MR. MOORE:  Objection to form.
7    A.   I don't remember.
8    Q.   Did you ask your father to stop or calm down in
9  any way?
10       MR. MOORE:  Objection to form.
11   A.   I asked him to calm down.
12   Q.   And did he listen to you?
13       MR. MOORE:  Objection to form.
14   A.   No.  He was scared.
15   Q.   Do you have any idea how long the struggle
16 between -- from the time that the officers approached
17 your father by the cashier to when he was handcuffed, do
18 you know how long that lasted?
19       MR. MOORE:  Objection to form.
20   A.   No.
21   Q.   And when you were done giving a statement to
22 the police and you left the officers -- I'm sorry -- the
23 manager's office, was your dad still at the scene or had
24 he been taken to the hospital?
25   A.   No, they already -- they already removed him.

Page 236

1    Q.   Did DCF ever contact you following this
2  incident in regards to your son M_____?
3    A.   I don't know if they did or not.  I don't
4  remember.  I don't think so.
5    Q.   So the other officer, not the taller one but I
6  guess the shorter one, did you ever see him place his
7  arms or hands around your father?
8    A.   I don't really remember.
9    Q.   And I believe your testimony was that the
10 shorter one is the one who administered the taser?
11       MR. MOORE:  Objection to form.
12   A.   I --
13   Q.   Or you don't know?
14   A.   I don't know.
15   Q.   Did you, I guess -- did you have any activities
16 or have any hobbies with your father growing up before
17 you moved in with your grandparents?
18   A.   No.  I was just a baby.
19   Q.   So then I think you testified earlier that when
20 you lived with your grandparents you might have visited
21 your dad every so often?
22   A.   Yeah.
23   Q.   And how often did you visit with him?
24   A.   I'm not really sure.  Whenever my grandmother
25 said it was okay.

Page 237

1    Q.   Would it have been once a year?
2        MR. MOORE:  Objection to form.
3    Q.   Twice a year?  Any idea?
4    A.   No, maybe once a month.
5    Q.   And would he come see you or would you go see
6  him?
7    A.   We go back and forth.
8    Q.   Did you go on any trips with your father?
9    A.   No.
10   Q.   Did you communicate with your father, you know,
11 via text or social media or anything?
12   A.   When?
13   Q.   When a -- at any point, I guess, when you
14 started having a social media account or cell phone.
15   A.   Phone.
16   Q.   Through phone?
17   A.   Phone.
18   Q.   Okay.  Would that be phone calls?
19   A.   Yes.
20   Q.   And how often did you speak to him on the
21 phone?
22   A.   Maybe once a week, once or twice a week.
23   Q.   Were there any times that you -- I know your
24 physical address might have been Dianne's address when
25 you guys were all staying together, but were there any

Page 238

1  point in times where you left and stayed with a friend
2  or stayed on your own somewhere in the last five years
3  prior to this incident?
4      A.  No.
5      Q.  Okay.  Did you have like a designated time to
6  speak with your dad once a week or so?
7      A.  No, not really.  Just whenever.
8      Q.  Just whenever?  Okay.  Did you pay for any of
9  the expenses in relation to your father's cremation?
10     A.  Yes.
11     Q.  And how much did you pay?
12     A.  I don't remember.
13     Q.  And was this out of your own pocket?
14     A.  What?
15     Q.  Was this out of your own pocket?
16     A.  It was the money that he had in the bank.
17     Q.  I have an amount for funeral expenses of
18  $1,242.  Does that sound right?
19     A.  Sounds right.
20     Q.  Were there any other expenses related to the
21  cremation or your father's death that you know of?
22     A.  Yeah, but not documented.
23     Q.  Like what?
24     A.  Just urns and pendents and the cost to have
25  them filled.

Page 239

1      Q.  Do you know how much that is?
2      A.  No.  I only did a couple with my brothers at
3  the time.
4      Q.  But how did you pay for that?
5      A.  I had income.
6      Q.  From where?
7      A.  I was getting SSI at the time.
8      Q.  Why were you getting SSI?
9      A.  Because my son -- my son was on SSI and I was
10  getting on SSI too because I couldn't work, because I
11  couldn't work outside, because I had blackout spells.
12     Q.  When did you start having blackout spells?
13     A.  I've had them my whole life.
14     Q.  What exactly happens?
15     A.  Well, we found out what it is now.  It's just
16  anxiety attacks.  They thought it was from the heat.
17     Q.  Are you taking anything for that?
18     A.  No.
19     Q.  Did someone diagnose you with this?
20     A.  Wuesthoff.  Or, no, Holmes Regional.
21     Q.  Wuesthoff or Holmes Regional?
22     A.  No, Holmes Regional.
23     Q.  And when was this?
24     A.  I don't remember.
25     Q.  Did you suffer -- so you said you suffered from

