```
 1   UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF FLORIDA
 2   ORLANDO DIVISION

 3   CASE NO. 6:19-cv-2187-Orl-40DCI

 4
     DIANNE LEVESQUE, as Personal
 5   Representative of the ESTATE
     OF DONALD WHITMER, JR., for and
 6   on behalf of his children BREANNA
     NIKOLE WHITMER, NICHOLAS WHITMER,
 7   DONALD WHITMER, III, DAKOTA
     WHITMER, TOMMI WHITMER, TREY
 8   WHITMER, BRITTONY WHITMER,

 9            Plaintiff,

10   vs.

11   CITY OF WEST MELBOURNE, a political
     subdivision of the State of Florida;
12   JACOB MATHIS; KEVIN KRUKOSKI; and
     DANIELLE QUINN, individually,
13
              Defendants.
14   _____/

15

16
     CONTINUED
17   DEPOSITION OF:     BREANNA WHITMER

18   DATE TAKEN:        August 7, 2020

19   TIME:              9:15 a.m. - 10:16 a.m.

20   PLACE:             U.S. Legal Support
                        Imperial Plaza Business Center
21                      6767 North Wickham Road
                        Suite 400
22                      Melbourne, Florida 32940

23   REPORTED BY:       Jill E. Hastey, RPR
                        and Notary Public
24

25
```

Page 250

```
 1  APPEARANCES:
 2      APPEARING ON BEHALF OF THE PLAINTIFF:
 3          JOHN V. MOORE, ESQUIRE
            John Vernon Moore, P.A.
 4          700 North Wickham Road
            Suite 206
 5          Melbourne, Florida 32935
            john@moorelegal.com
 6
            GARY L. HOLLAND, ESQUIRE
 7          Michael Bross & Bryan Savy, PLLC
            997 South Wickham Road
 8          West Melbourne, Florida 32904
            gholland@brosslawoffice.com
 9
10      APPEARING ON BEHALF OF THE DEFENDANT
        CITY OF WEST MELBOURNE:
11
            FRANK M. MARI, ESQUIRE
12          Bell & Roper, P.A.
            2707 East Jefferson Street
13          Orlando, Florida 32803
            fmari@bellroperlaw.com
14
15      APPEARING ON BEHALF OF THE DEFENDANTS
        JACOB MATHIS, KEVIN KRUKOSKI AND DANIELLE QUINN:
16
            ANDREA G. AMIGO, ESQUIRE
17          Roberts, Reynolds, Bedard & Tuzzio, PLLC
            470 Columbia Drive
18          Building C101
            West Palm Beach, Florida 33409
19          aamigo@rrbpa.com
20
21
22
23
24
25
```

Page 251

```
 1                 I N D E X
 2  AUGUST 7, 2020
 3  DEPOSITION OF:  BREANNA WHITMER
 4      Cross-Examination (Cont'd) by Ms. Amigo    252
        Redirect Examination by Mr. Mari           288
 5
    CERTIFICATE OF REPORTER                        290
 6  CERTIFICATE OF OATH                            291
 7                 *  *  *  *  *
 8
                   E X H I B I T S
 9
10  Defendants' Exhibit 12 (Previously marked)
    Photographs
11
    Defendants' Exhibit 13                         289
12  Notice of Taking Continued Deposition
    Duces Tecum
13
14                 *  *  *  *  *
15
16             S T I P U L A T I O N S
17
18      It is hereby agreed and so stipulated by
19  and between the parties hereto, through their
20  respective counsel, that the reading and signing of
21  the transcript are expressly waived by
22  the Deponent.
23
24
25
```

Page 252

```
 1                P R O C E E D I N G S
 2                     **********
 3              BREANNA WHITMER,
 4  having been first duly sworn to tell the truth, was
 5      examined and testified upon her oath as follows:
 6          THE WITNESS:  Yes.
 7              CROSS-EXAMINATION (Continued)
 8  BY MS. AMIGO:
 9      Q.  Good morning, Ms. Whitmer.  My name is
10  Andrea Amigo.  We met last time.  We were here back on
11  June 16th, 2020, for your deposition.
12          Could you please state your full name for the
13  record and spell your name, please.
14      A.  Breanna Whitmer, B-r-e-a-n-n-a, Whitmer,
15  W-h-i-t-m-e-r.
16      Q.  So same rules apply like the last deposition.
17  You know, you are under oath.  You're sworn to tell the
18  truth.  If you don't understand the question, please let
19  me know and I'll do my best to rephrase it.
20          If you need to take a break for any reason we
21  can take a short break.  I don't anticipate this taking
22  very long, so we're just trying to finish up where we
23  left off from last time.  But if you do need a restroom
24  break for anything, just let us know and we can take a
25  quick break.
```

Page 253

```
 1      Q.  Did the probation officer or anything -- did
 2  you have any issues from your last deposition?
 3      A.  No.  I got home about half an hour late, but I
 4  was okay.
 5      Q.  So no violations or anything?
 6      A.  No, it was fine.
 7      Q.  Okay.  So no arrests or convictions since we
 8  adjourned your deposition last time?
 9      A.  No.
10      Q.  Did you review anything in preparation for your
11  continued deposition today?
12      A.  No.
13      Q.  And when I ask if you reviewed anything, I mean
14  any documents, statements, videos, records, anything
15  like that.
16      A.  No.
17      Q.  Did you have a chance to speak with anyone
18  prior to your deposition today about your deposition?
19      A.  Not really.
20      Q.  When you say not really --
21      A.  No.  No.
22      Q.  Okay.  Did you have a chance to speak with
23  Mr. Moore or Mr. Holland prior to your deposition today?
24      A.  No.
25      Q.  And what about Ms. Levesque?
```

