UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:19-cv-2187-Orl-40DCI

DIANNE LEVESQUE, as Personal Representative of the ESTATE OF DONALD WHITMER, JR., for and on behalf of his children BREANNA NIKOLE WHITMER, NICHOLAS WHITMER, DONALD WHITMER, III, DAKOTA WHITMER, TOMMI WHITMER, TREY WHITMER, BRITTONY WHITMER,

Plaintiff,

vs.

CITY OF WEST MELBOURNE, a political subdivision of the State of Florida; JACOB MATHIS; KEVIN KRUKOSKI; and DANIELLE QUINN, Individually,

Defendants.
____________________________________/

DEPOSITION OF: DIANNE LEVESQUE

DATE TAKEN: August 7, 2020

TIME: 10:35 a.m. - 1:27 p.m.

PLACE: U.S. Legal Support
Imperial Plaza Business Center
6767 North Wickham Road
Suite 400
Melbourne, Florida 32940

REPORTED BY: Jill E. Hastey, RPR
and Notary Public

APPEARANCES:

APPEARING ON BEHALF OF THE PLAINTIFF:

JOHN V. MOORE, ESQUIRE
John Vernon Moore, P.A.
700 North Wickham Road
Suite 206
Melbourne, Florida 32935
john@moorelegal.com

GARY L. HOLLAND, ESQUIRE
Michael Bross & Bryan Savy, PLLC
997 South Wickham Road
West Melbourne, Florida 32904
gholland@brosslawoffice.com

APPEARING ON BEHALF OF THE DEFENDANT CITY OF WEST MELBOURNE:

FRANK M. MARI, ESQUIRE
Bell & Roper, P.A.
2707 East Jefferson Street
Orlando, Florida 32803
fmari@bellroperlaw.com

APPEARING ON BEHALF OF THE DEFENDANTS JACOB MATHIS, KEVIN KRUKOSKI AND DANIELLE QUINN:

ANDREA G. AMIGO, ESQUIRE
Roberts, Reynolds, Bedard & Tuzzio, PLLC
470 Columbia Drive
Building C101
West Palm Beach, Florida 33409
aamigo@rrbpa.com

I N D E X

AUGUST 7, 2020

DEPOSITION OF: DIANNE LEVESQUE

Direct Examination by Ms. Amigo 4

CERTIFICATE OF REPORTER 104

CERTIFICATE OF OATH 105

* * * * *

E X H I B I T S

(No Exhibits Marked.)

* * * * *

P R O C E E D I N G S

**********

DIANNE LEVESQUE,

having been first duly sworn to tell the truth, was examined and testified upon her oath as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MS. AMIGO:

Q. Good morning, Ms. Levesque. Is that how you pronounce your last name?

A. Yes.

Q. Could you please state your full name for the record and spell your name.

A. Dianne Levesque, D-i-a-n-n-e, L-e-v-e-s-q-u-e.

Q. Thank you. My name is Andrea Amigo. I represent officers Mathis and Krukoski in this lawsuit, and I'm going to be taking your deposition today. Have you ever given a deposition before?

A. No.

Q. Okay. So let me just go over some of the basic ground rules. I'm sure Mr. Moore and Mr. Holland probably have gone over this with you, but just so we're all on the same page, I'm going to ask you a series of questions, and I just need you to please give a verbal response to my questions. Okay?

A. Uh-huh. Yes.

Q. And that's a great. Everyone does it. That's okay. Either try to avoid saying "uh-huh" and "huh-uh," because the court reporter who is here can't take that down as a response. Okay?

A. Okay.

Q. And I know we're all following guidelines. We have our face masks on so sometimes it might be hard to hear your response or you might not hear my question. Just please let me know. I'll do my best to articulate my question so you can hear it, but please speak loud enough so the court reporter can take your answer down. Okay?

A. Okay.

Q. And if you need to take a break for any reason, you know, use the restroom, get some water, just let us know. We can take a quick break and resume the deposition. Okay?

A. Okay.

Q. And if for some reason you don't understand my question, I'll try to rephrase it. If you answer the question without asking for clarification, I'm going to assume you understood the question, but please don't feel, you know, afraid to ask for clarification if you don't understand where I'm going.

A. Okay.
Q. And the other thing that I wanted to make sure is that you might anticipate where I'm going with the question. Just let me finish it before you start answering, because the court reporter can't take two people down, you know, talking at the same time. Okay?
A. Yes.
Q. All right. And I'll try to do my best to not cut you off while you're talking or anything. Okay?
A. Okay.
Q. Have you gone by any other name other than Dianne Levesque?
A. Yes.
Q. And what is that?
A. Dianne Nissley.
Q. And how do you spell that?
A. N-i-s-s-l-e-y. Dianne Watrous, W-a-t-r-o-u-s.
Q. W-a-t-r-o --
A. -- u-s.
Q. Okay.
A. Dianne Davenport, D-a-v-e-n-p-o-r-t.
Q. Any other names?
A. No.
Q. Do you have a middle name?
A. I thought it was Marie for the longest time,

but come to find out, when we found my birth certificate, that it was not. And my original name was supposed to be Di, and then Anne was supposed to be my middle name, but they messed up my birth certificate so, no, technically, legally, I do not have a middle name.
Q. And I have -- oh, what is your date of birth?
A. [redacted]-66.
Q. So how old are you today?
A. 53.
Q. And I want to confirm that I have the correct social security number but I don't want to put it on the record, so what we'll do is we'll go off the record, I'll confirm it off the record, and then we'll go back on and you can let me know if it's correct or not. Okay?
A. Okay.
MS. AMIGO: All right. So we're off the record.
(Discussion off the record.)
MS. AMIGO: We'll go back on the record.
Q. Is the social security number I stated to you off the record correct?
A. Yes.
Q. Ms. Levesque, what did you do to prepare for your deposition today?

A. Spoke to my attorney.
Q. And I don't want to know what you discussed with your attorney, but is your attorney Mr. Moore and Mr. Holland?
A. Yes.
Q. Other than speaking with the two attorneys who are here today, did you speak with anyone else?
A. I spoke with Breanna.
Q. When did you speak with Breanna?
A. The day she had her original deposition.
Q. Before or after?
A. After.
Q. And what did you discuss with her?
A. Just how she did, how she was feeling.
Q. And what did she tell you?
A. That it was long and tiring and exhausting.
Q. Did you discuss what she testified about?
A. No.
Q. Did you discuss the questions that were asked of her?
A. No.
Q. And how long after her deposition -- you said it was that same day that you spoke to her?
A. That evening.
Q. That evening. Any other times that you've

spoken with Breanna in regards to preparing for your deposition today?
A. No.
Q. Did you speak with anyone else in preparation for your deposition today?
A. No.
Q. Did you have a chance to review any documents?
A. No.
Q. Did you have a chance to review any videos?
A. I have seen videos of that day.
Q. And when was that?
A. I do not remember.
Q. How many times did you watch the videos?
A. Twice.
Q. And which -- specifically what videos are you referencing?
A. The ones at Publix.
Q. Are these the Publix surveillance videos or are they videos taken by individuals at Publix?
A. I do not know who took them.
Q. Okay. Was there any sound to the videos?
A. Yes.
Q. And how did you come across these videos?
A. There were some on Facebook, and I got one from my attorney.

Page 10

Q. And the one that you saw on Facebook, how did you come across that?
A. I think it was on Breanna's Facebook. I don't know if -- I don't remember.
Q. So does Breanna have a Facebook account?
A. I don't know if she does now.
Q. But she did back in 2018?
A. Yes.
Q. And do you know what her user name was for the Facebook account?
A. No, ma'am.
Q. Was it under her name, just Breanna Whitmer?
A. I do not know.
Q. Do you have a Facebook account?
A. Yes.
Q. And what is your user name for the Facebook account? Do you have it under Dianne Levesque or --
A. Yes.
Q. I know sometimes people will use, you know, maiden names or nicknames or something, but your Facebook account is Dianne Levesque?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. That's okay. And I don't mean to be rude, you

Page 11

know, when I'm asking you to rephrase it. I just want to make sure we get your answer on record.
A. Yes, ma'am.
Q. Okay. So the video that you recall seeing on Facebook, do you know who posted that?
A. No.
Q. And that's the only video that you've seen?
A. Yes.
Q. Was that the same video that you received from your attorney?
A. Yes.
Q. I'm sorry?
A. No.
Q. All right. So the one that you received from your attorney, does that have sound?
A. Yes.
Q. And how is it different from the Facebook one?
A. I don't remember. It's been a while.
Q. Okay. Did you have a chance to review any photos?
A. Photos, no.
Q. What about any reports, like police reports or incident reports?
A. Autopsy.
Q. Which autopsy are you referring to?

Page 12

A. I don't remember.
Q. Was it the autopsy report done by the medical examiner back on May 22nd, 2018?
A. I do not remember.
Q. And when was the last time you reviewed the autopsy report?
A. It's been a while. I don't remember.
Q. Within the last month?
A. No.
Q. Year?
A. No.
Q. 2019? 2018?
A. I don't know. Right after this happened, when it came out.
Q. Okay. And how many times did you review it?
A. Just once.
Q. Any other reports or medical records or documents that you reviewed?
A. No.
Q. And do you have a valid Florida driver's license or ID with you?
A. Yes.
Q. Could you please pull that out so I can take a look at it? Is this your current Florida driver's license?

Page 13

A. Yes.
Q. So is your current address the one that's on this license?
A. Yes, ma'am.
Q. And so it says, "2275 Starlight Court, Apartment 297, Melbourne, Florida, 32904."
A. Yes.
Q. And how long have you been at this address?
A. April of this year.
Q. So what I'll do -- I'm just going to hand this back to you, but what I'd like to do is just get a copy before you leave, but I don't want to -- we don't have to take a break just yet to do that if that's okay.
So who resides with you at this address?
A. Breanna.
Q. Anyone else?
A. Her two boys.
Q. So are her two sons living with you right now at that address?
A. They will be.
Q. Where are they now?
MR. MOORE: Answer the question if you know.
THE WITNESS: Huh?
MR. MOORE: You can answer the question if you know.



Page 14

A. DCF custody.
Q. And how long have they been in DCF custody?
A. I don't know. January.
Q. Since January of 2020?
A. Yes.
Q. Why are they in DCF custody?
A. They claim we missed doctors' appointments.
Q. When you say "they," you mean DCF?
A. Uh-huh. Yes.
Q. And you missed doctor appointments for who?
A. M█████'s hearing aids.
Q. Who is the doctor you were supposed to take him to?
A. I don't remember her name.
Q. Does M█████ have a hearing disability?
A. Yes.
Q. Was that the only reason DCF took custody of both children?
A. That's what's on the paperwork, I guess.
Q. What doctor appointments were missed for the other child?
A. None.
Q. So was there a reason for taking the other child?
A. I don't know. You'd have to ask DCF.