Page 240

1  this your whole life but you just recently got
2  diagnosed?
3      A.  It had to have been 2015 or 2016 when it was.
4      Q.  Anyone diagnose you with anxiety, though?
5      A.  Yeah.  Well, no, not diagnosed.  They had me
6  take a test when I was locked up, because I had blackout
7  spells when I was locked up.
8      Q.  And that was back in 2019?
9      A.  Yeah.
10     Q.  Other than taking a test for anxiety, did you
11  get any other kind of medical or psychological treatment
12  while in jail?
13     A.  No.
14     Q.  Any other out-of-pocket expenses other than the
15  $1,200 we talked about and then the urns and pendents?
16     A.  No.
17     Q.  You're saying there's no way to document that,
18  but did you purchase these from a company?
19     A.  Online.  Online.
20     Q.  Through what company?
21     A.  Amazon.
22     Q.  Any other out-of-pocket?
23     A.  No.
24     Q.  And what about your siblings?  Do you know if
25  they incurred any out-of-pocket expenses since your

Page 241

1  father's death?
2      A.  No.
3      Q.  No?  Okay.  Do you have any records showing any
4  of the financial support that you testified your father
5  gave to you or your siblings?
6      A.  I mean, I have bank statements.
7      Q.  You still have those?
8      A.  Yeah.
9      Q.  Those are the ones from TD?
10     A.  Yeah.
11     Q.  Okay.  So if I ask for copies of those, can you
12  give those to your attorney or to the attorney here?
13     A.  Yes.
14     Q.  And what about for your siblings?  Do you know
15  if there's any record of financial support your father
16  might have given to them?
17     A.  No, he just did Western Union.
18     Q.  Okay.  Do you know when the last time your
19  father had any contact with any of your siblings?
20     A.  He was talking to my brother Donald, actually,
21  a couple days before he died, and my older sister.
22     Q.  Is that Brittony?
23     A.  Yes.
24     Q.  When was the last time he contacted her?  Do
25  you know?

Page 242

1    A.   The day before he died.
2    Q.   Did he ever -- did your father ever go visit
3  your siblings in Ohio in the five years prior to his
4  death?
5    A.   I think twice.
6    Q.   Did he see all of your siblings?
7    A.   Yes.
8    Q.   Did you go with him?
9    A.   No.
10   Q.   Why not?
11   A.   I just didn't want to.
12   Q.   And how often -- do you know how often he
13 communicated with your siblings?
14   A.   Some more than others.
15   Q.   So, like, Donald, for example?
16   A.   Yeah, more frequently, though, like, at least a
17 couple times a week he talked to him.
18   Q.   And did they talk or text?
19   A.   They called on the phone, usually.
20   Q.   Do you know when -- so do you have any idea
21 when the last time Donald saw your father?
22   A.   In person?
23   Q.   Right.
24   A.   Within the last year before he died.
25   Q.   Was that from a trip your dad made or was that

Page 243

1  from a trip Donald made?
2    A.   My dad made the trip to Ohio.
3    Q.   So your dad would have gone to Ohio maybe in
4  2017 sometime?
5    A.   By the end of 2017, beginning of 2018.
6    Q.   So then the same would go for all of your other
7  siblings?  That's the last time they all saw him?
8    A.   Yeah.
9    Q.   Other than ████?
10   A.   Who?
11   Q.   Other than ████.  Right?
12   A.   ████ hadn't seen my dad since he got took.
13   Q.   That's what I want to clarify, because I said
14 all your siblings, so I want to make sure.
15   A.   Yeah.
16   Q.   Do you have any idea when the last time your
17 dad communicated, you know, either phone, text, with
18 ████ or how often?
19   A.   No, not really.  Not off the top of my head.
20 How often, same as the rest of the kids.  He talked to
21 them at least once or twice a week over the phone.
22   Q.   What about Nicholas?  Do you know the last time
23 he communicated with him?
24   A.   No.
25   Q.   And Tommi?  Do you know the last time he