Page 254

1   A.   No.
2   Q.   Now, I understand the City noticed your
3 deposition as a duces tecum, which means there are
4 documents that you're asked to bring with you today.  We
5 cross-noticed the deposition.  Did you bring any
6 documents with you today?
7   A.   No, I forgot.  I didn't.
8   Q.   Okay.  So the list of documents that I saw in
9 the notice -- and what I'll do is I'll go ahead and mark
10 the City's notice of continued deposition duces tecum.
11 I had marked the photos last time we were here as 12, so
12 I will do this as 13 just so we don't mess up the order.
13       MS. AMIGO:  Do you mind if I just write on
14  here?
15       MR. MOORE:  No, that's fine.
16       MR. MARI:  There's four copies there.
17       MS. AMIGO:  Okay, great.  I'll pass this back.
18  Can you give one to her?
19       MR. MOORE:  Sure.
20   Q.   And you've just been passed a copy of the
21 notice of taking continued deposition duces tecum that
22 was served by the City.  Did you see this document?
23   A.   Oh, yeah.
24   Q.   Okay.  So you're familiar with this document?
25   A.   Yeah.

Page 255

1   Q.   Yes?  Okay.  And if you look at page 2 of 4,
2 there's a list of documents that you're asked to bring.
3 There's -- and it goes on to page 3.  There's 15
4 documents.  Which documents did you put together that
5 you forgot to bring today?
6   A.   The bank statements that you guys asked for.
7   Q.   Okay.  Anything else?
8   A.   No.
9   Q.   So the bank statements are requests No. 1.
10 Right?
11   A.   Yeah.
12   Q.   Okay.  So for request No. 2, documents you
13 contend supporting your claim for damages in this
14 action.  Do you have any documents?
15   A.   Which one?
16   Q.   For No. 2, all documents you contend support
17 any claim for damages in this action.
18   A.   No.
19   Q.   You don't have any?
20   A.   No.
21   Q.   Okay.  And No. 3, all documents for funeral or
22 memorial expenses for Donald Whitmer Junior.
23   A.   I do have those.
24   Q.   Okay.  Did you put those together with the bank
25 statements?

Page 256

1   A.   Yeah.
2   Q.   And where are those, the bank statements and
3 the funeral expense records?  Are they --
4   A.   In my file cabinet at home.
5   Q.   I'm sorry?
6   A.   In my file cabinet at home.
7   Q.   File cabinet.  Okay.  And what about No. 4, all
8 documents reflecting or evidencing any means of
9 contacting any of your siblings?
10   A.   No.
11   Q.   You don't have any?
12   A.   No.
13   Q.   And what about No. 5, all communications
14 between you and any of your siblings regarding any
15 matter related to this action?
16   A.   No.
17   Q.   You don't have any texts, communications or
18 emails?
19   A.   No.
20   Q.   What about No. 6, all communications between
21 you and Dianne Levesque regarding any matter related to
22 this action?  Do you have any of those records?
23   A.   No.
24   Q.   No text messages or emails between you and
25 Dianne regarding this case?

Page 257

1   A.   No.
2   Q.   What about No. 7, all documents reflecting or
3 evidencing any communications involving you and
4 Donald Whitmer Junior?
5   A.   Just what -- anything I received from my
6 attorney.
7   Q.   Which attorney are you talking about?
8   A.   John Moore.
9   Q.   Okay.  So is it your testimony that Mr. Moore
10 is representing you personally in this case?
11   A.   Yes.
12   Q.   And did you sign any kind of retainer agreement
13 with Mr. Moore?
14   A.   Yes.
15   Q.   And when did you sign that agreement?
16   A.   I don't know.
17   Q.   Other than the documents between you and
18 Mr. Moore, do you have any other communications
19 reflecting -- communications between you and your
20 father?
21   A.   No.
22   Q.   You don't have any text messages or email
23 communications?
24   A.   No.
25   Q.   And for No. 8, documents related to any

Page 258
1  counseling, treatment and/or therapy you contend you
2  received as a result of the incident that is the subject
3  of this action.
4      A.   Aspire.
5      Q.   Do you have those records?
6      A.   Yes.
7      Q.   Those are also in your file cabinet at home?
8      A.   Yes.
9      Q.   What about No. 9, statements made by you
10 regarding the incident that is the subject of this
11 action?
12     A.   No.
13     Q.   You don't have any?
14     A.   No.
15     Q.   What about No. 10, documents reflecting or
16 evidencing any support or services rendered to you or
17 any of your siblings by Donald Whitmer Junior?
18     A.   No.
19     Q.   You don't have any?
20     A.   No.
21     Q.   No. 11, documents reflecting or evidencing any
22 support or services rendered by you or any of your
23 siblings to Donald Whitmer Junior?
24     A.   No.
25     Q.   No. 12, all of your internet social media