Page 15

Q. Have you -- did DCF communicate with you prior to taking custody of the children?
A. No, I was at work.
Q. But have you had any communications with DCF since January 2020?
A. No.
Q. And what are the names of Breanna's two sons? You mentioned M█████, and what's the name of her other son?
A. J█████.
Q. And how do you spell M█████ and J█████?
A. M-█████████ and J█████████.
Q. And how old is M█████?
A. Three.
Q. Do you know his date of birth?
A. ███-17.
Q. And what about J█████? How old is J█████?
A. One and a half.
Q. And when is J█████'s date of birth?
A. ██████████ 2018.
Q. And before we go on -- I meant to ask you this. Have you taken any medications or anything within the last 12 hours prior to your deposition today?
A. Well, I take medications for my health, yes.
Q. Okay. And do those medications have any affect

Page 16

on your ability to understand my questions or answer my questions?
A. No.
Q. And have you consumed anything other than your prescribed medications within the last 12 hours before coming here today?
A. No.
Q. Any alcohol?
A. No.
Q. Okay. So just going back to who lives with you, so you have Breanna, M█████, J█████ -- or at least the two boys were staying with you until January 2019. Is that correct?
A. Yes, they lived with me.
Q. But that would have been at another address. Right? Because you just moved in April to the Starlight Court address?
A. Technically, no. I moved in February to a different address.
Q. All right. So Starlight, you've been there since February of 2020?
A. No.
Q. Since April?
A. Uh-huh.
Q. Yes?

Page 17

A. Yes. Sorry.
Q. That's okay. So why don't we do this. So your current address is Starlight. Prior to Starlight where did you live?
A. 2275 Orbit Court.
Q. And where is that?
A. Same complex. We just had to move apartments.
Q. What apartment was it?
A. 165.
Q. That's Melbourne?
A. Yes.
Q. And how long were you at the Orbit Court address?
A. Two months.
Q. Two months?
A. Yes.
Q. Okay. And who did you live with at Orbit Court?
A. Me, Breanna, her brother Tommi, his girlfriend Athena, and their son F█████.
Q. F█████, you said?
A. Uh-huh. Yes.
Q. What dates did you reside at the Orbit Court address?
A. February -- February 1st until -- wait a

minute. Yeah, February 1st until beginning of April.
Q. That's 2020. Correct?
A. Uh-huh. Yes.
Q. All right. So prior to Orbit Court, where did you reside?
A. 770 Wildbriar Road Northeast, Apartment 208, Palm Bay, Florida, 32905.
Q. And how long were you at that address?
A. About two years.
Q. Do you recall the dates?
A. No.
Q. And you resided at the Wildbriar address immediately prior to moving to Orbit Court?
A. Yes.
Q. So those two years, then, might have been sometime in 2018 to 2020?
A. Yes.
Q. And who lived with you at Wildbriar Road?
A. Me, Breanna, M[redacted], and Donald Whitmer, Jr.
Q. Anyone else?
A. No.
Q. And at the Orbit Court address that you mentioned earlier, you mentioned the dates February 1, 2020, to April 2020. Were Breanna's children living -- or did they ever live at that address?

A. No.
Q. No?
A. No.
Q. Okay. Have you or Breanna seen the two boys since they've been taken by DCF?
A. Yes.
Q. And how often?
A. I belive we was seeing them every week. They do visit, yeah. We see them every week by phone now.
Q. Prior to the Wildbriar address, where did you live?
A. A hotel on U.S. 1 for a little while.
Q. Which hotel?
A. I can't think of the name of it. River Palm.
Q. Was there any specific room number?
A. I don't remember what the room number was.
Q. And how long were you at the River Palm Hotel?
A. I don't know.
Q. It was prior to 2018?
A. Yes.
Q. And who resided with you at the River Palm Hotel?
A. Breanna, M[redacted], Donny.
Q. Anyone else?
A. No.

Q. And prior to staying at the River Palm Hotel, where did you live?
A. Aladdin Motel in Merritt Island.
Q. And how long were you at that hotel?
A. I don't remember.
Q. Do you recall what years?
A. No.
Q. Or an approximate time frame?
A. No.
Q. And who lived with you at the Aladdin Motel?
A. Breanna, M[redacted], Donny.
Q. And prior to the Aladdin Motel, where did you live?
A. Stayed at my daughter's on Oxford Avenue, 500 Oxford Avenue.
Q. And what city is that in?
A. Merritt Island.
Q. What's your daughter's name?
A. Chelsea James.
Q. And how long did you reside at Ms. James's address?
A. Four months, five months.
Q. Do you need to take a break?
A. (Nods head.)
Q. Are you sure?

A. (Nods head.)
Q. Do you want any water?
A. (Nods head.)
Q. Did anyone else reside with you and your daughter during that period?
A. Donny. My daughter's daughter, A[redacted].
Q. What was the name? I'm sorry.
A. A[redacted].
Q. That was Chelsea's daughter?
A. Yes.
Q. Anyone else?
A. Tommi and Athena came down.
Q. Anyone else?
A. No.
Q. So at that point Breanna wasn't staying with you?
A. Well, she came down. That's when she came down from Ohio while we were staying there.
Q. Okay. So when she came down did she end up living with you and Chelsea --
A. Yes.
Q. -- for a while?
Okay. And do you recall what year that was?
A. No.
Q. And I know you testified that you were there

for four to five months, but how long was Breanna at the Oxford Avenue, Merritt Island address?

A. I don't remember. About a month.

Q. And you mentioned Tommi and Athena just now and a little earlier. Who is Tommi?

A. That is Donny's son. Breanna's brother.

Q. And Athena is his girlfriend?

A. Yeah.

Q. Do you know Athena's last name?

A. Miller.

Q. And you said Tommi and Athena came down and stayed at the Oxford Avenue address for how long?

A. A couple weeks.

Q. So it was just more like a vacation?

A. Well, they were down here longer than that. They just stayed with -- at the house for a couple of weeks.

Q. And was Mr. Whitmer at the Oxford Avenue address with you the whole four- to five-month period of time that you were there?

A. Not the whole time.

Q. For how long did he stay at that address?

A. About two months, two and a half months.

Q. And why is that?

A. My daughter and him at that point didn't get

along.

Q. Why not?

A. I don't know. You'd have to ask them.

Q. Did they ever get into any kind of altercation?

A. They got into a yelling altercation the day Breanna moved out.

Q. When was this?

A. I don't know. Three weeks after -- I don't know. I don't know the date.

Q. And what were they yelling at each other about?

A. They are too much alike. That's pretty much just all it was. They are just too much alike.

Q. But was there anything specific that caused them to get into a verbal altercation?

A. No. I don't -- I don't know.

Q. And since I don't -- you know, I haven't had the opportunity to meet your daughter or Mr. Whitmer. You said they are too much alike. What do you mean by that?

A. They just like to, like, be head of household.

Q. So both strong personalities?

A. Yeah.

Q. What's your -- what was your daughter's date of birth?

A. [redacted]-89.

Q. And I understand your daughter passed away recently?

A. Yes.

Q. I'm sorry for your loss. When did she pass away?

A. 16th of June.

Q. Of 2020?

A. Yes.

Q. Do you know what the cause of death was?

A. Waiting for the autopsy.

Q. Was she still in Merritt Island at the time?

A. I do not know.

Q. Did Mr. Whitmer and your daughter, Chelsea, ever get into any kind of physical altercation?

A. No.

Q. And I think you testified that Mr. Whitmer and Breanna moved out of the Merritt Island address following this altercation with Chelsea?

A. Uh-huh.

Q. Is that correct?

A. Correct.

Q. Where did they go?

A. I have no idea.

Q. So prior to the Merritt Island address, where did you live?

A. Columbus, Ohio.

Q. Do you recall the physical address?

A. No.

Q. Is that where you're from?

A. No.

Q. So how long were you in Ohio?

A. Off and on for about five years. I had a house here too.

Q. And where was your house in Florida?

A. Palm Bay.

Q. Was that the Wildbriar address, or no?

A. No.

Q. What was the location of your house in Palm Bay?

A. 261 Edgevale Road.

Q. Edgefield?

A. E-d-g-e-v-a-l-e.

Q. And did you ever reside in that house in Palm Bay?

A. Oh, yeah.

Q. For how long?

A. I don't remember what year I moved into it.

Q. Okay. So after Mr. Whitmer and Breanna moved out of the Merritt Island address, did you stay in touch with them?

Page 26

A. Yeah, off and on. We're always in touch, but sometimes we would go months without being in touch.
Q. And how would you stay in touch with them?
A. Phone.
Q. So you said for how long?
A. For how long what?
Q. How long -- well, strike that.
After they moved out from the Merritt Island address, was there a period of time that you didn't see Breanna or Mr. Whitmer?
A. That I didn't see them? Yeah, there was a few months.
Q. And then you eventually ended up living together in the Aladdin Motel?
A. Yes.
Q. While staying at the Aladdin Motel, did Mr. Whitmer stay with you and Breanna at that motel the entire time or did he go anywhere else?
A. No, he stayed there.
Q. And same thing for the River Palm Hotel that you mentioned. When you, Breanna, M[redacted] and Mr. Whitmer were there, did Mr. Whitmer stay with you?
A. Yes.
Q. And was that his residency?
A. Yes.

Page 27

Q. So when did you first meet Mr. Whitmer?
A. 2010.
Q. And where was that?
A. Him and his wife were friends with my ex-husband and they came to Florida and they stayed with us.
Q. What is your ex-husband's name?
A. David Watrous, W-a-t-r-o-u-s.
Q. And when were you married to David Watrous?
A. Which time?
Q. Okay. What were the dates of marriage?
A. The first time I would say it was 1994 to 2000, and then 2008 or 2009 to 2010.
Q. So is Nissley your maiden name?
A. Nissley is my first married name.
Q. Oh, okay. And what was your ex-husband's name, full name?
A. Which one?
Q. Nissley.
A. Kevin.
Q. Kevin?
A. And I -- for the life of me I don't know what his middle name was at this point.
Q. When were you married to Mr. Watrous?
A. From 1984 to 1994.