Page 244

1  communicated with Tommi?
2    A.   No.
3    Q.   What about Trey?  When was the last time he
4  communicated with Trey?
5    A.   I don't know.
6    Q.   You mentioned that he was closer to some than
7  others.  Which ones would you say he was closer to?
8    A.   Probably Donald, Nick and -- Donald, Nick and
9  █████.
10   Q.   Did they ever go on trips with your dad?
11   A.   When they were younger, yeah.
12   Q.   But in the last five years prior?
13   A.   No.
14   Q.   No?
15   A.   No.
16   Q.   Did your -- how would you describe your dad's
17 relationship with Brittony?
18   A.   I mean, they were close.  They just didn't talk
19 every day like the other ones did.
20   Q.   I thought you said before he would talk maybe
21 twice a week, so just not twice a week with her,
22 necessarily?
23   A.   No, no.  He would at least talk to all of them
24 at least twice a week, but Donald and ████, he would
25 talk with them every day.

Page 245

1    Q.   Oh, okay.  Did he ever -- do you know if he
2  corresponded with any of your siblings by email?
3    A.   No.
4    Q.   You don't know, or no?
5    A.   No, he didn't use email very well.
6    Q.   Do you know who Betty and Jerry Willen are?
7    A.   Those are ████'s foster parents.
8    Q.   And John Buffington?
9    A.   He's got something to do with that family.  I'm
10 just not sure exactly who he is to them.  It might have
11 been Nick's.
12   Q.   Now, have you spoken with Officer Krukoski or
13 Officer Mathis since this incident?
14   A.   No.
15        THE WITNESS:  Do you care if I use the
16 restroom?
17        MS. AMIGO:  Sure.  Do you want to take a
18 minute?
19        (Recess held from 4:50 p.m. to 5:15 p.m.)
20        MS. AMIGO:  We can go back on the record.  So
21 during my questioning of the witness she asked to
22 take a break to use the restroom and did not return
23 following that break, so we reserve the right to
24 continue this witness's deposition testimony at a
25 later date.  And I don't know if the City has any

Page 246

1   follow-up questions, you know, any further
2   questioning that the City needs to do, but at least
3   on behalf of the officers we will reserve that
4   right to continue her deposition.
5        MR. MARI:  The City will make the same
6   reservation.  And, Mr. Moore, did you try to reach
7   out to your client to find out where she was?
8        MR. MOORE:  I did.  My office has also tried to
9   reach out to her as well.  They have talked to her
10  probation officer, who did not authorize her to
11  stay past -- or community control officer who did
12  not authorize her to stay past 5:00 o'clock, which
13  is the only inference I can make why she would have
14  left.  I have no issue with reserving, continuing.
15       MS. AMIGO:  Thank you.
16       (Defendants' Exhibit 12 was marked for
17  identification.)
18       (The deposition was recessed at 5:17 p.m.)
19                 *  *  *  *
20
21
22
23
24
25

Page 247

1              CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA  }
4   COUNTY OF BREVARD }
5
6
7        I, JILL E. HASTEY, RPR, do hereby certify that
8   I was authorized to and did stenographically report
9   the foregoing deposition of BREANNA WHITMER; that a review of
10  the transcript was not requested; and that the foregoing
11  transcript, pages 1 through 246, is a true record of my
12  stenographic notes.
13       I further certify that I am not a relative,
14  employee, attorney or counsel of any of the parties, nor
15  am I a relative or employee of any of the parties'
16  attorneys or counsel with the action, nor am I
17  financially interested in the action.
18       Signed this day of August 20, 2020, Brevard
19  County, Florida.
20
21
22            _Jill E. Hastey_
23            JILL E. HASTEY, RPR
24
25

Page 248

1              CERTIFICATE OF OATH
2
3   STATE OF FLORIDA  }
4   COUNTY OF BREVARD }
5
6
7        I, JILL E. HASTEY, Registered Professional
8   Reporter, a Notary Public for the State of Florida,
9   certify that the witness, BREANNA WHITMER, personally
10  appeared before me this day of July 16, 2020, and was
11  duly sworn.
12
13       WITNESS my hand and official seal this day of
14  August 20, 2020.
15
16  Identification:    FL Identification Card
17
18
19
20            _Jill E. Hastey_
21            JILL E. HASTEY, RPR
                Notary Public - State of Florida
22            Commission No.  HH002372
23            My Commission Expires:  8/13/2024
24
25