Page 259
1  activity regarding or referencing Donald Whitmer Junior.
2      A.   No.
3      Q.   You have none or --
4      A.   No, I don't have any.
5      Q.   Did any ever exist?
6      A.   No.
7      Q.   And social media activity can mean, you know,
8  picture postings, blogs, you know, any kind of social
9  media activity.  You're saying there's none?
10     A.   No.
11     Q.   No. 13, all documents related to the cash
12 Donald Whitmer Junior had in his possession on the date
13 of the incident that is the subject of this action.
14     A.   No.
15     Q.   You have no documents?
16     A.   No.
17     Q.   No. 14, all communications between you and
18 John V. Moore and his law firm other than those solely
19 related to any criminal case in which you are or were
20 the defendant and were or are represented by Mr. Moore.
21     A.   No.
22     Q.   When you say "no," you mean you have none?
23     A.   No.
24     Q.   No. 15, all communications between you and
25 Gary Holland and his law firm other than those

Page 260
1  communications solely related to any criminal case in
2  which you are or were the defendant and were or are
3  represented by Gary Holland.
4           MR. HOLLAND:  Object to form.  That's
5      attorney-client privilege.
6      A.   No.
7           MR. MARI:  Did you-all get the case I sent over
8      yesterday about attorney-client privilege with a
9      nonparty beneficiary of the estate?  I emailed it
10     to you yesterday.
11          MR. HOLLAND:  I'm not sure.
12          MR. MARI:  Okay.
13          MS. AMIGO:  I've got a copy here.
14          MR. MARI:  Have you checked your email since
15     yesterday?
16          MR. HOLLAND:  Probably so.  I've got a case
17     sitting there, but, you know, if she's represented
18     in the capacity as a beneficiary, then it's
19     attorney-client privilege.
20          MR. MARI:  It's not.  And there's one case I
21     was able to find on that that said there is no
22     attorney-client privilege between a nonparty
23     statutory survivor and the attorney for the PR of
24     the estate, who is the plaintiff to the case.  So,
25     you know, I do want to talk with you-all more about

Page 261
1  this, perhaps, if that will be useful, but I will
2      be moving to compel on that issue.
3           MR. HOLLAND:  Okay.
4           MS. AMIGO:  And we'll be joining as well.
5           MR. MARI:  So there is a copy of that case.
6  It's --
7           MS. AMIGO:  Yeah, I've got --
8           MR. HOLLAND:  Yeah, I've got a copy.
9           MS. AMIGO:  Oh, you do?  Okay.
10          MR. HOLLAND:  Yeah.
11          MS. AMIGO:  I've got this one case.  Is it the
12     Beaubrun v. GEICO?
13          MR. MARI:  Yes, that's the one.
14          MS. AMIGO:  Okay.  So Beaubrun v. GEICO, 2017,
15     WL3284825.  It's a case out of the Southern
16     District of Florida, August 1st, 2017, and in that
17     case --
18          MR. HOLLAND:  We'll look at it.  We don't need
19     to go into it right now, I don't think.  Go ahead
20     with your deposition.
21          MR. MARI:  Well, I mean, we could perhaps sort
22     it out now and not end up coming back for another
23     deposition with, you know, a claim of expenses and
24     also a motion to compel those documents as well.
25     And also in that regard, the objection made during

Page 262

1  the deposition, we're just reading the duces tecum
2  list now.  This notice was served quite a while
3  ago.
4      MR. HOLLAND:  So you want to know any
5  communications she's had with me?
6      MR. MARI:  Yes, other than perhaps -- if you're
7  the attorney for her criminal or VOP case, I don't
8  really care about those communications.  You know,
9  it appears to me, and I don't dispute the time,
10 that you and/or Mr. Moore are the attorney for
11 Breanna in her criminal VOP case.  I'm not asking
12 about that.  That's why we specifically excluded 14
13 and 15 on this list.
14     MR. MOORE:  Oh, these are yours?  I thought it
15 was the City's.
16     MR. MARI:  Yeah, it is the City's.
17     MR. HOLLAND:  I'll tell you what -- I mean the
18 officers.  In the interest of time, you can answer
19 that question because we haven't had any
20 conversations.
21 A.  Yeah, no.
22     MR. MARI:  Well, 15 isn't about communications.
23 It's about documented communications.  You can see
24 it in the request.  That was a different question
25 about communications themselves.  I think Mr. Moore

Page 263

1  stated earlier that Kristy sent over this list, so
2  there had been some communications between his
3  office and Breanna, obviously.
4  Q.  Right.  And when I ask you about that I'm not
5  just saying Mr. Moore and Mr. Holland.  The request
6  referred to his law firm, which means anybody who works
7  for either firm.  So have you had any communications
8  with anyone from Mr. Moore's office or Mr. Holland's
9  office?
10     MR. HOLLAND:  Why don't you guys continue and
11 we'll revisit this.  I will take a look at this
12 case.  Okay?  Otherwise, we're going to be here all
13 day.
14     MR. MARI:  The reason we're bringing it up now
15 is because I don't want to have to continue this at
16 a later date where I'm moving for fees for coming
17 back here.
18     MR. HOLLAND:  Well, I mean, if it's an issue,
19 it's an issue.  We don't mind if you're moving for
20 fees or not.  You know, we'll let the judge decide.
21 But if you want me to take a look at the case and
22 you go ahead with your deposition and we'll revisit
23 it in a few minutes.
24     MS. AMIGO:  Well, I have to get my question on
25 the record and her answer.