Page 28

Q. And what about Davenport? Is that a married name?
A. Yes.
Q. And what was your ex-husband's name?
A. Ronald Davenport, Jr.
Q. And when were you married to Mr. Davenport?
A. Two thousand -- I don't know. I think it was in between David -- 2000 to 2008.
Q. Any other marriages?
A. No, that was enough.
Q. What is your marital status now?
A. Single.
Q. And the individuals you just listed, did all those marriages end in divorce?
A. Yes.
Q. And you testified that your ex-husband David was friends with Mr. Whitmer and his wife. What was Mr. Whitmer's wife's name?
A. Bobbi Leigh.
Q. Do you know if Mr. Whitmer had any other marriages other than to Bobbi Leigh?
A. No.
Q. Do you have any children? I know you mentioned Ms. James, but do you have any other children?
A. No.

Page 29

Q. And who is Ms. James's father?
A. I have no idea. She's adopted.
Q. Okay. When did you adopt Ms. James?
A. She was 12, and she was born in '89.
Q. And have you ever been a party to a lawsuit as a plaintiff or a defendant? Ever sued anyone or been sued?
A. For auto accidents, yes.
Q. And when did that happen?
A. I could not give you the years.
Q. Were you the defendant or the plaintiff?
A. Plaintiff.
Q. You were the plaintiff? Okay. Do you recall where, like, in what state or county?
A. Florida.
Q. Do you recall what county?
A. I would say Brevard.
Q. And was it more than five years ago?
A. Yes.
Q. 10 years ago?
A. I don't remember.
Q. Did you have an attorney?
A. Yes.
Q. Do you recall who that was?
A. No.

Page 30

Q. Did you actually have to go to court --
A. No.
Q. -- testify in court or anything?
A. No.
Q. And did you have to give a statement like we're doing here today? Any kind of testimony?
A. No.
Q. And how many times do you think you were a party to a lawsuit as a result of a car accident?
A. Twice.
Q. Twice. Okay. And both in Florida?
A. Yes.
Q. Were they both in Brevard?
A. Yes.
Q. And in both cases you were the plaintiff?
A. Yes.
Q. Any litigation in Ohio?
A. No.
Q. Have you ever been arrested or convicted of a crime?
A. I've been arrested.
Q. For what?
A. I don't know how it's worded. Defrauding a pawnbroker.
Q. Defrauding a pawnbroker?

Page 31

A. Yeah, for $300.
Q. And when was this?
A. I don't know what year it was.
Q. Do you recall where this occurred?
A. Tampa.
Q. I know you testified earlier that you were in Ohio for some time and then you had the house in Palm Bay. So did you live in Tampa at some point?
A. We didn't live in Tampa, but, like, we'd come down from Ohio and we would stop in Tampa.
Q. When you say "we," who are you talking about?
A. Donny and me.
Q. So I know you testified earlier you met Donny in 2010. Is that right?
A. Correct.
Q. So this would have been sometime after 2010?
A. Correct.
Q. And before 2018?
A. Correct.
Q. Do you have any idea approximately when in that time frame?
A. No.
Q. Do you know which police agency investigated that case?
A. Hillsborough County.

Page 32

Q. And what happened with that case?
A. It's gone. It's done. Adjudication was withheld. Long story.
Q. Did you serve any time in jail?
A. I did in Ohio.
Q. For that incident?
A. Yes.
Q. Where in Ohio?
A. Columbus.
Q. Do you remember the facility?
A. No. County.
Q. And how long were you in county jail?
A. Three weeks.
Q. And other than serving those three weeks in jail, any other disposition or result of that arrest?
A. Well, they came to get me and because of my health they couldn't take me, so then Florida mandated the only time they could get me is if I came back to Florida. So I came back to Florida, I called and set up my court date, I walked in there, and the judge said, "We wouldn't even -- if she didn't need come back here and she didn't set up her own court date, she wouldn't be here." She just dismissed everything that day, so...
Q. And which judge was that?
A. I don't know.

Page 33

Q. All right. So if I understand you correctly, you came to Tampa with Mr. Whitmer like you did on occasion sometime between 2010 and 2018. I guess, how did the arrest come about?
MR. HOLLAND: Object. I'm not sure what you're getting at as far as any -- it's not been established it's a conviction of a misdemeanor involving dishonesty.
MS. AMIGO: Well, okay. I mean, she's saying she was charged with defrauding a pawnbroker, so I'm just trying to figure out what led up to that charge.
Q. Why were you charged with defrauding a pawnbroker?
MR. HOLLAND: I don't think -- I mean, you can ask her if she's been convicted of a crime involving dishonesty or if she's been convicted of a felony and how much time, but --
MR. MARI: My experience is witnesses don't understand that and we need to ask the factual questions to get behind it and then perhaps do additional investigation. So, I mean, Andrea is going to ask now or I'm going to ask when it's my turn.
MS. AMIGO: I mean, she said she was in jail

Page 34

for three weeks as a result of this charge. Adjudication, she believes, was withheld, but what I'm trying to figure out is, you know, what were the facts -- what's the factual situation that led up to defrauding --

MR. HOLLAND: What possible relevance could that have to her being, you know, in this case?

MS. AMIGO: Well, it goes to her credibility.

MR. MARI: I think the objection is just to form, you know, and that's it.

MR. HOLLAND: All right. I don't disagree with that, but we can --

MR. MARI: So we don't need to debate it. If we think a form objection is just misplaced, we just move on. You can't instruct her not to answer. This isn't privileged.

MR. HOLLAND: Well, I don't think that it's -- if it's so farfetched that it's impossible for it to come in at trial, then there's no reason to --

MR. MOORE: It rises to the level of harassment.

MR. HOLLAND: Yeah, it does.

MS. AMIGO: Really? Okay. So, I mean --

MR. MARI: So if you think it rises to the level of harassment, are you going to terminate

Page 35

over it? Are we going to file a motion and come back? I guarantee if we have to file a motion to come back I'm going to ask for my fees.

MR. HOLLAND: You know --

MS. AMIGO: Are you instructing her not to answer the question?

MR. MARI: Actually, we're getting somewhere with this line of questioning.

MR. HOLLAND: You can go ahead and finish. It just seems like you're really fishing. You're going into stuff that -- where she lived before any of this ever took place and stuff like that. She's a PR in a wrongful death case.

MR. MARI: And she lived with some of the survivors for some time. She lived with the decedent. This is all relevant. I don't want to go on with this forever, but this is definitely relevant, and I can't imagine any judge is going to disagree with that.

MS. AMIGO: You can object to the form and then we move on.

MR. HOLLAND: I'm going to allow her to go ahead and answer just so we can move on.

BY MS. AMIGO:

Q. Okay. So what led up to you being charged --

Page 36

what are the factual -- what is the factual situation that led up to you being charged with defrauding a pawnbroker back in Tampa?

A. I had bought my ex-husband some tools, and it was a really bad divorce because he cheated on me and whatever and so forth, so I had the tools sitting around so I decided I was going to take the tools back because they were fairly new. I was going to take them and try to get some money out of it, so I took them back. Well, come to find out that they weren't his tools. They were tools that he had borrowed from someone and they had reported them stolen, and that's the end of that.

Q. Which ex-husband?

A. David.

Q. Any other charge other than defrauding a pawnbroker as a result of that incident?

A. No.

Q. Any other arrests or convictions?

A. Not that I remember, no.

Q. What's the highest level of education that you completed?

A. Associate's.

Q. Where was that?

A. What's now called Florida something college. It was BCC. It was Brevard Community College, and now

Page 37

it's Florida something.

Q. And how long ago was that?

A. I don't remember. I was married to Ron, so I don't remember.

Q. Do you have any other degrees or education?

A. No.

Q. Are you currently employed?

A. Yes.

Q. And where do you work?

A. Health First Medical Group.

Q. Before we go into that, I just want to confirm. I know we went through some of the addresses, but what I'm trying to figure out is, from the moment that you, you know, met Mr. Whitmer in 2010, when did you first, I guess, start some kind of romantic relationship with him?

A. Two years later.

Q. So 2012?

A. Yeah.

Q. And did that start in Ohio?

A. No, it started --

Q. I'm sorry?

A. It started here in Florida.

Q. And did you start living with him in 2012 in Florida?

Page 38

A. No, I've been living with him since 2010.
Q. Okay. So what I want you to do is try to -- kind of going back in time from 2010 when you started living with Mr. Whitmer, can you provide me those addresses if they are different than ones you've already given me?
A. They are not.
Q. So then the last address we ended up on was your daughter's at Merritt Island, so you're saying that would have been 2010?
A. No. We came down in 2015. We were in Ohio.
Q. Okay. So, in Ohio, where did you live with Mr. Whitmer?
A. I don't remember the address. All I can tell you is Markison. The house number, I do not know.
Q. Markison, that's the road?
A. It's not "Road." I would say Markison Avenue, I believe.
Q. And at that time in 2010, did any of Mr. Whitmer's children or any of the survivors live with you and Mr. Whitmer?
A. No. They came over.
Q. Which kids?
A. All of them. His son F[redacted] lived with us.
Q. Okay. So let's go through the names of the

Page 39

children. So you have F[redacted]?
A. Uh-huh.
Q. Is that correct?
A. Yes.
Q. Last name Whitmer?
A. Yes.
Q. And do you know F[redacted]'s date of birth?
A. [redacted]-2005 or 2006. I'm not sure.
Q. And who is F[redacted]'s mother?
A. Bobbi Leigh. All the kids have the same mom, same dad.
Q. Okay. That makes it easier. Who are the other children that came to visit?
A. I'm trying to figure out the order to start them in. Brittony Whitmer, Tommi and Trey Whitmer, D[redacted] Whitmer, Nicholas Whitmer, and Breanna.
Q. And what's Brittony's date of birth?
A. I have no idea.
Q. I'm just looking at answers to interrogatories that were provided to me by Mr. Moore. I've got a date of birth here of [redacted]-93. Does that sound right?
A. Yeah, it could be. I know it's in July, yeah.
Q. What about Tommi Whitmer? Do you know his date of birth?
A. [redacted] something.