Page 264

1      MR. HOLLAND:  Yeah, go ahead.
2      MS. AMIGO:  But I agree with Mr. Mari that if
3  we do have to come back, then obviously we will
4  have to seek our fees and costs if you're
5  instructing her not to answer for any reason.
6  Q.  But my question to you, Ms. Whitmer, is have
7  you had any communications with Mr. Moore or anyone at
8  his law firm regarding this matter other than the
9  criminal case that they may be representing you on?
10 A.  I don't think so.
11 Q.  Any email communications?
12 A.  No.
13 Q.  Okay.  So when Mr. Moore said Kristy sent this
14 to you, do you know who Kristy is?
15 A.  His -- what is it?  Secretary?
16 Q.  And so when she sent it to you, did she email
17 it to you?
18 A.  It didn't come to me.  It went to my mom.
19 Q.  Okay.  But it was directed to you.  Correct?
20 A.  No, it was directed to my mom.
21 Q.  Well, it's for your deposition.  Okay.  So any
22 communications with anyone else from Mr. Moore's firm
23 other than Mr. Moore and Kristy?
24 A.  No.
25 Q.  Okay.  And do you have any text communications?

Page 265

1  A.  No.
2  Q.  Any written correspondence, letters --
3  A.  No.
4  Q.  -- that were either sent to Ms. Levesque --
5  that you received through Ms. Levesque from Mr. Moore's
6  office?
7  A.  I don't know.
8  Q.  Okay.  Would Ms. Levesque be in possession of
9  those communications?
10 A.  I don't know.
11 Q.  And same question for Mr. Holland and his firm.
12 Any written communications, whether it be emails,
13 letters, text messages, from anyone at Mr. Holland's
14 firm, including Mr. Holland?
15 A.  No.
16 Q.  And have you had any meetings with anyone at
17 Mr. Holland's firm regarding this matter?
18 A.  No.
19 Q.  Okay.  And/or any conference calls?
20 A.  No.
21 Q.  All right.  And what about with Mr. Moore?
22 Have you had any meetings or conference calls regarding
23 this matter?
24 A.  No.
25 Q.  So the first time you ever spoke with Mr. Moore

Page 266

1 was when you came to your depo on July 16th?
2   A.   No.
3   Q.   Okay.  So have you had communications with
4 Mr. Moore prior to your deposition this week?
5   A.   Yes.
6   Q.   And what did you discuss with Mr. Moore?
7   A.   Not since the last depo.
8   Q.   Well, I'm talking about anytime since this
9 incident.
10  A.   The only time we have spoken was about the
11 case.
12  Q.   And I don't want to know what you discussed
13 regarding your criminal case.  We're talking about this
14 litigation.
15  A.   Right.  The case.
16  Q.   What about?
17  A.   Just about -- I don't remember.
18  Q.   Did you discuss your deposition?
19  A.   No.
20  Q.   I mean prior to coming July 16, your
21 deposition.
22  A.   Yeah, we went over -- we talked the day before.
23  Q.   And what did you discuss?
24  A.   I don't remember.
25  Q.   Did you review any records or documents with

Page 267

1 Mr. Moore during that meeting?
2   A.   No.
3   Q.   Was this meeting in person?
4   A.   No, over the phone.
5   Q.   And how long was the meeting?
6   A.   It was just a few minutes on the phone.  It was
7 just basically explaining what a deposition was.
8   Q.   Okay.  Other than that, any other communication
9 with Mr. Moore --
10  A.   No.
11  Q.   -- or anyone from his office?
12  A.   No.
13  Q.   So this notice of continued deposition, you
14 know, asked you -- instructed you to bring these
15 documents, and if I'm understanding your testimony
16 you're saying the only documents that you have are the
17 bank statements from TD Bank, the funeral/memorial
18 expenses.  You mentioned for No. 7 the only documents
19 you have are from the attorney, so what documents are
20 those?
21  A.   I don't know right offhand.
22  Q.   And then the Aspire records and that's it?
23  A.   Yes.
24  Q.   Have you made any efforts to locate any of
25 these records that were requested from you?

Page 268

1   A.   No.
2   Q.   And why is that?
3   A.   I forgot about it.
4   Q.   I've got what I've marked -- and just before I
5 move on, those records that you do have in your
6 possession, we ask that you preserve those records
7 because we're going to need you to produce those since
8 this is your notice of deposition duces tecum, meaning
9 you're required to bring those records with you today,
10 and since you failed to do so we're going to need you to
11 provide those records after this deposition.
12  A.   Okay.
13  Q.   And I reserve the right to continue this
14 deposition and question you about those records, because
15 the whole point was for you to bring those so we can
16 review them, question you about them while you're here.
17 Now we won't have that ability because you didn't bring
18 those records.
19  A.   I forgot that I was obligated to bring them.
20       MR. MARI:  I'll join in that reservation.
21  Q.   I want to show you what we had previously
22 marked when we were here as Defendant's Exhibit 12,
23 which are photos that I labeled.  They go from 12A to
24 12J.  Have you seen these photos before?
25  A.   Yes.