Page 40

Q. And Trey Whitmer?
A. They are twins.
Q. And what about D[redacted]'s date of birth?
A. Do not know D[redacted]'s birthday.
Q. And Nicholas?
A. I do not know.
Q. And Breanna?
A. [redacted]-98.
Q. So are there any other children of Donald Whitmer that we haven't gone over just now?
A. Not that I'm aware of.
Q. Any adopted children that you're aware of?
A. What do you mean? That he adopted?
Q. Yes.
A. No.
Q. So back in 2010 when you lived with Mr. Whitmer in Ohio at the Markison Avenue address, where were the children living?
A. With their grandfather and grandmother.
Q. And what are their names?
A. Doug Habecker.
Q. Do you know how to spell that?
A. I think it's H-a-b-e-c-k-e-r, and for some reason -- Karen Habecker.
Q. And why weren't the children living with you

Page 41

and Mr. Whitmer back in 2010?
A. I do not know. They were not living with their parents when Bobbi was alive. That happened before me.
Q. Okay. So ever since you met Mr. Whitmer in 2010 through your ex-husband, it was your understanding that the children were not living with Mr. Whitmer?
A. Correct, just F[redacted]
Q. And how long did F[redacted] live with Mr. Whitmer?
A. The day he was born till he was -- I don't even remember what age he was, four, five.
Q. And why did he no longer live with Mr. Whitmer at the age of four or five?
A. DCF.
Q. And why did DCF take custody of F[redacted]
A. I do not know the whole situation.
Q. Did Mr. Whitmer tell you why?
A. They didn't quite understand it either.
Q. I think you testified F[redacted] was born in either 2005 or 2006. Is that right?
A. Something like that, yeah.
Q. Okay. So DCF took him into custody sometime in 2009 or 2010?
A. It would have had to be 2010 or 2011, something like that. I don't know. I'm not positive on the dates.

Q. Were you living with Mr. Whitmer at the time that P[redacted] was taken away?
A. I'm not really sure how to answer that. Yes.
Q. So it's your testimony you have no idea why DCF took P[redacted]?
A. I had been at my daughter's for -- I went to visit her and A[redacted] for about, I don't know, four or five days, and it was the day I got back that it happened, so I'm not really sure what led up to the incident.
Q. Did DCF speak with you or interview you about that?
A. No, they wouldn't talk to me because I wasn't his mom.
Q. And where was his mom at the time?
A. Dead.
Q. When did she pass away?
A. 2010.
Q. Do you know the circumstance of her death?
A. Accidental gunshot.
Q. Other than that, do you know any of the other details?
A. I know it was a self-inflicted accidental gunshot.
Q. So did you start living with Mr. Whitmer after

Bobbi Leigh passed away?
A. Correct.
Q. And do you know when in 2010 she passed away?
A. May 21st.
Q. Do you know where P[redacted] is living now?
A. Tampa.
Q. Do you know with whom?
A. Adoptive parents.
Q. Do you know their names?
A. No.
Q. Do you know when the last time Mr. Whitmer had any contact with P[redacted] before the date of this incident?
A. He wasn't allowed to have contact with him.
Q. And why is that?
A. Because he was adopted.
Q. I mean prior to the adoption when DCF took him into custody, was that --
A. He did visits with P[redacted] on a weekly basis.
Q. Okay. Did Mr. Whitmer have to terminate his parental rights over P[redacted]
A. Did he willingly, no.
Q. But he did in order for the adoption to occur?
A. They terminated his rights.
Q. Okay. When you say "they," do you mean a

court?
A. Yes.
Q. Do you know which court?
A. No.
Q. Was that in Florida?
A. Yes.
Q. And how often did the kids visit you and Mr. Whitmer at the Markison Avenue address in Ohio in 2010?
A. Maybe three times.
Q. Three times total?
A. In 2010, yeah.
Q. Did they all come together or was it --
A. I went and picked them up or their grandmother dropped them off.
Q. And how long did they stay with you?
A. A day and a night, usually. Sometimes the weekend.
Q. And how long were you at the Markison Avenue address with Mr. Whitmer?
A. I couldn't tell you how many years it was.
Q. Did they visit typically three times a year or was it less or more after 2010?
A. Well, we had moved to Whitehall and they started coming every weekend.

Q. And when did you move to Whitehall?
A. I was working at TJ's. I don't know. I don't know what year it was.
Q. And Whitehall, is that in Ohio?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And all the children would come and stay every weekend?
A. Yes.
Q. And Mr. Whitmer was living with you at Whitehall?
A. Yes.
Q. And do you have any idea how long you resided at Whitehall?
A. I would say about a year.
Q. And do you recall the addresses there?
A. I don't.
Q. And then after that one year at Whitehall, did you move somewhere else in Ohio?
A. We moved back over to Parsons Avenue. We were there for maybe, like, five months.
Q. And when you moved to Parsons Avenue, it was still just you and Mr. Whitmer?
A. Yes, and then Breanna came to live with us.

Page 46

Q. And when was that?
A. Like beginning of 2015 maybe. And then the kids would come over on the weekends, or Tommi and Donald -- did I name Donald when I gave you the kids' names?
Q. Oh, no.
A. Yeah, there's a Donald Whitmer, III. I knew I was forgetting one.
Q. And do you recall his date of birth?
A. I do not.
Q. Okay. So when you said "the kids," meaning all the kids in addition to Breanna would come over on the weekends?
A. Uh-huh, and sometimes during the week Donald and Tommi would just come over and stop by and hang out.
Q. How often during the week?
A. One or two times a week.
Q. And why did Breanna come live with you in 2015?
A. I don't -- I don't know what her reasoning was. I just know she wanted to be around her dad.
Q. Did she run away from her grandparents' house?
A. I don't think so. I think he knew where she was.
Q. When you say "he," what do you mean?
A. Her grandfather.

Page 47

Q. So Breanna lived with you at that Parsons address for the whole five-month period that you were there?
A. Yes.
Q. Okay. So then after Parsons, then, did you move somewhere else in Ohio?
A. Where else did we live? Right before we left we were staying at an apartment on Livingston. Donny had a broken leg, so we stayed there.
Q. How did he break his leg?
A. I don't remember.
Q. How long were you at this apartment in Livingston?
A. Not very long. A couple months.
Q. And did Breanna stay with you there too?
A. Yes.
Q. Anyone else?
A. Tommi, Athena.
Q. And were Tommi and Athena there for that two-month period as well?
A. Yes.
Q. Anyone else?
A. No.
Q. So you stayed at the Livingston apartment right before leaving Ohio to come to Florida?

Page 48

A. Yes.
Q. Yes? Okay. And when you came to Florida you came with Mr. Whitmer, Breanna. Did Tommi and Athena come with you too?
A. No, it was just Donny and I.
Q. I'm sorry?
A. It was just Donny and I.
Q. Okay. And Breanna?
A. No.
Q. No?
A. She didn't come right away. She came, like, two weeks later.
Q. Okay. So do you have any idea where Breanna stayed for those two weeks?
A. In the apartment on Livingston.
Q. By herself?
A. With Tommi and Athena.
Q. Okay. So then when you first came to Florida with Mr. Whitmer, that's when you stayed at your daughter's in Merritt Island?
A. Yes.
Q. Did any of Mr. Whitmer's children, other than Breanna and Tommi, ever live with you and Mr. Whitmer at any point in time from 2010 until the day of this incident?

Page 49

A. His daughter Brittony did for a little while.
Q. And when was that?
A. I couldn't tell you what years they were.
Q. But that was when you lived with Mr. Whitmer?
A. Yes.
Q. Okay. I just want to make sure. I didn't know if it was before. And do you recall for how long of a period of time?
A. She might have been with us probably about six months.
Q. And was that in Ohio?
A. In Ohio and when we were coming down to my house in Florida.
Q. That was the one in Palm Bay?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay.
A. Sorry.
Q. That's okay. So other than Brittony, anyone else? Any other survivors or children that stayed with you and Mr. Whitmer?
A. No. Our goal was to bring them all down here. We were both coming down to get jobs, get a place, and then they were all supposed to come.

Page 50

Q. And you mentioned that Mr. Whitmer had a broken leg. Do you know how he broke it back when you were in Ohio?
MR. HOLLAND: Object, asked and answered.
Q. I mean, was it a car accident, a sports accident, work accident?
A. I don't remember.
Q. Okay. So how would you describe your relationship with Mr. Whitmer when you first met?
A. Best friends.
Q. So from the start in 2010?
A. Yes.
Q. At that point he was still married to Bobbi?
A. She was deceased. Well, the first time I met them, yeah, they were together. Yeah, he was still married to Bobbi. Me and Bobbi were best friends too. We would do garage sales and stuff together, get our nails done.
Q. And were Mr. Whitmer and Bobbi still married at the time that she passed away?
A. Oh, yes, definitely.
Q. And so when you -- obviously when you first met him he was still married?
A. Yes.
Q. Did you have any kind of romantic relationship

Page 51

while he was married?
A. No, no.
Q. So you were friends first and then it grew into a romantic relationship later?
A. Two years later, after she passed away. Two years later.
Q. And how long, I guess, would you call him your boyfriend? Were you ever engaged at any point?
A. We talked about marriage, yeah.
Q. But you weren't formally engaged?
A. I mean, he asked me if I would marry him and to be there for him and the kids, so -- but it never --
Q. And when was this?
A. We were in Ohio on Parsons so -- I have no idea. 2013, beginning of 2014.
Q. And was there any point in time where you ever lost contact with Mr. Whitmer?
A. For a couple months.
Q. And was that during the time that we talked about before when he left the Merritt Island address or was this another time?
A. It was another time.
Q. So when did you lose contact with them for a couple months?
A. It was sometime in 2017. Like, April.

Page 52

Q. And why did you stop contact or lose contact with them?
A. Because I started working and I was living in, like, a group home and he was working for a company and he traveled and I just lost track of him for a little while.
Q. You said you were living in a what home?
A. Like a -- it's Hacienda, but it's for older people. They take in, like, older people to try and help you get situated in life to try and get your life back together.
Q. Okay. And so Mr. Whitmer wasn't living with you in Hacienda?
A. No. They would -- when I finally caught up with them again, they came, you know, visited me and stayed there a few nights.
Q. And when you say "up with them," who are you referencing when you caught up with them?
A. Breanna and Donny.
Q. Okay. So do you know whether Breanna and Mr. Whitmer were living together at that time that you're in Hacienda?
A. Yes.
Q. Do you have any idea where?
A. No.

Page 53

Q. And how long were you at Hacienda?
A. Maybe four months.
Q. So is that kind of the situation where you, like, rent out a room or something?
A. Yeah.
Q. And you were saying to kind of help you get back on your feet. Do you mean -- do they provide any kind of counseling, any kind of support in that way?
A. They do provide counseling and that, and I stayed there and I got a job and started working.
Q. All right. So you moved in there sometime in 2017?
A. Yes.
Q. Any other time where you lost contact with Mr. Whitmer or did not live with him from the point in time that you started to live with him in 2010 until the date of this incident?
A. Not that I recollect.
Q. After Hacienda -- well, strike that.
Is Hacienda in Florida?
A. Yes. It's on Croton Road.
Q. What road?
A. Croton.
Q. What city is that in?
A. Melbourne.