Page 269

1   Q.   So what I want you to do is if you can please
2 go through each photo and just identify who is in the
3 photo and when these were taken.
4   A.   Well, the first one is my son M▓▓▓▓ and my
5 dad, and that had to have been 2017 when this one was
6 taken because it looks like he's about a year old.  The
7 second one is my dad.  Do not remember when that was
8 taken.  Same with the third one.
9   Q.   And before you go through -- I'm sorry.  The
10 first and the second, do you know where these were
11 taken?
12  A.   I don't remember where we were on the first
13 one.
14  Q.   Do you know who took that photo?
15  A.   Either me or Dianne.
16  Q.   Okay.  And for the second one, do you know
17 where this photo was taken?
18  A.   That's the River Palm -- or, shoot.  I think
19 it's the River Palm Hotel on U.S. 1 in Palm Bay.
20  Q.   Is this the hotel where your father lived?
21  A.   He bounced around from hotel to hotel whenever
22 he traveled for work, so...
23  Q.   But was this a hotel he stayed at for work?
24  A.   Yeah, he did for a couple of weeks.
25  Q.   Did you take this photo?

Page 270

1  A. I think so.
2  Q. Were you staying at this hotel with your
3  father?
4  A. Yeah, I was staying there for about a week.
5  Q. Do you know approximately when this photo was
6  taken?
7  A. I don't remember.
8  Q. It doesn't have to be an exact date, obviously,
9  but do you recall a month or year?
10 A. It had to be 2018.
11 Q. Why is that?
12 A. Because I remember staying at this hotel with
13 him, which was close to the apartment that I was staying
14 at on Wildbriar in Palm Bay. It was down the road on
15 U.S. 1, so...
16 Q. And the apartment that you're referencing,
17 Wildbriar, is that one where Dianne lives?
18 A. Not currently. Not now. We did live there.
19 Q. Right. And the next photo?
20 A. Same place, same timing.
21 Q. And what about the next one, which I think I
22 have as 12D?
23 A. It says "D" on it.
24 Q. Yeah, the exhibit is Exhibit 12, but that's
25 "D". Right?

Page 271

1  A. Yeah.
2  Q. Who is in that photo?
3  A. My son M▓▓▓▓ and my dad.
4  Q. And when was this photo taken?
5  A. I have no idea.
6  Q. You said before, I think, at your last
7  deposition, your son was born in ▓▓▓▓ 2017.
8  A. Yes.
9  Q. Is that correct? Okay.
10    And this is M▓▓▓▓ you said. So how old do
11 you think he is in this picture?
12 A. He's under a year old.
13 Q. So do you think it was sometime in 2017, early
14 2017?
15 A. Yeah.
16 Q. Where was this photo taken?
17 A. I don't know.
18 Q. Do you know who took it?
19 A. It wasn't me, so it was Dianne.
20 Q. And how do you know?
21 A. Because it was just me and her around him.
22 Q. Oh, I'm sorry. I thought you said, "It wasn't
23 me. It was Dianne." So if it wasn't you --
24 A. It was her.
25 Q. Okay. Is this of the same hotel room?

Page 272

1  A. No, that's not the same hotel.
2  Q. Is this the apartment?
3  A. No, it's a different hotel, it looks like.
4  Q. Was your father working back in 2018?
5  A. I don't think so.
6  Q. Because you testified earlier that the photos,
7  you know, 12B and 12C, were taken sometime in 2018 at a
8  hotel where your father used for work.
9  A. Oh, ESCO Services, LLC.
10 Q. That was in 2018?
11 A. Yes.
12 Q. Do you know what periods of time he worked for
13 ESCO in 2018?
14 A. He worked there in 2017, too.
15 Q. Do you know the dates?
16 A. No.
17 Q. All right. Then what about the picture that
18 I've marked as E?
19 A. That was in Palm Bay. I don't remember where
20 we are, though. We're on U.S. 1 in Palm Bay, though.
21 Q. And who took this photo?
22 A. I did.
23 Q. And how do you recall that?
24 A. I remember that day.
25 Q. Do you know approximately when this was taken?

Page 273

1  A. No.
2  Q. Could it have been sometime in 2018?
3  A. I don't remember.
4  Q. And what about this next photo that is marked
5  as F?
6  A. That was after he got his Jaguar in 2018 after
7  taxes.
8  Q. Is that the 2006 Jaguar?
9  A. Yes.
10 Q. The same one that he drove to Publix on the day
11 of the incident?
12 A. Yes.
13 Q. And you're saying he purchased this vehicle
14 after filing his taxes?
15 A. Yes.
16 Q. And do you know approximately when that was?
17 A. 2018.
18 Q. And just to clarify, picture E and F are both
19 pictures of your father?
20 A. Yes.
21 Q. And picture F, what is he holding in his hand?
22 A. That's a vape.
23 Q. One of those vape pens?
24 A. It's a mod.
25 Q. What's that?

Page 274

1   A.   It's a vape.
2   Q.   And what did he smoke in the vape?
3   A.   Vape juice.
4   Q.   And how often -- or strike that.
5        When did he start using this vape, or any vape?
6   A.   He got it in 2018 after he got his car.  He was
7   trying to quit smoking.
8   Q.   How long did he smoke for?
9   A.   Since he was a child.
10  Q.   At what age, do you think?
11  A.   13.
12  Q.   And when did he start to try to quit smoking?
13  A.   2018.
14  Q.   Is that the first time?
15  A.   To my knowledge.
16  Q.   And it's my understanding on the day of this
17  incident he was 45 years old?
18  A.   Yes.
19  Q.   Okay.  So that means he would have been smoking
20  for 32 years?
21  A.   Sounds about right.
22  Q.   And do you recall how often he smoked?  Was it
23  --
24  A.   Every single day.
25  Q.   Do you know how many packs?