Page 54

Q. So I'm just trying to figure out, you had moved into Hacienda before staying at the River Palm Hotel with Breanna and Mr. Whitmer?
A. Yes.
Q. So after that four-month stay at Hacienda, you left and then the three of you stayed at the hotel. Is that correct?
A. Yes.
Q. I was trying to figure out the timeline. And other than Mr. Whitmer and Breanna, did any other of Mr. Whitmer's children come with Mr. Whitmer to visit you at Hacienda?
A. Huh-uh.
Q. No?
A. No.
Q. And prior to the date of this incident, which I have as May 21st, 2018 -- does that date sound correct to you?
A. Okay. So Bobbi passed away March 21st. Yes. We keep saying how the 21st is not a good day. So May 21st, right.
Q. So prior to that day, was there any period of time leading up to the day of the incident that you did not see Mr. Whitmer?
A. The night before the incident he stayed at

Page 55

River Palm, I believe.
Q. The hotel?
A. Yeah.
Q. Was it only one night or was it more than a night?
A. I think it was for a couple nights.
Q. And why was he staying at a hotel?
A. Oh, he was looking into buying a trailer, so he was going all around and trying to find one to surprise Breanna and M[redacted].
Q. Back in May of 2018, were you at the Wildbriar address?
A. 2018? I don't remember what year that house got foreclosed on. I'm not sure. I don't believe so, no.
Q. Okay. But you weren't staying at the hotel with Mr. Whitmer. Is that correct?
A. No. That night he stayed at the motel, I had the apartment at Wildbriar.
Q. Okay. So that's what I was trying to get at. So you're living at Wildbriar and he stayed at a hotel?
A. Yes.
Q. And what about -- you testified earlier that Breanna and M[redacted] were staying also at the Wildbriar address.

Page 56

A. Yes.
Q. So where were they?
A. With me.
Q. So the night -- or the -- I guess the 24-hour period before this incident, Breanna and M[redacted] were at your house?
A. Yes.
Q. So just to clarify, you and Mr. Whitmer were never married. Correct?
A. Correct.
Q. So why are you the personal representative in this case?
MR. HOLLAND: Object to form. Calls for a legal conclusion.
Q. Well, were you selected to be the personal representative of this case by any of the survivors? Like, how were you appointed as personal representative?
A. Breanna asked me if I would.
Q. And when did she ask you this?
A. I don't know. After Donny's death sometime.
Q. I guess what I'm wondering is, why aren't any of the other adult children the personal representatives of this case?
A. Because they don't live here. Because they just thought it would be easier if I did it since I knew

Page 57

more about Donny than most.
Q. Did you know more about Donny than his children, then?
A. No. But they were just -- some of them were too young. They were underage.
Q. I'm talking about the adult children.
A. They just weren't here and they just felt it would be better to have somebody as a personal representative that lived here.
Q. And I'm just looking at the answers to interrogatories. The latest version I received was just the other day on August 6, 2020, and one of the questions asked to list any of the decedents -- heirs or decendents. And according to this response, Breanna is listed, Nicholas, Donald III, D[redacted], Tommi, Trey and Brittony. Why is F[redacted] not listed?
A. Because F[redacted] has been adopted.
Q. So there's no claims being made on F[redacted]'s behalf in this case. Is that correct?
A. You would have to ask my attorney that.
Q. Well, you're the personal representative. Is that correct?
A. As far as I know, there is not, no.
Q. Do you know if Mr. Whitmer has any surviving siblings?

Page 58

A. He does not. He has a half-sister.
Q. Do you know her name?
A. We were just talking about her this morning. I can't think of her name right now.
Q. Have you ever met her?
A. Yes.
Q. And what was -- I guess, how would you describe her relationship with Mr. Whitmer?
A. They were not very fond of one another.
Q. Do you know why?
A. No, I do not.
Q. Do you have any idea where she lives?
A. Ohio.
Q. Do you know where in Ohio?
A. I do not.
Q. Any other siblings of Mr. Whitmer that you're aware of?
A. No, none.
Q. And other than M[redacted] and J[redacted], any other grandchildren?
A. Yes.
Q. And who are they?
A. Oh, goodness. So Tommi has P[redacted], and Athena is pregnant again. I don't know what this baby's name is going to be. Donald has H[redacted], and he had a little

Page 59

boy as well and I, off the top of my head, cannot think of his name. Brittony has three. She has J[redacted], and I don't know what the other two's names are. They are just slipping my mind right now. Nicholas just had a little baby, and I want to say that's all.
Q. Do you know -- well, strike that.
With respect to Breanna's two sons, M[redacted] and J[redacted], do you know who their father is?
A. Do not ask, do not tell. I don't know.
Q. Why do you say, "Don't ask, don't tell"?
A. Because I figure that's her business.
Q. Do you know if there's ever been any paternity testing done for her children?
A. I do not know.
Q. Have there been any claims that she's made for child support for her two kids?
A. No.
Q. All right. So other than the children that we listed for Mr. Whitmer, any other survivors that you're claiming in this case --
A. No.
Q. -- exist? No?
A. No.
Q. Did either of Miss Whitmer's -- Breanna Whitmer's children -- I know you mentioned M[redacted] has a

Page 60

hearing disability. Do either of them have any other medical conditions that you're aware of?
A. Yes.
Q. And what are they?
A. J[redacted] was born with a diaphragmatic hernia.
Q. Anything else?
A. M[redacted] was born with CMV.
Q. What is that?
A. Cytomegalovirus. I don't know.
Q. Anything else?
A. No.
Q. So have her kids' medical conditions had an impact on Ms. Whitmer's emotional well-being? Like, has it caused stress for her?
A. I can't really speak to her state of mind. I don't --
Q. Well, you live with her. Right?
A. Yeah.
Q. Okay. So from the moment that they were born, which it looks like you're saying 2017 and 2018, they have these medical conditions?
A. Right.
Q. Okay. And how has that impacted Ms. Whitmer?
A. I mean, she's had to take care of sickly children. I mean, they were both in the hospital for

Page 61

three or four months after they were born. I mean, like any other mother, I mean, I'm sure it was stressful.
Q. And you testified earlier that the kids -- Donald's kids were living with the grandparents. Do you know when they started living with them?
A. No, ma'am.
Q. Okay. And do you know whether there was any point in time Mr. Whitmer regained custody of his children?
A. I do not know.
Q. Do you know what the highest level of education Mr. Whitmer completed?
A. I do not know.
Q. Do you know if he graduated high school?
A. I do not know.
Q. Do you know if he was employed on the date of the incident?
A. No.
Q. You don't know or he wasn't?
A. I don't know.
Q. Do you know from the time you met him in 2010 until the day of this incident, was he employed during that time frame?
A. Yes.
Q. Okay. And do you know when you first met him

Page 62

where he was employed?
A. Johnson Home Repairs.
Q. Do you know how long he worked there?
A. Off and on for several years.
Q. And what did he do for Johnson Home Repairs?
A. Home repairs.
Q. Anything specific?
A. Not that -- I don't know.
Q. Do you have any idea how much he earned?
A. No, I don't know.
Q. Have you taken any steps to confirm with any of the survivors how much Mr. Whitmer earned while working at Johnson Home Repairs?
A. What do you mean by survivors? His kids?
Q. Sure.
A. They don't know.
Q. Have you checked with them?
A. Yeah, they don't have any idea. Donny doesn't share things like that.
Q. And so who did you confirm this information with?
A. That he worked with Johnson Home Repairs?
Q. Yes, and what his salary was.
A. Well, I don't know what his salary was, and with Johnson Home Repair he -- that was a friend of his

Page 63

company. That's why he would work off and on for them.
Q. Okay. But I guess what I'm asking is, you don't know how much he earned. Correct?
A. No.
Q. Did you check with any of the survivors to find out that information after this incident?
A. None of his survivors would know what he made.
Q. But did you check with them?
A. No.
Q. Other than Johnson Home Repairs, are you aware of any other employment that he had, say, within the eight years that you knew him?
A. A temp service, Labor Ready.
Q. Do you know what he did for Labor Ready?
A. It's a temp service. Pretty much whatever they had, anywhere they could put him out.
Q. Do you have any idea how much he earned?
A. Not -- I don't know what he brought home daily, because they took child support out.
Q. Child support for who?
A. I don't know which children.
Q. Was there an order requiring him to pay child support?
A. I do not know.
Q. Any other employment that you're aware of?

Page 64

A. Yeah, he worked for a company -- oh, I can't think of the name of it now. It was one of our times when we were separated, but I can't think of the name of the company. He was like a -- did construction. But the name slips my mind.
Q. You said that was when you lost contact with him?
A. Uh-huh.
Q. Yes?
A. While I was at Hacienda.
Q. Okay. So that would have been sometime in 2017?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay. All right. Any other employment that you're aware of?
A. Not that I can think of.
Q. Okay. And for this construction company that he worked for, do you have any idea of what year?
A. I -- I do not know.
Q. Do you have any idea what Mr. Whitmer's net income was per year for the five years prior to this incident?
A. No.

Page 65

Q. Do you know if Mr. Whitmer suffered from any medical conditions?
A. Not that I'm aware of.
Q. Did he suffer from high blood pressure?
A. I don't remember.
Q. Insomnia?
MR. HOLLAND: Object to form. Asked and answered. She said she didn't know.
Q. Well, I'm going through a list to see if that triggers her memory. Do you know if he suffered from insomnia?
A. Yes.
Q. And when did he start suffering from insomnia?
A. Before I met him. I don't know.
Q. Did he treat with anyone for that?
A. I don't know if he did in the beginning or not.
Q. But after you met him?
A. No.
Q. Did he have any condition with respect to his lungs?
A. I don't know.
Q. What about his kidneys?
A. Not that I'm aware of.
Q. Any heart conditions?
A. I don't know.

Page 66

Q. Did he have any issues with his hearing?
A. Not that I'm aware.
Q. What about his vision? Any issues?
A. I don't know.
Q. Did he wear glasses or contacts?
A. No.
Q. During the time that you were with Mr. Whitmer, did he take any medication?
A. Yes.
Q. For what?
A. His back.
Q. What medication?
A. All I know of, gabapentin.
Q. And do you know who prescribed him that?
A. I do not.
Q. Did he have -- did he suffer an injury to his back?
A. Yes.
Q. How?
A. I'm not really sure what happened.
Q. Do you know when?
A. No. Before I met him.
Q. Any other medications other than the gabapentin that you're aware of Mr. Whitmer taking?
A. No.