Page 275

1   A.   At least a half a pack a day.
2   Q.   And then when he switched over to the vape --
3   what did you call it?  A vape --
4   A.   Mod.  It's a mod box.
5   Q.   Okay.  Mod box.  How often did he use the vape
6   mod box?
7   A.   He would go back and forth from using the vape
8   to cigarettes in order to slow down, so daily.
9   Q.   So when he was using the vape box, he was still
10  smoking cigarettes in between?
11  A.   Yes.
12  Q.   And how many cigarettes was he smoking in
13  between on an average day?
14  A.   Like, four or five.
15  Q.   Did he smoke anything else?
16  A.   No.
17  Q.   All right.  And the next picture I have is G.
18  Who is in this photo?
19  A.   My dad.
20  Q.   And when was this taken?
21  A.   2019.
22  Q.   Where was this taken?
23  A.   At the apartment on Wildbriar in Palm Bay.
24  Q.   Any idea approximately when in 2018?
25  A.   No.

Page 276

1   Q.   And do you know who took this photo?
2   A.   I did.
3   Q.   This next photo is H.  Was that taken around
4   the same time as 12G?
5   A.   Same day.
6   Q.   And that's your father?
7   A.   Yes.
8   Q.   And same location.  Correct?
9   A.   Yes.
10  Q.   And this next photo that is marked as I, do you
11  recall when this photo was taken?
12  A.   Beginning of 2018.
13  Q.   And who is in the photo?
14  A.   Me and my father.
15  Q.   And where was this taken?
16  A.   At the -- it was at the Oaks movie theater.
17  Q.   And who took the photo?
18  A.   I don't know.  We handed the phone to a
19  stranger so they could take a picture of us.
20  Q.   So how old were you in this photo?
21  A.   The same one we're on?
22  Q.   Yes.
23  A.   19, I think.
24  Q.   Okay.  And then the next photo I have marked as
25  J, who is in this photo?

Page 277

1   A.   Me and my dad.
2   Q.   And where was it taken?
3   A.   Cocoa Beach.
4   Q.   And do you know when?
5   A.   2015, in December.
6   Q.   And who took the photo?
7   A.   My stepsister, Chelsea.
8   Q.   What was Chelsea's last name again?
9   A.   James.
10  Q.   James.  And she's Ms. Levesque's daughter.
11  Right?
12  A.   Yes.
13  Q.   Okay.  Were you living in Cocoa Beach at the
14  time?
15  A.   No, we were -- I don't remember where we were
16  staying.  This was the -- this was the day I got here to
17  Florida.
18  Q.   So how old were you?
19  A.   I was 17.
20  Q.   And before that you were in Ohio?
21  A.   Yes.
22  Q.   I think you testified earlier, or at your last
23  deposition, that in Ohio you were living with your
24  grandparents.  Right?
25  A.   Yes.

Page 278

1  Q.  Okay.  And those were your paternal
2  grandparents on your dad's side?
3  A.  My grandmother was my dad's mom.  My grandpa
4  was -- he's not my blood, but my grandmother remarried,
5  so...
6  Q.  Oh, okay.  And why did you leave your
7  grandparents' residence in Ohio?
8  A.  After my grandma died I wanted to be with my
9  dad.
10 Q.  And when did she pass away?
11 A.  2011.
12 Q.  But you didn't move down to Florida until 2015?
13 A.  December 20th, yes.
14 Q.  But did you move in with your father up in Ohio
15 after 2011?
16 A.  I moved in with my dad when I turned -- right
17 when I turned 16 years old.
18 Q.  And what year would that have been?
19 A.  Oh, gosh.  I don't know.
20 Q.  Okay.  And when you moved in with your dad,
21 that was still in Ohio?
22 A.  Yes.
23 Q.  Did your siblings stay with your grandparents
24 after you moved out?
25 A.  Yes.

Page 279

1  Q.  All of them?
2  A.  Yes.
3  Q.  Was your grandmother's husband still alive at
4  the time?
5  A.  Yes.
6  Q.  And how did your grandmother pass away?  What
7  was the cause of her death?
8  A.  She had severe diabetes and kidney failure.
9  Q.  And it's my understanding you lived with your
10 grandmother and her husband since you were one years
11 old.  Correct?
12 A.  Yes.
13 Q.  So were you close with your grandmother?
14 A.  Yes.
15 Q.  After she passed away, how did that affect you
16 emotionally?
17 A.  I mean, I was upset about it.
18 Q.  Did you seek any kind of counseling?
19 A.  No.
20 Q.  Grieving or grief counseling?
21 A.  No.
22 Q.  And then when you moved in with your father at
23 the age of 16 in Ohio, was Dianne Levesque living with
24 him at that point?
25 A.  Yes.