Page 67

Q. Do you have any idea where he filled any of his prescriptions?
A. No.
Q. Did he have a primary care doctor?
A. No.
Q. Was he ever hospitalized?
A. Yes.
Q. When?
A. Oh, gosh. Well, obviously the year he died.
Q. But since you've known him in 2010, has he been hospitalized other than the date of this incident?
A. Yes, here in Melbourne. I could not tell you when.
Q. Do you know the name of the hospital?
A. Holmes Regional Medical Center.
Q. And what was the reason for the hospitalization?
A. I do not know.
Q. Did you go to the hospital with him?
A. I visited him.
Q. Was he diagnosed with anything at the hospital? Receive any treatment?
A. I don't know. I didn't talk to the doctor.
Q. Was he hospitalized as a result of some kind of accident?

Page 68

A. I don't know. I was at work.
Q. Was it related to any use of drugs or medications?
A. I do not know.
Q. Any other hospitalizations that you're aware of in the eight years that you knew Mr. Whitmer?
A. I think, yeah, he was in Wuesthoff in Rockledge.
Q. And why was he hospitalized in Wuesthoff?
A. That one I definitely don't know. I was not there at the time.
Q. Where were you?
A. I was staying at a friend's house.
Q. When was this?
A. 20 -- end of 2015. Is that right? No. I don't know.
Q. Who is your friend?
A. Maria.
Q. What's her last name?
A. Gardunia.
Q. How do you spell that?
A. G-a-r-d-u-n-i-a.
Q. And how long did you stay with Ms. Gardunia?
A. A day.
Q. So was Mr. Whitmer living in Rockledge at the time?

Page 69

A. Where was he living? He was staying somewhere down in -- yeah, down in Rockledge, Merritt Island.
Q. So you weren't living with him at that point?
A. Not at -- not at that point.
Q. And was he staying with anyone in Rockledge or Merritt Island at that point?
A. The kids, Breanna, Tommi and Athena.
Q. And do you know where in Rockledge?
A. No.
Q. Was it a hotel?
A. I don't know.
Q. Did you visit him at the hospital, at Wuesthoff?
A. Yes.
Q. Did you speak with any of the doctors or nurses while at the hospital?
A. No, I just sat in his room.
Q. Did he ever tell you why he went to Wuesthoff Hospital?
A. No.
Q. I'm sorry?
A. No.
Q. Any other hospitalizations that you're aware of?

A. Not that I can remember.
Q. Either before or after you met him?
A. Not that I can remember.
Q. Are you aware of any emergency room visits where he wasn't necessarily admitted into the hospital but went to the emergency room?
A. For his foot.
Q. Okay. Which emergency room?
A. I don't know.
Q. What city?
A. Columbus.
Q. And what happened to his foot?
A. I don't know. I don't remember.
Q. Any other emergency room visits that you're aware of?
A. Not that I can think of.
Q. How about urgent care facilities? Do you know if he ever treated at an urgent care?
A. Not to my knowledge.
Q. Are you aware of Mr. Whitmer having any surgical procedures?
A. No.
Q. Did Mr. Whitmer ever suffer any work-related accident?
A. His back.

Q. Do you know what happened in that accident?
A. I believe he fell off scaffolding.
Q. When did this happen?
A. I don't know. It was before.
Q. Before you met him?
A. Yes.
Q. Do you know if he treated anywhere for that work-related accident?
A. Do not know.
Q. Do you have any idea who he was working for?
A. No.
Q. Are you aware of him having any non-work-related accident, like a motor vehicle accident, slip and fall, sports injury?
A. The only motor vehicle accident I know of was in my van.
Q. And when did this happen?
A. Two months before he died.
Q. So at the date of incident, like we discussed before, May 21, 2018 -- so the accident would have been sometime in March?
A. March.
Q. And where did this accident occur?
A. U.S. 1, Palm Bay.
Q. And he was driving your van?

A. Yes.
Q. And what happened?
A. I don't know. I wasn't there.
Q. Do you know who was with -- if there was anyone with him in the car?
A. Breanna and the baby.
Q. Which baby?
A. M[redacted].
Q. And did Mr. Whitmer suffer any injuries?
A. I don't know. He came home that night, so I don't know.
Q. Did he go to the hospital?
A. Yes.
Q. What hospital?
A. They took him to Palm Bay.
Q. And did he receive any treatment that you're aware of at the hospital?
A. Again, I wasn't there. I was with Bree and the baby and they took them to Melbourne, so I got called from work over there.
Q. Did Breanna or M[redacted] suffer any injuries?
A. No, they were fine.
Q. And did Mr. Whitmer treat anywhere else after this car accident?
A. No.

Q. What about Miss Breanna Whitmer or M[redacted]? Did they go see a doctor or anything after the accident?
A. Other than the emergency room visit, no.
Q. Is it your understanding they all went to Palm Bay Hospital?
A. No.
Q. So Mr. Whitmer went to Palm Bay?
A. Correct.
Q. And where did Breanna --
A. Melbourne.
Q. Melbourne --
A. -- Regional.
Q. Any other motor vehicle accidents that you're aware of that involved Mr. Whitmer?
A. No, not that I'm aware of.
Q. And what about any slip and falls or other types of non-work-related accidents?
A. Not that I'm aware of.
Q. Was this accident that you're just describing, could it have occurred on January 26th, 2018?
A. I suppose it could have.
Q. And was your vehicle a 2005 Chevy van?
A. It was.
Q. And at the time of this accident, were you residing at the Oxford Avenue address in Merritt Island?

Page 74

A. At the time of the accident with the van?
Q. Right.
A. No.
Q. Where were you residing?
A. Wildbriar.
Q. And what about Mr. Whitmer?
A. Wildbriar.
Q. And Breanna?
A. Wildbriar.
Q. Did you ever live at 6010 Highway 599, Seffner, Florida?
A. Did I ever live in Seffner, no.
Q. Do you know if Mr. Whitmer ever resided there?
A. I think we stayed at a hotel in Seffner, Florida. We never resided in Seffner, Florida.
Q. Do you recall the hotel?
A. Oh, good Lord. No, I don't remember.
Q. All right. So this accident that we were just talking about, the motor vehicle accident, was Mr. Whitmer ejected from the vehicle?
A. I wasn't there. I do not know.
Q. Well, did you discuss the accident with Mr. Whitmer or Breanna?
A. Yeah, we talked about it.
Q. And did they tell you how the accident

Page 75

happened?
A. They said something broke in the front of the van and it lost control and hit -- the tire hit inside the ditch. I think they said he got ejected out, but I couldn't -- I don't know. When I went to see my van, the front windshield was in my van, so he must have gone out the side. I don't know. Like I said, I wasn't there so I don't know the total -- I don't know.
Q. Do you know if Mr. -- or did Mr. Whitmer ever sustain a motor vehicle accident on May 7, 2015, in Columbus, Ohio, while driving a vehicle that you owned?
A. Not that I'm aware of.
Q. Was Mr. Whitmer ever diagnosed with any psychological or psychiatric condition?
A. Not that I'm aware of.
Q. Was he ever diagnosed with bipolar disorder?
A. I don't know that he was ever diagnosed with it, no.
Q. But do you believe he suffered from bipolar?
A. I'm not a doctor. I don't know.
Q. Okay. The reason why I ask you is one of the questions that we had posed in our discovery, our interrogatories, had asked whether he suffered from any medical -- physical infirmity, disability or sickness at the time, and your response was, "He had heart problems

Page 76

and bipolar disorder."
A. I believed him to be bipolar, which is what my daughter was, Chelsea. So comparing it to him, that's why I said they clashed a lot. They were a lot alike. They had their moments where they could -- you know, so I feel that he was bipolar. I don't know that he's ever been diagnosed bipolar.
Q. Okay. So when you say you believed he was bipolar, I guess what characteristics or how did he behave that made you believe he had bipolar disorder?
A. His moods could just change from one minute to another or he would just act different. He would be -- it's hard to explain unless you live with somebody who's been bipolar like my daughter.
Q. And how would his mood change from one minute to the other?
A. I mean, one minute he could be happy and the next minute he's just sitting there looking like his dog died, like he'd have stuff on his mind, you know. He would be deep in thought, I guess, is the look on his face, but he just...
Q. Okay. And did he have any specific, like, episodes, like manic episodes or anything like that that you witnessed that made you think he had bipolar disorder?

Page 77

A. No, just acting the way that my daughter did, and she was diagnosed bipolar.
Q. Okay. And how did she act?
A. Same way as he does.
Q. Well, I mean, you're there. I wasn't there, so I'm just asking you if you can describe it other than just saying "like your daughter," because I never met her, so I have no idea. So I guess how -- other than his mood changing, was there anything else that you noticed about Mr. Whitmer that made you think he had bipolar?
A. I can't even put it into words. It was just -- it was just his mood swings, pretty much just the way he was with his mood swings. I don't know.
Q. And how often would he have these mood swings?
A. I don't know, a couple times a week.
Q. Did he self-medicate?
A. No.
Q. Was he ever prescribed any medication for any psychological or psychiatric condition?
A. Not to my knowledge.
Q. Have you consulted with any of his children whether he was ever diagnosed with a psychological or psychiatric condition?
A. Not that they know of.

Page 78

Q. No. I mean, did you ask --
A. Yes.
Q. And did you ask all of them or certain specific children?
A. Well, the adult ones at the time.
Q. Who did you ask about that?
A. Tommi, Brittony.
Q. Anyone else?
A. No.
Q. And when did you discuss this with them?
A. I don't know. About a month after he passed.
Q. And after being served with this interrogatory, this question that asked you whether the decedent suffered from any physical infirmity, disability or sickness at the time of the incident described in the amended complaint, once you received these questions, did you consult with any of the children whether or not Mr. Whitmer suffered from any disorder, any --
A. Breanna.
Q. Other than Breanna?
A. And Tommi.
Q. Anyone else?
A. No.
Q. And what did they tell you?
A. That they saw the same things in him that I did.

Page 79

Q. The same mood swings, you said?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And who told you he had heart problems?
A. I think Breanna did or he did. I cannot remember which.
Q. When you say "he" you're talking about --
A. Donny.
Q. So you haven't consulted with any of the other survivors about his medical conditions?
A. No.
Q. No? Is that correct?
A. Correct. No.
Q. Do you know if Mr. Whitmer has ever treated with any mental health counselor, psychiatrist or psychologist?
A. No, not consultations or anything with anyone else.
Q. Did you confirm whether that's the case with Mr. Whitmer's children, whether he had any psychological or psychiatric treatment during his life?
A. The only two I've talked to about any of it was pretty much more Tommi and Bree because they were around him more.