Page 280

1  Q.  Were they romantically involved at that point?
2  A.  No, I think they were still at the time just
3  friends.  That happened over time.
4  Q.  I'm just going to represent to you that the
5  exhibit that we went over, Exhibit 12, are photos that
6  were produced to us by Mr. Moore in response to our
7  request for production of photos of your father prior to
8  the incident.  Are you in possession of any other
9  photos --
10 A.  No.
11 Q.  -- of your father?
12 A.  Oh, I mean, at home, yes.
13 Q.  And specifically the request was for any and
14 all color photographs, digital copies of photographs and
15 videos in possession, custody or control of the
16 plaintiff, her attorneys, investigators, agents,
17 servants and police, showing your father, the decedent,
18 Donald Whitmer Junior, in the last year of his life.
19     So do you have any digital photos, like, maybe
20 in your phone or online somewhere that aren't
21 necessarily, you know, printed out like this?
22 A.  I do on that old phone.  I just got a new
23 phone, so not on this device.
24 Q.  Would there be any photos on the old phone from
25 the last year of his life?

Page 281

1  A.  I don't know.  I would have to look.
2  Q.  Okay.  I just ask that you please preserve
3  those photos.  You know, don't erase them or anything
4  because we'll need those.
5  A.  Okay.
6  Q.  So they may not be printed ones.  If you have
7  them on your phone or, like, on social media like
8  Facebook or Instagram or, you know, Snapchat, whatever
9  you use, if you can please preserve those so that way we
10 can get copies of those photos.
11     You mentioned you might have photos at home.
12 Are those printed photos, like, in picture frames, that
13 kind of thing?
14 A.  I have a photo album.
15 Q.  And would those be photos during the last year
16 of his life?
17 A.  I'm sure.
18 Q.  Okay.  So, again, I'd ask you to please keep
19 those and, you know, as we'll be requesting those so
20 those can be produced to us.
21 A.  Okay.
22 Q.  Do you have any videos?
23 A.  No.
24 Q.  I think the last time we were here you had
25 testified that your father had overdosed on drugs on two

Page 282

1  occasions that you're aware of. Do you recall that
2  testimony?
3     A.  Yes.
4     Q.  Okay. Were you ever actually with your father
5  when he suffered from any of these overdoses?
6     A.  I don't recall.
7     Q.  Do you recall him suffering from any overdose
8  back in February of 2016?
9     A.  I don't remember.
10    Q.  Okay. Do you recall staying at a Budget Inn
11 with your father back in February of 2016 --
12    A.  I don't know.
13    Q.  -- in Cocoa Beach?
14    A.  A Budget Inn? I don't remember.
15    Q.  Do you recall ever calling the police because
16 your father was in distress or having a bad reaction to
17 using drugs?
18    A.  No.
19    Q.  Did you ever witness your father trying to hurt
20 himself?
21    A.  I don't think so.
22    Q.  Did a detective from Cocoa Beach Police
23 Department ever speak to you or take your statement in
24 regards to any incident involving your father and the
25 use of drugs?

Page 283

1     A.  Not that I remember.
2     Q.  Was your father ever hospitalized at Wuesthoff
3  Hospital?
4     A.  Wuesthoff?
5     Q.  Yes.
6     A.  I don't -- not to my knowledge.
7     Q.  Did you ever -- did you ever stay at
8  Crosswinds?
9     A.  I did.
10    Q.  And when was that?
11    A.  I was still 17. I was a runaway still.
12    Q.  What do you mean you were a runaway?
13    A.  Well, I ran away from home, so I wasn't really
14 allowed to be out of the state that I'm from.
15    Q.  Okay. And how did you end up at Crosswinds?
16    A.  That I don't remember.
17    Q.  How long were you at Crosswinds?
18    A.  Not long.
19    Q.  So if you were 17 years old, this would have
20 been after you moved in with your father?
21    A.  After what?
22    Q.  After you moved in with your dad.
23    A.  Yes.
24    Q.  Okay. And I think you testified just when we
25 were looking at the photos, like, 12J, that this was

Page 284

1  taken in Cocoa Beach in 2015 when you first came to
2  Florida. Is that correct?
3     A.  The last photo, yes.
4     Q.  Okay. So you were 17 back in 2015?
5     A.  Yes.
6     Q.  And while you were at Crosswinds, were you ever
7  -- did you ever give a statement to the police about
8  your father?
9     A.  Not that I remember.
10    Q.  Do you recall any detectives speaking to you
11 about your relationship with your father?
12    A.  No.
13    Q.  Have you ever been questioned as to whether you
14 were ever the victim of any type of sexual assault or
15 sexual abuse?
16    A.  No.
17    Q.  Okay. And did you ever have any kind of sexual
18 relationship with your father?
19    A.  No.
20    Q.  Did DCF ever contact you in regards to any
21 incident involving your father?
22    A.  No.
23    Q.  You know what DCF is. Right? The Department
24 of Children and Family Services.
25    A.  Yeah.

Page 285

1     Q.  And then you testified that you have two boys.
2  Correct?
3     A.  Correct.
4     Q.  M▓▓▓▓ and J▓▓▓▓?
5     A.  Yes.
6     Q.  Are they still in foster care?
7     A.  They are.
8     Q.  I know when we were here last time you didn't
9  know who the father was of your sons. Have there ever
10 been any kind of paternity testing done to determine who
11 the father is?
12    A.  No.
13    Q.  And while you were at Crosswinds, were you ever
14 questioned as to any allegations that were made by
15 anyone that you and your father had a sexual
16 relationship?
17    A.  No.
18    Q.  Did Ms. Levesque ever state at any point in
19 time since you've known her that she suspected that you
20 and your father had any kind of sexual relationship?
21    A.  No.
22    Q.  Were any of your other siblings staying with
23 you and your dad back in 2015 when you came to Florida?
24    A.  My brother Tommi and his fiancée.
25    Q.  And who is his fiancée?