Page 80

Q. Okay. So is it your testimony that you asked Tommi and Breanna if he's ever had any psychiatric or psychological treatment?
A. Correct.
Q. And they said no?
A. Correct, not to their knowledge.
Q. But as we sit here today, you haven't consulted with any of the other survivors. Is that correct?
A. Correct.
Q. Was Mr. Whitmer ever Baker Acted?
A. Yes.
Q. And when?
A. Well, it was here, so it was -- I don't know the date.
Q. Do you know approximately when?
A. No. I know it was here in Florida.
Q. Well, you moved to Florida in 2015. Right?
A. Uh-huh.
Q. Correct?
A. Yes.
Q. And the date of this incident is May 21, 2018. Correct?
A. Yes.
Q. So sometime between 2015 and May 21st of 2018 he was Baker Acted? Is that correct?

Page 81

A. Yes.
Q. But as you sit here today, you have no idea?
A. 2016.
Q. And where in Florida?
A. Brevard County.
Q. And who Baker Acted him?
A. I don't know. I don't remember who it was.
Q. Was it a police agency?
A. I don't know.
Q. What led up to Mr. Whitmer being Baker Acted?
A. I would say -- I'm trying to think. Hold on. The hospital.
Q. I'm sorry?
A. The hospital.
Q. What about the hospital?
A. They had him Baker Acted.
Q. Which hospital?
A. Rockledge.
Q. Is that the name of the hospital or is that the city it's in?
A. It's in Rockledge. It's Wuesthoff.
Q. Okay. So is that the same hospitalization you were telling us about before or is this a different hospitalization?

Page 82

A. Same.
Q. Okay. So do you recall now why he was hospitalized at Wuesthoff?
A. (Nods head.)
Q. No?
A. No. I got a call from him one day saying that he was being sent over there. He was being Baker Acted.
Q. And who called you?
A. He did.
Q. Did he say why he was being Bakered?
A. No.
Q. Do any of the surviving children -- or strike that.
Did you consult with any of the surviving children about this incident and being Baker Acted?
A. No.
Q. Did you ever speak to any of them about that?
A. I mean, Breanna knew, I think.
Q. How did she know?
A. Well, she was in Florida.
Q. Was she with him at the time he was Baker Acted?
A. No.
Q. Did Mr. Whitmer use any illegal or illicit drugs?

Page 83

A. Not that I'm aware of.
Q. So during the whole time that you knew him from 2010 till the day of this incident, you're not aware of him ever using any illicit or illegal drugs?
A. No.
Q. Do you know what flakka is?
A. Nope.
Q. Any other times that Mr. Whitmer was Baker Acted?
A. Not that I know of.
Q. Do you recall ever calling the police or calling 911 while with Mr. Whitmer because of any distress that he was in?
A. No.
Q. Do you recall ever calling the police, the Melbourne Police Department, and them responding to the scene, a hotel room, where you and Mr. Whitmer were staying?
A. No.
Q. Do you recall ever telling the police that Mr. Whitmer may have taken flakka, a synthetic drug?
A. No, I've never even heard of flakka.
Q. So it's your testimony that you never told anyone of the Melbourne Police Department that Mr. Whitmer smoked something and started saying anything

Page 84

weird or acting strange?
A. No.
Q. You're saying that never happened?
A. That never happened.
Q. Do you recall staying at the River Palm Hotel --
A. Yes.
Q. -- on October 8th, 2017?
A. No, I don't remember the exact dates we stayed there.
Q. Did you ever stay at the River Palm Hotel room in 2017?
A. I've stayed there. I don't know if it was in 2017. Hold on. Yes, we were there for Christmas of 2017.
Q. And do you recall the police ever responding to that hotel in regards to Mr. Whitmer?
A. Not that I'm aware of. I mean, I was working.
Q. Did you ever respond or arrive to the hotel following the police being called out there because of Mr. Whitmer?
A. No.
Q. I just want to confirm. I have your date of birth [redacted]-66. Is that right?
A. Yes.

Page 85

Q. And what's your cell phone number?
A. Right now, 321-795-0652.
Q. How long have you had that number?
A. I don't know. A while. A couple years.
Q. Okay. And prior to having this number, what was your number?
A. I have no idea.
Q. Did you ever have the number 321-709-4633?
A. 709 -- I don't know.
Q. What cell phone providers have you had?
A. Mostly Boost.
Q. Anyone else?
A. What did I switch to? Yeah, we switched one time. It was for, like, two months, but I'm trying to think. I had Cricket one time for a couple months, and then there was another one, but I can't remember who it was.
Q. Do you recall the number you had when you had Cricket?
A. No.
Q. What about on the date of this incident? What was your phone number?
A. The day of the death?
Q. The 5-21-18.
A. The number I have now.

Page 86

Q. And that was Boost Mobile?
A. Uh-huh.
Q. Correct?
A. Yes.
Q. Was Mr. Whitmer ever detained under the Marchman Act?
A. I cannot answer that question.
Q. Do you know what that is?
A. Nope. That's why I can't answer that question.
Q. That's fine. Thanks for asking for clarification, because the Marchman Act could be involuntarily or voluntarily. It's when someone suffers from alcohol or drug abuse.
A. No, unless it was when they Baker Acted him. No, not that I'm aware of.
Q. And have you ever -- go ahead.
A. Unless it might -- it might have something to do with DCF in Tampa maybe. Not that I'm aware of.
Q. As you sit here today, have you ever consulted with any of his children whether he's been detained or undergone any kind of detention under the Marchman Act?
A. No.
Q. And are you aware of him undergoing any kind of alcohol or substance abuse treatment?
A. No.

Page 87

Q. And have you consulted any of the children about that?
A. No.
Q. So the Baker Act incident that you were talking about before in 2016 at Wuesthoff Hospital, did you visit him there?
A. Did I visit him where?
Q. At Wuesthoff.
A. Yes.
Q. Okay. And did you speak with any of the nurses or doctors?
A. No.
Q. Do you know a Nora George?
A. No.
Q. Did you ever consult or speak with any of the hospital employees about Mr. Whitmer while you were at the Wuesthoff Hospital?
A. There was one that I was sitting in the waiting room and she came out and was talking to me.
Q. And who was that?
A. I don't know.
Q. Was she a hospital employee?
A. I think she might have been a nurse. I don't know.
Q. But it was a female?

Page 88

A. Yes.
Q. Okay. And what did you say to the female?
A. I just said that I was really irritated because he kept asking for Breanna and I was getting irritated and I said, "I hate how close they are sometimes."
Q. That's all you said?
A. Yeah.
Q. Did you tell this employee that Mr. Whitmer and Breanna do drugs together?
A. No.
Q. Did you tell this employee that they had -- that Mr. Whitmer and Breanna had a sexual relationship?
A. No.
Q. Did you ever suspect Mr. Whitmer and Breanna of having a sexual relationship?
A. No.
Q. Why did it irritate you that he kept asking for Breanna?
A. Well, because I was with him and I thought he should have been asking for me, but I think he was just worried about her because she was young, you know.
Q. Did he ask for any of his other kids?
A. No. They weren't living with us.
Q. Did you give a statement to a detective with the Cocoa Police Department at the Wuesthoff Hospital?

Page 89

A. Yes, I did.
Q. And what did you say to the detective?
A. She asked me about their relationship and I said they're father/daughter and that's all, and that the nurse took it the wrong way.
Q. Did you admit to making statements of being jealous of Breanna and Mr. Whitmer's relationship?
A. I didn't say I was jealous. I just wished he asked for me a little more. But, no, I'm not really jealous of their relationship. I was happy that they had one.
Q. And did you tell the detective that you were upset or jealous because Mr. Whitmer paid for certain things and bought certain things for Breanna and not you?
A. Not to my knowledge.
Q. And are you aware of Breanna being the victim of any kind of sexual abuse or sexual assault?
A. No.
Q. You're not aware?
A. No.
Q. So it's your testimony that this hospital employee, if she reported to the police that you had made the statements that Breanna and Mr. Whitmer were having a sexual relationship and using drugs together,

Page 90

is it your testimony that that hospital employee was lying to the police?
A. No. It's my thought she took it out of context. And this is what I told the detective, and she made me swear under oath and she dropped it and she left.
Q. So you're saying the hospital employee took out of context you saying that you hated how close they are sometimes and she translated that to Donald and Breanna --
A. She took it as closeness.
Q. Let me finish the question. So your testimony is that the language you said to the hospital employee was that you hated how close they are sometimes and the hospital employee somehow twisted that to say that Breanna and Donald did drugs together and had sex?
A. Well, that's the first time I've heard about the drugs together, but, yeah.
Q. But you heard about the sexual relationship allegation?
A. Correct.
Q. So that's your testimony, that the female employee at the hospital twisted what you said into that?
A. Yes. I don't think she did it on purpose. I

Page 91

think she just took it a different way.
Q. Did you ever deal with this hospital employee before?
A. No.
Q. So there's no bad blood between the two of you?
A. No.
Q. Okay. Do you have any reason to believe why she would say what she said to the police, then?
A. Again, I think she just took it the wrong way.
Q. Okay. Are you aware of Mr. Whitmer ever using amphetamines?
A. Amphetamines, no.
Q. What about methamphetamine?
A. No.
Q. No, he didn't or --
A. No, I'm not aware of it.
Q. As you sit here today, have you consulted with any of the survivors whether Mr. Whitmer had ever used any illegal or street drugs?
A. No.
Q. No, you haven't consulted?
A. No.
Q. Are you aware of Mr. Whitmer ever using any prescription medication without a prescription?
A. No.