Case 6:19-cv-02187-PGB-DCI   Document 90-3   Filed 09/23/20   Page 11 of 12 PageID 1271

Breanna Whitmer
August 07, 2020                                                                                   286 to 289

## Page 286

1  A.  Athena Miller.
2  Q.  Athena, A-t-h-e-n-a?
3  A.  Yes.
4  Q.  Are they married?
5  A.  No, they're still engaged.
6  Q.  So they came down in 2015 at the same time as
7  you?
8  A.  Yes.
9  Q.  And how long did they stay with your father?
10 A.  They was only here for a couple of months
11 before they went back.
12 Q.  Any of your other sisters who -- you know,
13 other than your brother Tommi, any of your sisters come
14 and stay with you and your dad?
15 A.  No.
16 Q.  You mentioned your stepsister might have taken
17 that picture on the beach.
18 A.  Yes.
19 Q.  Were there ever any allegations of your father
20 having any kind of sexual relationship with your
21 stepsister?
22 A.  No.
23 Q.  And how old was your stepsister back in 2015?
24 A.  I do not know.
25 Q.  Do you know her date of birth?

## Page 287

1  A.  No.
2  Q.  Were you ever taken to JDC?
3  A.  I don't know what that is.
4  Q.  Okay.  Were you ever put into juvenile
5  detention, like a juvenile detention center?
6  A.  No.
7  Q.  Back in February of 2016, would you have been
8  staying with your father?
9  A.  Yes.
10 Q.  And would that have been in Florida?
11 A.  In 2016, yes.
12 Q.  At any time that you stayed with your father at
13 any of these hotels -- because I know you testified
14 earlier in your last deposition that you would move from
15 hotel to hotel at some point while you're with your dad
16 in Florida.  At any of those times did you ever have to
17 call the police because of any incident involving your
18 father?
19 A.  Not that I remember.
20 Q.  And at any point in time when you're at those
21 hotels or motels with your father, did you see him take
22 any drugs or take anything --
23 A.  No.
24 Q.  And did your dad ever lock himself in a hotel
25 room while you were staying with him trying to hurt

## Page 288

1  himself in any way?
2  A.  Not that I remember.
3  Q.  Do you recall speaking to a Detective Branda
4  Marchica of the Cocoa Beach Police Department on
5  February 29, 2016, at the Crosswinds youth shelter?
6  A.  I don't think so.
7  Q.  Did you ever speak with anyone regarding
8  Ms. Levesque making statements about you and your
9  father's relationship or her being jealous of your
10 relationship with your father?
11 A.  Not that I remember.
12     MS. AMIGO:  I will tender the witness.  I don't
13   know if you have any questions.
14     MR. MARI:  I need to take a quick break before
15   I get to my questions.
16   (Recess held from 10:05 a.m. to 10:13 a.m.)
17             REDIRECT EXAMINATION
18 BY MR. MARI:
19 Q.  Breanna, there's been some time since the first
20 portion of your deposition.  Is there any more
21 information that either I asked you about during the
22 first portion or Andrea asked you about during the first
23 portion you didn't remember then that you do remember
24 now?
25 A.  No.

## Page 289

1  Q.  I think I asked you these questions at the
2  outset of the first portion of your deposition, but I'm
3  going to ask you again since some time has passed.  Have
4  you used any drugs at all in the last 12 hours?
5  A.  No.
6  Q.  Have you consumed any alcohol in the last 12
7  hours?
8  A.  No.
9  Q.  Is there anything that affects your ability to
10 remember things now?
11 A.  No.
12 Q.  Is anything distracting you from being able to
13 testify at the deposition now?
14 A.  No.
15     MR. MARI:  I don't think I have any other
16   questions for you.
17     MR. MOORE:  No questions.
18     MR. MARI:  I'll just make a motion to read or
19   waive?
20     MR. MOORE:  I'll waive.
21   (Defendants' Exhibit 13 was marked for
22   identification.)
23   (The deposition concluded at 10:16 a.m.)
24           * * * *
25

www.uslegalsupport.com

Page 290

CERTIFICATE OF REPORTER

STATE OF FLORIDA  }
COUNTY OF BREVARD }

I, JILL E. HASTEY, RPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of BREANNA WHITMER; that a review of the transcript was not requested; and that the foregoing transcript, pages 1 through 289, is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel with the action, nor am I financially interested in the action.

Signed this day of August 20, 2020, Brevard County, Florida.

_____
JILL E. HASTEY, RPR

Page 291

CERTIFICATE OF OATH

STATE OF FLORIDA   }
COUNTY OF BREVARD  }

I, JILL E. HASTEY, Registered Professional Reporter, a Notary Public for the State of Florida, certify that the witness, BREANNA WHITMER, personally appeared before me this day of August 7, 2020, and was duly sworn.

WITNESS my hand and official seal this day of August 20, 2020.

Identification:   FL Identification Card

_____
JILL E. HASTEY, RPR
Notary Public - State of Florida
Commission No.  HH002372
My Commission Expires:  8/13/2024