Page 92

Q. And have you consulted regarding that topic with any of the survivors?
A. No.
MS. AMIGO: Why don't we take a quick break, maybe five, 10 minutes. Why don't we go off the record.
(Recess held from 12:57 p.m. to 1:15 p.m.)
MR. HOLLAND: A moment ago -- I just want to indicate to you that the reason I asked Jill, the court reporter, to come outside was so I could ask her if she had a much larger room that would accommodate us, and unfortunately they don't have one available right now. So we're not just trying to get out of this deposition. We're just trying to protect our client's health.
MS. AMIGO: Okay. So just so it's clear on the record, it's 1:14 p.m. You know, we started this deposition, I think, a little after 10:30 and we were just informed that Ms. Levesque has some kind of underlying medical condition that we're not a hundred percent sure what it is, but she doesn't feel comfortable continuing with the deposition and plaintiff's counsel would like to adjourn the deposition at this time.
As counsel for the officers, I object to not

Page 93

continuing with the deposition today since it was scheduled and noticed for quite some time. I don't know if the City attorney has a position similar to mine, but, you know, I think this is something that should have been brought up from the beginning of this deposition today since it's clear under the federal rules of civil procedure that the deposition could last up to seven hours, so this is something that I believe Ms. Levesque should have been aware of when arriving here today. So, you know, we do object to adjourning the deposition at this time as we are willing to accommodate and try to give her some more distance, but it's our understanding that that's still not enough for her.
MR. HOLLAND: Well, the fact is we're not in accordance with the CDC guidelines, but that's only one of the issues. In other words, we're not six feet apart. It's a small room. There's six of us in here all breathing --
MS. AMIGO: We're all wearing masks.
MR. HOLLAND: Okay. But everybody has on a different kind of mask. I don't know that much about masks or how effective they are, but --
MS. AMIGO: Just for the record, I am sitting -- and I've been asking the questions. I am

Page 94

sitting more than six feet away from the witness.

MR. HOLLAND: From the witness, and you're sitting two feet from me or three feet maybe.

MS. AMIGO: But that's not a problem for the witness. Right?

MR. HOLLAND: And then we're sitting -- you know, we're not six feet across from each other unless you back your chair way up. But, you know, that's just not the reality of the way this is going to take place, so --

MR. MARI: Okay. So I'll offer again to rearrange it --

MR. HOLLAND: This is due to the COVID thing. Just let me finish. Our client has a compromised immune condition and she has a low tolerance as far as being able to tolerate sitting for long periods of time and she's indicated to us that she doesn't think she can do it, and she's also very concerned about the COVID issues.

MS. AMIGO: Just for the record, I did advise the witness from the beginning if she needs to take any breaks that we would be glad to accommodate her and she can take as many breaks as she wanted.

MR. MARI: I'm going to join the officers' attorney objection. Along with that, I think this

Page 95

should have been raised when the deposition was noticed, and if not, then certainly at the outset of the deposition to figure out how it was going to proceed.

It's clear that it was going to take a significant amount of time to complete the deposition. The witness testified that she discussed with Breanna how long the first portion of Breanna's deposition took, so she shouldn't have expected anything less than that.

I've offered to rearrange the room to try and accommodate whatever unspecified concern the witness has, the attorney has. It hasn't been addressed --

MR. HOLLAND: I think it's been specified pretty well.

MR. MARI: No, I actually would like to specify, what do we need so that we're not playing Whack-a-Mole with, you know, trying to arrange a different setting for this deposition? We don't want to show up there and you tell us, "Oh, it doesn't meet some unspecified standard." What do you-all need?

MR. HOLLAND: I think six feet apart is one thing, have plenty of space to be six feet apart.

Page 96

MR. MARI: We can put her six feet apart from everyone else in this room.

MR. HOLLAND: And what about us? Are we all going to be able to be six feet apart?

MR. MARI: Well, obviously, for the record, I'm not concerned about myself. If you don't want to be around me, that's okay, but I'm fine as is.

MR. HOLLAND: So I think -- well, it's a misstatement to say that we can make this thing in accordance with the, you know, CDC guidelines.

MR. MARI: I think we could.

MR. HOLLAND: Well, I'm just saying, you may not be concerned for yourself. That doesn't necessarily speak for everybody else in this room.

MR. MARI: Where was that concern when we first noticed it?

MR. HOLLAND: Well, I'm not sure what you're talking about.

MR. MARI: Where was that -- you voice this concern now approximately three hours into the deposition. Why didn't you voice that concern when we first noticed the deposition?

MR. HOLLAND: This is the first deposition I've attended in this case, and when I first got in here I was like, Okay, this is a small room and -- just

Page 97

for myself, not considering the client's issues, but I was wondering, you know, I'm like, okay, I mean, I've done depos, I've done them by Zoom since COVID, for the most part, but, you know, I was thinking, well, for myself, maybe if this is going to be a relatively -- you know, if we're done before noon or something like that, I mean, I'd be okay for myself. But, again, I can't speak for other people.

MR. MARI: And we haven't actually heard on the record from the witness what her specific health issues are. I'd request to hear that. I don't care if she stands outside the door and yells in as long as the court reporter can get it on the record. She can be as far away as she wants. You know, whatever is sufficient to produce a record. So I would like to hear from her on record under oath what these concerns are that prohibits her from continuing to complete the deposition today.

MS. AMIGO: I think that's fair.

MR. MOORE: Typically the witness -- I mean, Mr. Holland has already expressed that he, too, and myself, I don't think --

MS. AMIGO: Yeah, but, I mean, you can't provide testimony for her. She --

Page 98

MR. MOORE: I'm not saying -- even if she didn't have testimony.

MR. HOLLAND: Yeah, I mean, what's the point? You can ask her at her next deposition or the continuation of the deposition, but what's the point if there's overall concerns here? I mean, we're not just talking about one individual.

MR. MARI: Like I said, I think we can reconfigure this room. It's well more than six feet wide and six feet long. I think we can get all six feet apart in here.

MR. HOLLAND: What about the ventilation?

MR. MARI: I don't think that's the guideline. Everyone is wearing their masks. I'm wearing mine correctly. I don't know if you two have worn yours consistently throughout the deposition, but I think --

MR. HOLLAND: Are you a doctor?

MR. MARI: I read the CDC guidelines that you cite to so frequently.

MR. MOORE: I thought earlier you said, "What guidelines?"

MR. MARI: I wasn't familiar with the guidelines you were referring to because it seemed to be fictional.

Page 99

MR. MOORE: What other guidelines would there be?

MR. MARI: You tell me. You seem to be --

MR. HOLLAND: What?

MR. MOORE: You're the physician, right?

MR. MARI: I'm not saying that. You two are here now. If you want to go through the meet and confer regarding my second motion to compel in person, I will do it now.

MR. MOORE: What do you want to do, Gary?

MR. MARI: While we're here, why not? The second motion to compel that I filed, you-all didn't call me back.

MS. AMIGO: And I just want to put on the record that, again, we do object to continuing this deposition and, you know, if we have to seek leave for, you know, court intervention to continue this deposition and to get clarification since they don't want to bring the witness back here to specify what her issues or concerns are, if we have to file a motion with the court to obtain that clarification we will be seeking attorney's fees and costs.

MR. MARI: I will make the same reservation and join. And I'm talking about the motion that I

Page 100

filed. You-all were ordered to show cause. You filed a response yesterday, so that's the motion I'm offering to confer about.

MR. HOLLAND: Yeah, I think we can do that. Yeah, I mean, we can do that, sure. I mean, that's off the record. I mean, just don't --

MR. MARI: No, why don't we just stay on, because there seems to be a dispute about whether or not phones work, you know, claiming my phone --

MR. HOLLAND: Why should we stay on the record for something that's an issue for a hearing before the judge?

MR. MARI: I think it's a better idea.

MR. HOLLAND: No, I don't understand what you're saying. This was for her deposition. If her deposition is adjourned, it's adjourned.

MR. MARI: Again, I'm not agreeing to adjourn it, and I think it's a better idea we stay on the record for the meet and confer.

MR. HOLLAND: No.

MR. MARI: Okay. Again, I'm trying to -- my position is --

MR. HOLLAND: So basically what you're trying to do is have a meet and confer with the court reporter?

Page 101

MR. MARI: Well, I'm trying to talk to you --

MR. HOLLAND: That's not fair to Jill, either. If you're going to do that, then she should be getting an additional fee for a separate proceeding.

MR. MARI: She is getting a fee for all of her time here, and I'm the one who noticed the deposition so my firm is paying it.

I served three interrogatories upon the plaintiff. It's my first set from the City. She responded "I don't know" to each of them. It's my position that she made allegations in both the complaint and the amended complaint of facts, and I asked what the facts were behind those allegations, and she said "I don't know" to each, which I think is insufficient, so I moved the court to compel her to actually give me an answer to these, all three of them.

So I couldn't meet and confer with you-all before filing because I didn't get returned calls, nobody picked up the phone, so my contention is she needs to actually respond to these. She has an obligation. She has to have facts to support the allegations when she filed the complaint, when she filed the amended complaint --

Page 102

MR. MOORE: We're going to adjourn.

MR. MARI: Look, if you-all walk -- if you decide to walk out, that's your decision. But, again, I'm trying to have this conversation with you. I'm not agreeing to stop the deposition.

MR. HOLLAND: That's nice. I don't have the --

MR. MARI: I can't place you under arrest, but you do what you --

MR. HOLLAND: I don't have the rogs in front of me. I'm --

MR. MARI: Well, how about this. Get them in front of you, get the motion in front you, and why don't you-all call me. I gave you my number.

MR. HOLLAND: Okay.

MR. MARI: You have my cell number. You have my office number. Try to do it now. I tried to do it before when I called Mr. Moore three times. I've tried to address it by email with you-all not getting anywhere, so this was yet another --

MR. HOLLAND: Did you ever call me?

MR. MARI: I didn't because, like you say, you didn't show up to anything before.

MS. AMIGO: And I'd just like to put on the record as well that, you know, I want to reserve the right, obviously, to continue this deposition

Page 103

and also seek -- you know, file a motion with the court because this was adjourned without us even being able to question the witness about the reason for adjourning this deposition, and we will be moving for sanctions.

MR. MARI: Definitely. Same for the City.

(The deposition was recessed at 1:27 p.m.)

* * * *

Page 104

CERTIFICATE OF REPORTER

STATE OF FLORIDA }
COUNTY OF BREVARD }

I, JILL E. HASTEY, RPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of DIANNE LEVESQUE; that a review of the transcript was not requested; and that the foregoing transcript, pages 1 through 103, is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel with the action, nor am I financially interested in the action.

Signed this day of August 20, 2020, Brevard County, Florida.

*Jill E. Hastey*

JILL E. HASTEY, RPR

Page 105

CERTIFICATE OF OATH

STATE OF FLORIDA }
COUNTY OF BREVARD }

I, JILL E. HASTEY, Registered Professional Reporter, a Notary Public for the State of Florida, certify that the witness, DIANNE LEVESQUE, personally appeared before me this day of August 7, 2020, and was duly sworn.

WITNESS my hand and official seal this day of August 20, 2020.

Identification: FL Driver's License

*Jill E. Hastey*

JILL E. HASTEY, RPR
Notary Public - State of Florida
Commission No. HH002372
My Commission Expires: 8/13/2024

Jill E. Hastey Notary Public State of Florida Comm# HH002372 Expires 8/13/2024